UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JOHN DOE,                                    :

              Plaintiff,              :

                          :

       -against-                     :

                          :

COLGATE UNIVERSITY, COLGATE UNIVERSITY   :
BOARD OF TRUSTEES, JEFFREY HERBST,        :
individually and as agent for Colgate University, :
SUZY M. NELSON, individually and as agent for   :
Colgate University, KIMBERLY TAYLOR,      :
individually and as agent for Colgate University, :
MARILYN RUGG, individually and as agent for   :
Colgate University, VALERIE BROGAN,       :
individually and as agent for Colgate University, :
and TAMALA FLACK, individually and as agent   :
for Colgate University,                   :

                          :

             Defendants.           :
-------------------------------------------------------------------X

| | |
|---|---|
| Civil Action No: | |
| 5:15-CV-1069[LEK/DEP] | |
| **COMPLAINT** | |
| **JURY TRIAL** | |
| **DEMANDED** | |

Plaintiff John Doe [1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys

Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

<u>THE NATURE OF THIS ACTION</u>

      1.     This case arises out of the actions taken and procedures employed by

Defendants Colgate University ("Defendant Colgate" or "Colgate" or the "University"), Colgate

University Board of Trustees ("Defendant Board of Trustees"), Jeffrey Herbst ("Defendant

Herbst"), Suzy M. Nelson ("Defendant Nelson"), Kimberly Taylor ("Defendant Taylor"),

Marilyn Rugg ("Defendant Rugg"), Valerie Brogan ("Defendant Brogan") and Tamala Flack

("Defendant Flack") concerning allegations made against Plaintiff, a male senior student at

---

[1] Plaintiff herewith files a Motion to proceed pseudonymously.

Colgate as a result of false allegations of nonconsensual sexual activity with fellow Colgate senior students Jane Doe 1, Jane Doe 2 and Jane Doe 3.

2.      The allegations involving Jane Doe 1 purportedly refer to what was clearly consensual sexual touching that occurred on the evening of October 28-29, 2011 ("Incident 1").

3.      John Doe and Jane Doe 1 remained friendly after the alleged incident and saw each other almost every day during their freshman year.

4.      The allegations involving Jane Doe 2 purportedly refer to what was clearly consensual sexual activity that occurred on the evening of February 11-12, 2012 ("Incident 2").

5.      John Doe and Jane Doe 2 remained cordial after the alleged incident, including while participating in small group discussions in a shared class last year.

6.      The allegations involving Jane Doe 3 purportedly refer to what was clearly consensual sexual activity that occurred on the evening of April 28-29, 2012 ("Incident 3").

7.      Subsequent to the alleged incident, John Doe and Jane Doe 3 remained friendly and spent time with the same group of friends.

8.      On October 28, 2014 at approximately 12:00 p.m., nearly three years after Incident 2 allegedly occurred, Jane Doe 2 submitted an anonymous complaint of sexual misconduct against John Doe to Colgate's Office of Equity and Diversity. Upon information and belief, Jane Doe 2 came forward and identified herself to Defendant Rugg the following week.

9.      On October 28, 2014 at approximately 2:00 p.m., three years after Incident 1 allegedly occurred, Jane Doe 1 submitted an anonymous complaint of sexual misconduct against John Doe to Colgate's Office of Equity and Diversity. Upon information and belief, Jane Doe 1 came forward and identified herself to Defendants during the investigation of Jane Doe 2's allegations.

10.      On October 29, 2014 at approximately 8:00 a.m., more than two and a half years after Incident 3 allegedly occurred, Jane Doe 3 submitted an anonymous complaint of sexual misconduct against John Doe to Colgate's Office of Equity and Diversity. Upon information and belief, Jane Doe 3 came forward and identified herself to Defendants during the investigation of Jane Doe 2's allegations.

11.      After an unreasonably delayed investigation process which took place over five and a half months, on March 24, 2015 John Doe received three charge letters identifying the exact nature of the allegations against him for the first time. A hearing before the Equity Grievance Panel (the "EGP") was scheduled for April 7, 2015.

12.      Subsequent to Defendant Taylor's denial of John Doe's reasonable requests for an adjournment of the Hearing and for separate hearings on each complaint, a combined Hearing on all three charges proceeded before the EGP on April 7, 2015 (the "Hearing"). Thereafter, on April 8, 2015, one month prior to John Doe's expected graduation date and one day before Colgate's annual Board of Trustees meeting, Defendant Taylor issued three identical decision letters, finding John Doe responsible for each of the charges (the "Decision"). As a result, Defendants assessed the following sanctions to John Doe: with respect to Incident 1, disciplinary expulsion; with respect to Incident 2, immediate suspension through January 2016; and with respect to Incident 3, disciplinary expulsion (collectively, the "Sanction"). The three combined sanctions had the purpose and effect of permanently expelling John Doe from Colgate a mere thirty-nine (39) days prior to his graduation.

13.      In addition to the damages sustained by John Doe, including his inability to complete his final semester at Colgate and receive his degree, John Doe has sustained tremendous damages to his future education and career prospects as a result of the Decision and

Sanction, which have already had the effect of preventing John Doe from attending medical school and pursuing a career as a physician.

14.     Throughout the investigative process, Defendants failed to abide by Colgate's own guidelines and regulations and acted in direct violation of federal and/or state law.

15.     A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a timely investigation of the allegations and failed to timely bring the case to a close within sixty (60) days, while arbitrarily denying John Doe's reasonable request for an adjournment of the Hearing; (ii) Defendants failed to conduct a thorough and impartial investigation; (iii) Defendants evidenced a gender bias against John Doe as the male accused throughout the investigative and hearing process; (iv) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (v) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; and (vi) the Sanction was unwarranted and disproportionate in light of the circumstances, all of which demonstrated substantial procedural errors in violation of Title IX and other federal and/or state laws.

16.     When Defendants subjected John Doe to disciplinary action, they did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex. Defendants failed to adhere to Colgate's own guidelines and regulations, and the guidelines and regulations themselves are inherently discriminatory and insufficient to protect the rights of male students. The Decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males and the underlying motive to protect Colgate's reputation and financial wellbeing was required for a conclusion of sexual misconduct to be reached.

17.     John Doe has been greatly damaged by the actions of Defendants: his education and career prospects have been severely compromised as he is unable to gain admission to a medical school, the significant monies spent on obtaining a college education at Defendant Colgate squandered. Additionally, as a result of Defendants' actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

18.     John Doe therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972, breach of contract and other state law causes of action.

## THE PARTIES

19.     Plaintiff is a natural person, citizen of the United States, and resident of the State of Florida. During the events described herein, Plaintiff was a student at Colgate University and resided on Colgate's campus in Hamilton, New York.

20.     Upon information and belief, Defendant Colgate is a private, liberal arts college in the city of Hamilton, New York, with an address of 13 Oak Drive, Hamilton, New York 13346.

21.     Upon information and belief, Defendant Board of Trustees is the governing body of Colgate University. It is composed of thirty-five (35) members who are alumni, parents of students and the President of Colgate. Upon information and belief, it oversees and approves Colgate's written policies.

22.     Upon information and belief, Defendant Herbst is an individual residing in the State of New York and was the President of Colgate University at all relevant times herein.

23.     Upon information and belief, Defendant Nelson is an individual residing in the State of New York and is Vice President and Dean of the College at Colgate University.

24.     Upon information and belief, Defendant Taylor is an individual residing in the State of New York and is Associate Dean for Conduct at Colgate University.

25.     Upon information and belief, Defendant Rugg is an individual residing in the State of New York and is Associate Provost for Equity and Diversity at Colgate University. By virtue of her position, Defendant Rugg is Colgate's Title IX Coordinator.

26.     Upon information and belief, Defendant Brogan is an individual residing in the State of New York and is Assistant Director for Investigations at Colgate University.

27.     Upon information and belief, Defendant Flack is an individual residing in the State of New York and is Director for Equal Opportunity and Affirmative Action at Colgate University.

28.     John Doe and Defendants Colgate, Board of Trustees, Herbst, Nelson, Taylor, Rugg, Brogan and Flack are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

29.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and under 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) John Doe and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

30.     This Court has personal jurisdiction over Defendant Colgate on the grounds that it is conducting business within the State of New York.

31.     This Court has personal jurisdiction over Defendant Board of Trustees on the grounds that it is conducting business within the State of New York and is the governing body of Colgate University.

32.     This Court has personal jurisdiction over Defendant Herbst on the grounds that he was acting as an agent of Colgate at all relevant times herein.

33.     This Court has personal jurisdiction over Defendant Nelson on the grounds that she was acting as an agent of Colgate at all relevant times herein.

34.     This Court has personal jurisdiction over Defendant Taylor on the grounds that she was acting as an agent of Colgate at all relevant times herein.

35.     This Court has personal jurisdiction over Defendant Rugg on the grounds that she was acting as an agent of Colgate at all relevant times herein.

36.     This Court has personal jurisdiction over Defendant Brogan on the grounds that she was acting as an agent of Colgate at all relevant times herein.

37.     This Court has personal jurisdiction over Defendant Flack on the grounds that she was acting as an agent of Colgate at all relevant times herein.

38.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Colgate is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.      Agreements, Representations, Covenants &
        Warranties Between Plaintiff and Colgate

39.     Plaintiff worked diligently at Singapore American School located in Northern Singapore, followed by Neuqua Valley High School in Naperville, Illinois where he earned a 3.9 GPA and achieved a score of 34 on the ACT. John Doe was named both an Indian Prairie Scholar and an Illinois State Scholar for his academic achievements. John Doe was a senior leader, playing a role in mentoring the first-year students, and an athletic trainer, while also competing as a two sport Varsity athlete in Football and Track and Field. As a result of his academic and extracurricular accomplishments, John Doe was offered scholarships to several top rated institutions.

40.     However, setting his sights on a leading liberal arts education, John Doe applied Early Decision II to Colgate University. Upon his acceptance to the class of 2015, John Doe withdrew the rest of his college applications.

41.     As a Biology major and Chinese minor, John Doe excelled academically; he was selected for numerous awards at Colgate, was accepted into the Beta Beta Beta Biological Honor Society and planned to attend medical school upon graduation. John Doe was also actively involved in Colgate's academics and extracurricular activities; he traveled with Colgate faculty to the rainforest of Costa Rica to undertake research, where he collected data that later became the topic of his senior thesis.

42.     John Doe was the co-founder and President of the Secular Association of Skeptical Students (SASS), an integral part of Colgate's Interfaith Community, serving as President of the Interfaith Interest House that he helped found. He also served as treasurer, then Vice President of Brothers of Colgate University, was a member of the highly selective

Konosioni Senior Honor Society, a board member of Broad Street Association and an active participant in the All Beliefs Community. In addition, John Doe was a First Aid and CPR certified lifeguard and was sports medicine assistant for the Colgate football team. John Doe was also active in giving back to the Hamilton, New York community as a volunteer teacher of Chinese language to children at the local elementary school. John Doe was a demonstrated leader who made significant positive contributions to the Colgate community. Prior to April of his senior year, John Doe maintained an otherwise unblemished disciplinary record.

43.     Upon his acceptance to the University, Colgate provided John Doe with copies of its school policies, including the Colgate University Student Handbook (the "Handbook"), the 2014-2015 edition of which is available on Defendant Colgate's Internet website.

44.     With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, Colgate's Handbook states in relevant part:

> This policy prohibits acts of discrimination, harassment, sexual assault and sexual exploitation...[a]ny and all such acts are serious violations of our community values. This policy is a fundamental part of a Colgate community where all members can study, live, and work together in a community characterized by equal opportunity, inclusiveness, safety and mutual respect.
>
> Colgate fully subscribes to all federal and state civil rights law banning discrimination in private institutions of higher education. These include but are not limited to Title IX....Colgate is committed not only to compliance with these laws but with promoting a community that lives out the values these equal opportunity laws envision.

45.     Colgate's Handbook sets forth the procedures by which Colgate students who have been accused of violating one or more of the enumerated policies are investigated, heard, and, possibly, disciplined.

46.     A complaint that alleges a violation of the Handbook is addressed through Colgate's Equity Grievance Process. The members of the Equity Grievance Panel are selectively chosen by the President of the College, Defendant Herbst, and the Associate Provost for Equity and Diversity, Defendant Rugg, in comparison to members of the Student Conduct Board, who are objectively elected by faculty, students and administrators.

47.     The Handbook specifies that although there is no formal time limitation on bringing a complaint, *"prompt reporting is very strongly encouraged"* (emphasis added), recognizing that "the passage of time may make effective responsive action difficult."

48.     In fact, the Associate Provost for Equity and Diversity may exercise discretion in deciding whether to pursue a complaint in which substantial time has passed since the alleged incident.

49.     Following receipt of a notice of violation or complaint, Colgate's Handbook provides that the *complainant* is promptly given the opportunity to select an EGP member or other individual to serve as an adviser. The respondent, which is invariably a male student, is *not* immediately provided the opportunity to select an adviser. Thus, the complainant is able to receive assistance and guidance from the outset, before respondent is even aware that a complaint has been filed against him.

50.     The Associate Provost for Equity and Diversity makes an initial determination as to whether a policy violation may have occurred and/or whether conflict resolution might be appropriate, based solely on the information contained within the complainant's notice of violation or complaint.

51.     Significantly, Colgate's policies do not require that *any notification* be given to the respondent when a notice of violation or complaint is filed against the respondent. In fact,

Colgate does not require that any notice be given to the respondent until a Notification of Charges letter is delivered by the EGP chair (the "Chair") at least *one week* prior to the Hearing, generally after the investigation has been completed.

52.     In cases where a complaint appears to allege a policy violation, the Associate Provost for Equity and Diversity appoints EGP member(s) to conduct the investigation. Investigations are to be completed within sixty (60) days, unless there is "appropriate cause" for extending the time.

53.     Despite the fact that an investigation may proceed without notifying a respondent that a complaint has been filed, Colgate's policies require that the complainant and respondent have an equal opportunity to share information and request that witnesses be interviewed during the investigation. However, the Handbook does not identify any specific procedures that the investigator(s) must follow; rather, it provides the investigator with complete discretion "to determine how to conduct the investigation and what information is necessary and relevant," thus allowing the investigator to selectively present the facts he or she deems relevant, rather than produce an objective, thorough and impartial investigation report.

54.     Once an investigation is completed, the investigator(s) will meet with the Associate Provost for Equity and Diversity and the appropriate EGP co-chair to determine whether the results of the investigation warrant proceeding with the complaint process. In cases where the alleged behavior is one that may result in the imposition of a suspension or dismissal, the matter will normally proceed to a formal hearing.

55.     Should the matter proceed to a formal hearing, the Associate Provost for Equity and Diversity will appoint a non-voting panel chair and three members of the EGP to the hearing panel (the "Panel").

56.     At least one week prior to the hearing, the designated hearing panel Chair will send a Notification of Charges letter to the parties stating the following: a description of the alleged violation(s) and a description of applicable procedures; the time, date and location of the hearing; the right to an adviser; and a reminder that retaliation against a *complainant*, or someone who supported or assisted the complainant, is a serious violation of the policy.

57.     EGP hearings are to be convened within one or two weeks of completion of the investigation. However, for compelling reasons, the hearing panel Chair may reschedule the hearing.

58.     Colgate's policies enable the EGP Chair to act as gatekeeper, giving the Chair the authority to select what information, evidence and witnesses should ultimately be presented to the Panel. Consequently, the EGP Chair has the power to predetermine the outcome of the hearing.

59.     For instance, prior to the hearing, the parties may submit the names of all witnesses the party intends to call and a brief description of the subject(s) about which the party believes the witness has relevant information. However, the EGP Chair may exclude the names of any witnesses he or she deems irrelevant. The Chair also may determine whether or not witnesses must be physically present, or if their testimony can be adequately summarized by the investigator during the Hearing.

60.     Further, the Chair has the discretion to determine what information may be considered, including hearsay; history and information indicating a pattern of behavior; all questions of procedure; and to determine whether particular questions, evidence or information will be accepted or considered.

61.     The hearing Panel will deliberate in a closed session to determine whether the respondent is responsible for the misconduct alleged, based on a preponderance of the evidence standard. If a respondent is found responsible by a majority of the Panel, it moves to a consideration of sanctions. At that time, written impact statements and character references may be submitted on behalf of each party.

62.     Factors to consider when determining a sanction may include: the nature, severity and circumstances surrounding the violation; previous disciplinary history; previous complaints or allegations involving similar conduct; the need for sanctions to bring an end to the behavior; and the need for sanctions to prevent future recurrence.

63.     The parties will receive simultaneous written notification of the outcome, which must include a rationale for the outcome. The notification will also include information with respect to appeal procedures.

64.     All appeals must be submitted in writing within ten (10) calendar days of the delivery of the written findings. An appeal may be based on the following grounds: a procedural error or omission occurred *during the EGP hearing* which, based on the entire record, is reasonably likely to have changed the outcome; new information unavailable during the EGP hearing or investigation has come to the attention of one of the parties, which is reasonably likely to have changed the outcome; or any sanction imposed was disproportionate to the nature or severity of the violations. Notably, appeals may not be based on procedural errors that occurred during the investigation phase, thus allowing Colgate to conduct investigations in whatever manner it so chooses.

65.     Colgate's Handbook expressly covenants to provide the following rights to the accused student in a sexual misconduct investigation:

- To be treated with respect by university officials;

- To experience a safe living, educational, and work environment;

- To be able to take advantage of campus support resources;

- To have an adviser during an EGP Hearing and all related meetings;

- To refuse to have an allegation resolved through conflict resolution procedures;

- To have complaints heard in substantial accordance with Colgate's procedures;

- To attend a hearing in person or via speakerphone or videoconference;

- To receive written notification of the outcome/resolution of the complaint.

66.     Notably, a respondent does not have the explicit right to receive written notification of the charges against him at any time; he is only granted the right to receive written notification of the outcome.

67.     In addition to the rights provided to a respondent, a complainant is granted two additional rights that are *not* afforded to respondent; namely,

- To receive amnesty for minor student misconduct (such as minor alcohol violations) that is ancillary to the incident; and

- To be free from retaliation.

II.     **The Night of October 28-29, 2011 ("Incident 1")**

68.     Plaintiff entered Colgate as a freshman in the fall of 2011. On October 28, 2011, Plaintiff joined with other friends from Curtis Hall, his dormitory, to go out to a party. One of the friends was Jane Doe 1, who was also a freshman, and one of Plaintiff's good friends.

69.     Jane Doe 1 informed everyone that evening that she was ill and was suffering from mononucleosis. While at the party, Jane Doe 1 appeared to be intoxicated and the group of friends decided that she should go back to her dorm room. It was determined that, because John Doe was the most sober person among the group, he would walk Jane Doe 1 back to her room.

70.     While John Doe accompanied Jane Doe 1 back to her room, Jane Doe 1 began behaving erratically and repeatedly tried to run into the lake. John Doe stopped her, but Jane Doe 1 caught him off guard at one point and got her foot in the water. During the walk home, John Doe gave Jane Doe 1 his sweatshirt when she indicated she was cold. Once they arrived at Jane Doe 1's room, John Doe made sure that Jane Doe 1 took her shoes off because they were soaked and freezing.

71.     Jane Doe 1 began undressing, presumably to get ready for bed. John Doe did not leave at that time because Jane Doe 1 was still talking to him and he wanted to ensure that she made it safely to bed. Jane Doe 1 thanked John Doe for making sure that she got home safely. Jane Doe 1 removed her own clothing, down to her underwear, and hugged John Doe. Although this confused John Doe because nothing similar had ever happened during the course of their friendship, John Doe hugged her back and started touching her breasts. Although Jane Doe did not object or otherwise express that she wanted him to stop, John Doe quickly realized that he should stop, and returned to his own dorm room. John Doe and Jane Doe 1 never spoke

of the evening thereafter, but they continued to be good friends and spend time with the same group of people throughout their freshman year.

### III.    The Night of February 11-12, 2012 ("Incident 2")

72.     On the evening of February 11, 2012, John Doe attended a fraternity rush party. Although he has very limited recall of the evening, John Doe believes he consumed approximately twenty (20) to twenty-five (25) beers and also smoked marijuana. He was evidently extremely inebriated, as he became ill from drinking, and was vomiting and stumbling. His precarious condition was readily apparent to anyone who came into contact with him, including Jane Doe 1 and Jane Doe 2. John Doe's memory of the evening is limited to only fragments of events.

73.     The first recollection John Doe has of the evening is walking back towards the dorm, with one of his arms around Jane Doe 1 and the other arm around Jane Doe 2. Because they were all friends, John Doe recalls thinking that Jane Doe 1 and Jane Doe 2 must have found him in a helpless state and decided to help him back to his dorm room.

74.     John Doe's next memory is of being in a dorm room in Center Stillman. He recalls sitting in the room and kissing Jane Doe 2. He also recalls that there was marijuana being passed around the room but he does not recall smoking it.

75.     John Doe's next memory is of being in Jane Doe 1's room. He believes Jane Doe 1 and Jane Doe 2 brought him there, but he does not know why they took him to Jane Doe 1's room instead of back to his own room given his condition. John Doe vaguely recalls that Jane Doe 1 was now wearing a shirt and no bra, and Jane Doe 2 was now wearing a bra and no shirt.

76.     John Doe's next recollection is of being on Jane Doe 1's bed, with Jane Doe 2 on top of him, shirtless and kissing him. Jane Doe 1 was no longer in the room; he later learned that she had gone downstairs with his friends.

77.     John Doe believes he then fell asleep, as his next snapshot of the evening was feeling as though he was waking up, when Jane Doe 2 opened the door to leave and the light from the hallway shined in his face. Jane Doe 2 said something to the effect of, "I'm going to bed" and John Doe fell back asleep.

78.     John Doe woke up at 8:00 a.m., alone in Jane Doe 1's room. He went downstairs to his room, texting Jane Doe 2 on the way, to say something along the lines of, "Hey, I don't remember much of last night, but I know I was with you, so I am sorry if I made a fool of myself and I hope we are okay." She later responded, "Don't worry, we're fine!"

79.     John Doe got his toothbrush from his room and went to the bathroom to brush his teeth. There, he ran into his best friend, S.M., who asked if John Doe recalled the prior evening. John Doe responded that he got drunk and ended up kissing Jane Doe 2. John Doe further indicated that he was not happy about this, and he never would have kissed her while sober, because he had a crush on Jane Doe 2's ex-roommate. Coincidentally, John Doe had finally worked up the courage to ask Jane Doe 2's ex-roommate to a Formal, which was set to take place two days later.

80.     S.M. told John Doe that the people on his floor were upset because he and Jane Doe 2 had kicked Jane Doe 1 and her roommate out of their own room. John Doe was extremely embarrassed, and even more so when he found out that his date for the upcoming formal had walked in on him and Jane Doe 2 kissing; John Doe was devastated when she subsequently told him to find a new date to the formal.

81.     John Doe and Jane Doe 2 remained friendly thereafter, despite feeling some awkwardness between them. Nonetheless, they were in the same class last year and were cordial even in small group discussions.

**IV.     The Night of April 28-29, 2012 ("Incident 3")**

82.     On April 28, 2012, during the spring semester of John Doe's freshman year, John Doe attended a party at an interest house on Broad Street with his friends. As it was Jane Doe 3's birthday, also a freshman, the group of friends all became intoxicated.

83.     As the party was winding down, John Doe's best friend texted him that Jane Doe 3 told him she wanted to go home with John Doe. Right after receiving the text, Jane Doe 3 came over to John Doe and started flirting, asking if he was walking back up the hill. When he responded that he was, the two decided to walk back to their dorms together.

84.     As John Doe and Jane Doe 3 walked up the hill, they stopped multiple times to make out. They agreed they wanted to take things further, however they both had roommates that had stayed in that night, so they had nowhere private to go.

85.     John Doe thought they might be able to find some privacy at the Ho Science Center so they began to walk in that direction. However, when they were unable to gain access to the building, John Doe and Jane Doe 3 sat down on a bench nearby and continued to kiss. Jane Doe 3 actively engaged in kissing John Doe for approximately fifteen to twenty minutes.

86.     As they kissed, John Doe and Jane Doe 3 simultaneously touched each other over their clothing. At one point, John Doe began to move his hand up the bottom of Jane Doe 3's shirt and Jane Doe 3 stopped him; she expressed that she wanted to take things further with John Doe but was uncomfortable engaging in sexual activity outside. When John Doe tried to persuade Jane Doe 3 to continue, Jane Doe 3 became upset and decided she did not want to

proceed. As soon as Jane Doe 3 indicated that she did not want to continue, all physical interaction stopped and the two began walking back to the dorms together.

87.     When they arrived at the dorms, Jane Doe 3 said good night to John Doe in a manner that indicated she was angry. During his walk home, John Doe texted Jane Doe 3 something to the effect of, "I'm sorry, and I hope we can still be friends."

88.     John Doe and Jane Doe 3 subsequently met up to discuss the evening, at which time John Doe apologized, and Jane Doe 3 said she forgave him. They remained friendly thereafter; in fact, John Doe spoke with Jane Doe 3 and her parents after she had shoulder surgery the following summer.

## V.     Failure to Conduct a Thorough and Impartial Investigation

89.     Colgate's Handbook provides: "[I]t is the policy of Colgate University not to discriminate on the basis of sex in the educational programs and activities which it operates. Colgate University will comply with all applicable provisions of Title IX of the Educational Amendments of 1972 and its implemental Regulation."

90.     Colgate's Handbook mandates that a respondent be treated with respect by university officials throughout the EGP investigation and hearing process.

91.     Notwithstanding, Colgate performed a one sided and biased investigation in favor of Jane Doe 1's, Jane Doe 2's and Jane Doe 3's allegations of sexual misconduct.

92.     On October 23, 2014, the Brothers of Colgate University, a non-Greek fraternal organization, and the Student Government Association held a brown bag discussion regarding the Colgate "hookup culture." The lunch featured a panel of Colgate students representing all class years on campus who shared their thoughts and experiences of the campus' sexual climate.

93.     On Monday, October 27, 2014, Colgate University held a Sexual Climate Forum organized by Jane Doe 2, among others. The two-hour meeting was attended by approximately 300 students, the purpose of which was to provide an opportunity for discussion about sexual assault on college campuses. Upon information and belief, Jane Doe 1 and Jane Doe 3 were also in attendance. The forum panel included Defendant Brogan and Defendant Rugg.

94.     Following the Sexual Climate Forum, on October 27, 2014 and October 28, 2014, announcements were made about the upcoming Carry That Weight Campaign, to take place nationally and on Colgate's campus on October 29, 2014.

95.     On Tuesday, October 28, 2014 at approximately 12:00 p.m., nearly three years after Incident 2 allegedly occurred, Jane Doe 2 submitted an anonymous formal complaint of sexual misconduct against John Doe.

96.     Two hours later, on Tuesday, October 28, 2014 at approximately 2:00 p.m., three years after Incident 1 allegedly occurred, Jane Doe 1 submitted an anonymous formal complaint of sexual misconduct against John Doe.

97.     Finally, 18 hours later, on Wednesday, October 29, 2014 at approximately 8:00 a.m., more than two and a half years after Incident 3 allegedly occurred, Jane Doe 3 submitted an anonymous formal complaint of sexual misconduct against John Doe.

98.     Significantly, all three complaints were filed approximately three years after each of the incidents allegedly occurred, within twenty hours of each other, and by three complainants who were all friends.

99.     Although the complaints were initially filed on October 28 and 29, 2014, Colgate did not notify John Doe of the exact nature of the charges against him until March 24, 2015, five months after the investigation had commenced and two weeks prior to the Hearing.

100.    On October 29, 2014, Colgate participated in the Carry That Weight Campaign, a national movement to protest sexual assault on college campuses. The Colgate campus was strewn with mattresses, containing written messages with alleged quotes of sexual harassment heard at Colgate. In fact, John Doe assisted several of his friends in carrying the mattresses around campus.

101.    On Thursday, December 4, 2014, John Doe was called to the office of Defendant Taylor, where he was given a No Contact Order for each complainant.

102.    On Friday, December 12, 2014, John Doe met with Defendant Brogan and Defendant Flack. John Doe was informed for the first time that allegations of misconduct had been made against him; when he inquired as to what the specific allegations were, Defendant Brogan stated she could not share that information with John Doe yet, as this was just an "information gathering process." Nonetheless, Defendant Brogan questioned John Doe about the allegations, vaguely asking him whether he recalled ever being intimate with any of the complainants. John Doe was consequently forced to participate in the investigation process and begin formulating his defense to the charges, without being notified of the exact allegations against him.

103.    John Doe returned from winter break on January 28, 2015, for a second meeting with Defendant Brogan and Defendant Flack. During this second meeting, John Doe was informed verbally that he was being accused of Sexual Misconduct I and Sexual Misconduct II.

104.    Defendant Brogan asked John Doe to write a statement in response to the allegations. On February 11, 2015, John Doe received an email from Defendant Taylor indicating that his statement was due by 8:00 a.m. on February 16, 2015. John Doe timely submitted his statement, which was drafted based on his understanding that he was being charged with Sexual Misconduct I and Sexual Misconduct II.

105.    On February 16, 2015 at 10:09 a.m., Defendant Brogan sent John Doe an email containing various questions about his statement, which he responded to on February 18, 2015.

106.    On February 27, 2015 at 11:58 a.m., John Doe received an email from Defendant Brogan requesting that he schedule a meeting with her to clarify some aspects of his written statement. When John Doe informed her that he would not able to meet until the following week, Defendant Brogan threatened that if he did not meet her at 3:30 p.m. that afternoon, Defendant Brogan would send the case "as is" to Defendant Rugg and Defendant Taylor.

107.    John Doe replied at 12:34 p.m., stating that he was unable to make the meeting at 3:30 p.m. on such short notice because he already had a meeting scheduled for that time. He offered his cell phone number to Defendant Brogan and inquired whether they could speak by phone or alternatively, reschedule for the following Monday.

108.    Unsurprisingly, Defendant Brogan denied John Doe's request for a postponement of the meeting, stating they could not speak over the phone due to the "sensitive nature of this matter" and advised that it would need to be done in person. Defendant Brogan indicated that she would submit the file to Defendant Taylor, regardless of whether she obtained the clarifications sought.

109.   Left without any other option, John Doe advised he would come to the office immediately, and left his previously scheduled meeting to go to Lathrop Hall at 1:31p.m.

110.   On March 24, 2015, nearly five and a half months after Colgate commenced its investigation, John Doe received three charge letters which identified the nature of the allegations made by each complainant for the first time. Significantly, while Colgate identified the charges against John Doe as Sexual Misconduct I and Sexual Misconduct II in the meeting of January 28, 2015, the Notification of Charge letters included an additional charge, for Sexual Exploitation. Notably, John Doe had operated under the belief that the charges presented to him at the meeting of January 28, 2015 were the charges he had to defend himself against throughout the investigation process. Yet, two weeks prior to the Hearing, and after the entire investigation had been completed, Colgate introduced the charge of Sexual Exploitation for the first time.

111.   Charge letter number one identified two allegations against John Doe; namely, that John Doe had (a) "digitally penetrated [Jane Doe]'s vagina without her consent"; and (b) that he "put [his] hands down [Jane Doe 1]'s underwear and touched her in a sexual manner without her consent." The resulting charges were Sexual Misconduct I and Sexual Misconduct II.

112.   Charge letter number two identified four allegations against John Doe; namely, (a) that John Doe "put [his] hands down [Jane Doe 2]'s underwear and touched her buttocks without her consent;" (b) that John Doe "touched [Jane Doe 2]'s breasts without her consent;" (c) that John Doe "forced [Jane Doe 2] to touch [his] penis with her hand, without her consent;" and (d) that John Doe "exposed [his] penis to [Jane Doe 2] without her consent." The resulting charges were Sexual Misconduct II and Exploitation.

113.   Charge letter number three identified five allegations against John Doe; namely, (a) that John Doe "digitally penetrated [Jane Doe 3]'s vagina without her consent;" (b) John Doe

"forced [Jane Doe 3] to touch [his] penis with her hand, without her consent; (c) John Doe "unhooked [Jane Doe 3]'s bra and touched her breasts without her consent;" (d) John Doe "pushed [his] penis against [Jane Doe 3]'s thigh without her consent; and (e) John Doe "exposed [his] penis to [Jane Doe 3] without her consent." The resulting charges were Sexual Misconduct I, Sexual Misconduct II and Sexual Exploitation.

114.    The Handbook defines Sexual Misconduct I as:

> The sexual penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, forcibly or without consent or where the victim is incapable of consent due to mental or physical incapacity. Sexual penetration includes vaginal or anal penetration by a penis, tongue, finger, or object, or oral copulation by mouth to genital contact, or genital to mouth contact. Sexual Misconduct I also includes non-forcible sexual intercourse with a person who is under the statutory age of consent (which in New York is age 17).

115.    Colgate defines Sexual Misconduct II as:

> Any intentional sexual contact, however slight, with an object or bodily part, by a person upon another person that is without consent. This includes any bodily contact with the breasts, groin, genitals, mouth or other bodily orifice of another individual, or any other bodily contact in a sexual manner. Sexual Misconduct II also includes any disrobing of another or unwelcome exposure from one person to another without consent.

116.    Colgate's Handbook defines Sexual Exploitation as:

> When one takes non-consensual sexual advantage of another. Examples of sexual exploitation include but are not limited to observing or recording others engaged in sexual or private activity (such as undressing or showering) without the consent of all involved; or taking intimate pictures of another but then distributing the pictures to others without the photographed person's consent or in a way that exceeds the bounds of consent; or exposing one's genitals in non-consensual circumstances; or engaging in sexual activity with another while knowingly infected with a sexually transmitted disease (STD) without informing the other person of such infection.

117.    Colgate defines "consent" as:

> Knowing, voluntary and clear permission by word or action, by all participants to a sexual activity....For consent to be valid there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct.
>
> A person cannot consent if that individual is unable to understand what is happening or is disoriented, helpless, asleep, or unconscious for any reason, including due to alcohol or other drugs. An individual who engages in sexual activity when the individual knows, or should know, that the other person is physically or mentally incapacitated has violated this policy. It is not an excuse that the individual respondent was intoxicated and, therefore, did not realize the incapacity of the other.
>
> Incapacitation is defined as a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of the sexual interaction).

118.    The Handbook specifies that "[t]he existence of consent is based on the totality of the circumstances, including the context in which the alleged incident occurred."

119.    All three charge letters indicated that a formal hearing was scheduled for Tuesday, April 7, 2015 at 3:30 p.m. Evidencing a presumption of guilt from the outset, in all three charge letter, Defendant Taylor recommended that John Doe speak with his administrative advisor or another University official about his options and the possible financial consequences should a change in his student status result from the disciplinary process.

120.    The charge letters further indicated that the relevant file with case materials would be made available for John Doe and his adviser's review.

121.    In fact, the file with case materials was not made available for review until three days later, on Friday, March 27, 2015. As John Doe was required to view the file in person, at

the office of Defendant Taylor, his ability to thoroughly prepare for the Hearing with his adviser was substantially restricted.

122.    John Doe retained counsel to act as his adviser as quickly as possible, and scheduled a meeting with attorney George Hildebrandt for Monday, March 30, 2015, the first day on which they were both available.

123.    On Tuesday, March 31, 2015, John Doe became very ill and required treatment in the hospital's urgent care. He consequently missed classes on Tuesday and Wednesday, and returned to class on Thursday, April 2, 2015. John Doe advised Defendant Taylor by email that he had therefore been unable to view the case file during that time. He scheduled his review of the case file for April 3, 2015, the first day on which he was available to review the file along with his adviser.

124.    On Good Friday, April 3, 2015, John Doe and Mr. Hildebrandt met in the office of Defendant Taylor to review the file with case materials, which included an investigation report that was over eighty-two (82) pages long. After spending several hours reviewing the materials and gathering the details of the allegations, John Doe and Mr. Hildebrandt recognized that a thorough review and analysis of the file, as well as the preparation of John Doe's defense, would require significantly more time than allowed.

125.    Accordingly, on Sunday, April 5, 2015, during the Passover and Easter weekend, Mr. Hildebrandt sent an email to Defendant Taylor requesting an adjournment of the Hearing scheduled for April 7, 2015.

126.    In his letter of April 5, 2015, Mr. Hildebrandt also requested that the three complaints be heard before three separate panels, considering the alleged incidents occurred at different times, in different locations, involved different types of conduct, different complainants

and different circumstances. Accordingly, it would be inherently prejudicial and create an unfair proceeding to have all three allegations heard before any of same panel members.

127.     Nonetheless, on Monday, April 6, 2015, Defendant Taylor responded by letter, arbitrarily denying both requests. Despite the fact that the investigation had been ongoing for at least five and a half months and the complainants had had more than three years to prepare their cases and recruit favorable witnesses, Defendant Taylor denied John Doe's reasonable request for an adjournment on the grounds that the Handbook technically only requires at least one weeks' notice of the Hearing. Defendant Taylor cited to the fact that Plaintiff had been given two weeks' notice of the Hearing to justify her denial of the adjournment.

128.     Defendant Taylor failed to recognize that two weeks was certainly an insufficient amount of time for John Doe to locate and obtain an advisor, confer with the adviser, set up a meeting, conduct his own investigation, search for evidence relating to incidents that occurred more than three years before, review and digest multiple reports and witness statements compiled over nearly five and a half months and prepare his defenses to three different complaints.

129.     Moreover, Defendant Taylor denied John Doe's request to proceed before separate panels, citing to a potential "pattern of behavior" despite the fact that the three complaints involved different circumstances, different dates and locations, different complainants and different allegations of misconduct. Nonetheless, Defendant Taylor unjustly determined that the same panel should hear all three proceedings, undermining the panel's responsibility to provide an impartial and fair proceeding.

130.     On April 7, 2015, John Doe submitted a three (3) page Impact Statement detailing his academic accomplishments, campus leadership positions, work in the lab and travel

to Costa Rica, his semester in China to improve his Mandarin, and his work as a sports medicine assistant for the Colgate football team. Additionally, he submitted six (6) character references, one of which came from a female friend who stated she was a rape survivor and found John Doe to be extremely sensitive and caring regarding her personal history.

131.    The Hearing proceeded on April 7, 2015 before the Equity Grievance Panel and was attended by the Chair of the Panel Defendant Taylor, Investigators Defendant Brogan and Defendant Flack, panel members Mary Moran, Nikki Doroshenko, and Jeff Bary, and the complainants and their advisers. A review of the individuals in attendance at the Hearing reveals several conflicts of interest; specifically: Defendant Brogan had served on the panel for Colgate's Sexual Climate Forum on October 27, 2014, which was organized by Jane Doe 2 and attended by Jane Doe 1 and Jane Doe 3; Ms. Moran served on a panel with Jane Doe 2 during International Women's Day sponsored by Oxfam and the Department of Women's Studies one month prior, on March 9, 2015; and Mr. Bary, the sole male present for the Hearing, is married to Mary Simonson, a Professor of Women's Studies. Interestingly, Jane Doe 2 was the sole women's studies major in her class year and earned the Women's Studies Award for Academic Excellence in April 2015.

132.    While the Panel asked very few questions of the complainants, the Panel members expressed their skepticism as to John Doe's credibility when they engaged in a hostile cross-examination of John Doe. The questions presented were evidently intended to confirm the Panel's own predispositions about the allegations, rather than to elicit any information or to determine the truth.

133.    On April 8, 2015, Defendant Taylor issued three decision letters, finding John Doe responsible for each of the violations alleged. Despite Colgate's provision requiring that the

findings letter include a "rationale for the outcome," the three finding letters were identical, simply stating, "[a]fter a careful review of the information presented during the hearing, the Hearing Panel found [Jane Doe 1/2/3]'s account to be more credible than yours." Defendant Taylor failed to provide any explanation whatsoever for these credibility determinations and boilerplate findings, yet John Doe was held responsible in each case.

134.    Consequently, Colgate meted out the following sanctions to John Doe: as to Jane Doe 1's complaint, expulsion; as to Jane Doe 2's complaint, suspension through January 2016; and as to Jane Doe 3's complaint, expulsion. Thus, the three combined sanctions had the purpose and effect of permanently expelling John Doe from Colgate a mere thirty-nine (39) days prior to his expected graduation date.

135.    Subsequently, in light of his upcoming graduation date and final examinations, John Doe submitted a request to Defendant Nelson to stay the Sanction pending the outcome of his anticipated appeal. Yet, Defendant Nelson denied John Doe's request, citing to Colgate's Handbook which provides that sanctions are implemented immediately, unless there are extraordinary circumstances. Defendant Nelson inexplicably determined that no such extraordinary circumstances existed to warrant a stay, despite the fact that John Doe was a final semester senior, was one month away from graduating and departing Colgate's campus, excelled academically, had no prior disciplinary record, the alleged incidents occurred more than three years prior and the complainants had all remained on the same small campus as John Doe without any issues over the prior three and a half years. Defendant Nelson's determination that the foregoing did not constitute "extraordinary circumstances" to warrant staying the Sanction begs the question of what would be considered extraordinary under Colgate's policies.

136.     John Doe timely submitted his appeal on April 25, 2015, in which he outlined a disciplinary process that was replete with flaws and procedural errors, including: the complainants' delay in reporting their claims, inadequate time for respondent's preparation for the hearing, refusal to provide separate hearings for the three complaints, bias by the investigator, gender discrimination, the panel's lack of specific findings, and the imposition of a disproportionately severe sanction (the "Appeal").

137.     Approximately one month *after* John Doe's graduation date had passed, Defendant Nelson denied John Doe's Appeal, on the grounds that appeals may only be based on procedural errors that occur *during* the EGP Hearing, and not during the investigation, or otherwise prior to the Hearing. Further, Defendant Nelson refuted each of John Doe's well-reasoned bases for the Appeal by repeatedly citing to Defendants' unlimited discretion in the administration of the investigation and hearing process.

**VI.      Failure to Conduct a Timely Investigation**

138.     Colgate's Handbook provides: "The University aims to complete all investigations within a 60-calendar-day time period, which can be extended as necessary for appropriate cause…" Despite the absence of any "appropriate cause" Colgate took over five and a half months to complete its investigation. Had Colgate conducted an objective and impartial investigation, it would have aimed to complete the investigation as quickly as possible, given John Doe's anticipated graduation date.

139.     Further, while Colgate's Handbook *strongly encourages* prompt reporting, all three complaints were filed approximately three years after the alleged incidents. When substantial time has passed since the misconduct alleged, the Associate Provost for Equity and Diversity may exercise discretion in deciding whether to pursue the complaint. Undoubtedly, this

was the exact type of situation in which Defendant Rugg should have exercised her discretion in choosing *not* to pursue the complaints.

140.   At the time the complaints were filed, John Doe was a successful student in his last year of college, who planned to attend medical school after graduation. He had an otherwise unblemished record at Colgate, and the alleged events occurred during his freshman year. Understandably, the passage of time considerably affected his ability to recall events, witnesses and evidence. In fact, Colgate itself acknowledges in the Handbook that "the passage of time may make effective responsive action difficult."

141.   While Defendants enjoyed substantial leeway in conducting the investigation and building a case against John Doe, Defendants strictly enforced Colgate's time limits when they denied John Doe's reasonable request for additional time to prepare his defense.

142.   Defendant Rugg's decision to pursue the three complaints, despite the three year delay in filing, was therefore a substantial violation of Colgate's policies, as well as John Doe's right to fair process.

**VII.   Defendant Brogan performed a one-sided investigation**

143.   Defendant Brogan conducted a one sided investigation, mischaracterized witness statements and presented unsupported conclusions of credibility all in an effort to fit within the narrative that John Doe was guilty of the misconduct alleged.

144.   Colgate's Handbook grants significant discretion and authority to the investigator in an EGP proceeding, which allowed Defendant Brogan to take on multiple roles during the subject investigation and hearing. In a clear conflict of interest, the investigator is an employee of Colgate and also serves as a member of the EGP Panel. Not only is the investigator given complete discretion to determine how to conduct the investigation, decide what

information is necessary and relevant, selectively present the facts that she deems relevant, and present her findings to the Panel, but she is also permitted to offer a subjective assessment as to the evidence and credibility of the parties.

145.    Further, Colgate's Handbook notes that "any undisputed conclusions of the investigation report will *not* be revisited, except as necessary to determine sanctions/responsive actions or as determined necessary by the chair." Consequently, the initial findings of the investigator will rarely be disturbed.

146.    Upon information and belief, Defendant Brogan worked with the Onondaga County Sheriff's office for 24 years, the last 16 of which she spent as a detective in the Abused Persons Unit. In fact, the Advisory Committee on Campus Security in their 2013/2014 Compliance Report states: "[Defendant Brogan] maintains, as needed, a part-time staff relationship with the [Hamilton Police Department]…" and in the same report extols "[Defendant Brogan]'s liaison role with the local police department is crucial." (*See* http://www.colgate.edu/offices-and-services/campussafety). Thus, it is highly unlikely that Defendant Brogan's work history and current involvement with the local police department has not resulted in an inherent bias against males accused of sexual misconduct. Accordingly, the role of *impartial investigator* and *primary witness* at the Hearing was astonishingly entrusted to an individual who worked for years investigating and prosecuting sexual assault cases.

147.    Defendant Brogan conducted a one-sided investigation when she proceeded to investigate the subject incidents prior to notifying John Doe of the charges against him. John Doe was not made aware of the exact nature of the allegations against him until five and a half months after Defendant Brogan had commenced, and completed, her investigation.

148.     Nevertheless, in the interim, Defendant Brogan met with and questioned John Doe multiple times and required him to prepare a written statement, all of which allowed her to build a case against John Doe in which a Panel would unquestionably find him responsible.

149.     Further demonstrating the administration of a one-sided investigation, while Defendant Brogan specifically questioned complainants' witnesses about the incidents, Defendant Brogan failed to question John Doe's witnesses about anything substantively related to the allegations. For instance, Defendant Brogan's interview of witness K.A. focused on John Doe's character; K.A. was not asked anything specific about the allegations. When K.A. stated that John Doe would never engage in the behavior alleged, Defendant Brogan responded to K.A. "Good people do bad things," insinuating that John Doe had already been found guilty of the charges.

150.     Moreover, although witness M.K. informed Defendant Brogan that he had been with John Doe during the evening of February 11-12, 2012, Defendant Brogan failed to effectively question M.K. about the events leading up to Incident 2. Similarly, while witness S.M. was the first person to interact with John Doe after Incident 2, Defendant Brogan failed to question S.M. about his knowledge of the incident, his conversation with John Doe, or his observation of John Doe's condition. Thus, Defendant Brogan performed a one-sided and biased investigation when she failed to pursue all information and witnesses pertinent to the alleged incidents, choosing instead to focus on the testimony favorable to complainants.

151.     Significantly, Defendant Nelson and Defendant Taylor have assured anonymous complainants that they *will never have to answer any questions* regarding the serious accusations that they make. This guarantee also extends to a complainant's witnesses. Defendants Nelson and Taylor wrote in a Colgate Maroon News article dated September 25, 2014 that, "[a]

33

requirement to subject any person who has provided information in support of an investigation to cross-examination in a hearing…would chill the reporting of misconduct by those who wish to see it addressed but who fear retaliation or the intimidation of cross-examination." (*See* *http://www.thecolgatemaroonnews.com/commentary/article_3368e252-a97c-11e4-a7232b55 0f971948.html*). Evidently, the EGP has effectively appointed itself as mouthpiece for complainants and their witnesses, by allowing Defendant Brogan to present complainant's side of the story when complainants choose not to participate in the hearing. The same consideration is not offered to the respondent or his witnesses.

152.    As none of the witnesses appeared at the Hearing, John Doe was denied the opportunity to question the witnesses and verify or challenge Defendant Brogan's summary of their testimony. Accordingly, the Panel was left to presume that the witness accounts summarized in Defendant Brogan's own words were accurate accounts of the incidents.

153.    Additionally, Defendant Brogan demonstrated a presumption of guilt against John Doe when she repeatedly used the term "victim" to describe the complainants throughout her reports. Such a characterization of the parties engendered a presumption that the allegations against John Doe were true, before the Hearing even commenced, in violation of Colgate's obligation to conduct a fair and impartial investigation.

154.    Finally, Defendant Brogan presented unsupported conclusions of credibility when she gave more weight to the complainants' testimony, despite the lack of any corroborating evidence. Notably, Defendant Brogan utilized a different standard to weigh the credibility of each complainant. Specifically, Defendant Brogan concluded that Jane Doe 3 was more credible than John Doe because she had promptly discussed the alleged misconduct with several friends. On the other hand, Jane Doe 1 was also deemed to be more credible than John Doe even though

she failed to report anything or tell anyone about the alleged misconduct for three years. Finally, Jane Doe 2 was found to be more credible on the grounds that John Doe had gaps in his memory of the night in question, notwithstanding the fact that it had occurred three years prior.

155.   Based on the foregoing, Defendant Brogan conducted a one-sided investigation and presented arbitrary conclusions of credibility to the Panel based on her inherent bias against John Doe as the male accused.

## VIII.   Gender Bias Against John Doe as the Male Accused

156.   Pursuant to the U.S. Department of Education Office of Civil Rights Guidelines, Colgate was required to conduct an impartial and unbiased investigation process.

157.   Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct against male complainants at Colgate.

158.   Upon information and belief, Defendants are knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

159.   Upon information and belief, Defendants have recognized the increased pressure from the United States government to aggressively discipline male students accused of sexual misconduct.

160.   Defendants' disparate and discriminatory treatment of John Doe was evident throughout the investigation and adjudication process when it accepted Jane Doe 1, Jane Doe 2 and Jane Doe 3's version of the events as more credible than John Doe's despite the lack of any reliable or corroborating evidence.

161.   Defendants demonstrated a bias against John Doe as the male accused when it failed to inform him of the nature of the allegations against him, in violation of John Doe's right

to fair process. While Colgate commenced its investigation of the three alleged incidents in October 2014, it did not inform John Doe of the exact charges against him until March 24, 2015, two weeks prior to the Hearing and after a five month investigation had been completed.

162.     Significantly, Colgate informed John Doe in January of 2015 that he was being charged with Sexual Misconduct I and Sexual Misconduct II. Thus, John Doe drafted his written statement and participated in further interviews and meetings based on this understanding of the charges against him. Nevertheless, on March 24, 2015, Colgate indicated in the charge letters that in actuality, John Doe was being charged with Sexual Misconduct I, Sexual Misconduct II and Sexual Exploitation. Further, the charges with respect to each complainant were different than what had been relayed to John Doe on January 28, 2015.

163.     Defendant Brogan deliberately proceeded to conduct the investigation related to Incident 1, Incident 2 and Incident 3 before notifying John Doe that the complaints had even been filed. Requiring John Doe to participate in the investigative process, submit to interviews and provide a written statement before being made aware of the exact nature of the allegations against him allowed Defendant Brogan to build her case against John Doe prior to hearing his version of the events.

164.     Undoubtedly, John Doe was not provided an equal opportunity to share information and request that witnesses be interviewed when Defendant Brogan refused to notify him of the exact allegations against him yet required him to participate in the investigation process. Thus, Colgate failed to abide by its own self-imposed policies requiring that the complainant and respondent "have an equal opportunity to share information and request that witnesses be interviewed."

165.     In addition to the foregoing, Colgate's Handbook grants unfettered discretion to the investigator "to determine how to conduct the investigation and what information is necessary and relevant." Consequently, the imposition of any rules meant to ensure that the disciplinary process proceeds fairly and impartially is undercut by the simultaneous granting of unlimited discretion to those who carry out the process. Defendant Brogan utilized such discretion to engage in a disciplinary investigation that was neither fair nor impartial and evidenced a clear gender bias against John Doe as the male accused.

166.     Moreover, Defendants demonstrated a gender bias against John Doe when they failed to penalize or prevent retaliation against John Doe as a result of his involvement in the subject EGP process. Colgate's Handbook states "Retaliation is defined as any adverse action taken against a person for participating in a protected activity. Retaliation against an individual for reporting a complaint or concern about a violation or suspected violation of this policy, supporting a complainant, or for assisting in providing information in the context of an investigation or disciplinary proceeding pursuant to this policy is a serious violation of Colgate's policy and will be subject to discipline pursuant to this policy and the EGP Process..."

167.     Nonetheless, Defendants failed to abide by Colgate's own policies when fellow Colgate students engaged in several acts of retaliation against John Doe including: public social media discussions about John Doe, labeling him a serial rapist and claiming the organizations he was a part of allowed rapists to be members; complainants' friends violently elbowing him in the kidney while at a bar; fellow students telling John Doe's friends that he is a bad guy; students pulling aside his date at Senior Ball to warn her that he is a bad guy who can't be trusted and will hurt her; and Jane Doe 3 posting a celebratory message on Instagram after learning of John Doe's expulsion, prompting another round of social media attacks on John Doe's character.

168.     Despite the public and repeated acts of retaliation against John Doe, Defendants failed to take any steps to ensure that such retaliation ceased and/or penalize the individuals responsible for the retaliation.

169.     Colgate's biased and discriminatory treatment of John Doe was also evident in its decision to conduct all three hearings before the same Panel members; although they were nominally separate and took place one after another, the same members were exposed to the information provided in each unrelated case. As it is inherently impossible to consider the allegations in isolation, Colgate's decision to combine the hearings tainted the entire process and produced a Panel that could not avoid forming a predisposition against John Doe. The failure to conduct three entirely separate hearings, before three separate hearing bodies, negated any semblance of impartiality.

170.     Further, Colgate engaged in gender bias against John Doe as the male accused when it selectively appointed a Panel that was noticeably favorable toward the complainants. Specifically, Jane Doe 2 was the *only* women's studies major in the class of 2015; yet, somehow two of the Panel members had ties to the women's studies department (Mary Moran is a Professor of Anthropology and Women's Studies and Jeff Bary's wife, Mary Simonson, is a Professor of Women's Studies). Additionally, Defendant Brogan and Defendant Rugg had served on the panel for Colgate's Sexual Climate Forum on October 27, 2014, which was organized by Jane Doe 2 and attended by Jane Doe 1 and Jane Doe 3. Finally, Ms. Moran had served on a panel with Jane Doe 2 during International Women's Day sponsored by Oxfam and the Department of Women's Studies one month prior, on March 9, 2015. Evidently, the composition of the Panel cannot reasonably be attributed to pure coincidence.

171.     Based on the foregoing, Defendants evidenced a clear gender bias against John Doe as the male accused throughout the investigation and hearing process, in violation of Title IX and his rights to fair process.

**IX.     Failure to Abide by the Requisite
         Preponderance of the Evidence Standard**

172.     The U.S. Department of Education Office of Civil Rights and Colgate's Handbook require that a preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. The Handbook defines preponderance of the evidence as: "whether it is more likely than not that the accused individual committed each alleged violation."

173.     The preponderance of the evidence standard does not equate to judging the accused as guilty until proven innocent. In fact, nowhere in the Department of Education's guidelines or Colgate's policies is such a standard referenced. However, Colgate's investigation process demonstrated a clear gender bias which resulted in a Decision that did not afford John Doe the requisite presumption of innocence.

174.     Specifically, the Panel improperly placed the burden of proof on John Doe to establish that each of the complainants consented to the alleged sexual activity, when it accepted at face value complainants' allegations.

175.     Upon accepting the complainants' uncorroborated account of the events, the Panel discriminated against John Doe, based solely on his gender. A fair reading of the evidence reveals that each of the complainants' account of the events lacked any corroboration or reliability. In fact, all three complainants initiated physical contact with John Doe; Jane Doe 1 removed her own clothing, down to her underwear and began hugging him; Jane Doe 2 brought John Doe back to her dorm room, removed her own shirt and climbed on top of him, while he was obviously extremely intoxicated; and Jane Doe 3 told a mutual friend that she wanted to "go

home" with John Doe for her birthday, implying that she wanted to hook up with him. Despite the lack of any evidence demonstrating complainants did not consent to the sexual activity, John Doe was inexplicably deemed less credible and found responsible for sexual misconduct in each case.

176.    Further, the Panel failed to consider that Jane Doe 1 did not file a complaint against John Doe for three years, and only did so after discussing the allegations and aligning her story with her friends, Jane Doe 2 and Jane Doe 3. Jane Doe 1 did not speak to anyone about the alleged misconduct in the intervening three years and the limited evidence revealed that Jane Doe 1 freely and consensually participated in the sexual touching. In fact, Jane Doe 1's only witnesses, her former roommate M.W., did not confirm any aspect of Jane Doe 1's account of the events.

177.    Similarly, Jane Doe 2 did not present any evidence in support of her allegations. In fact, she admitted that she agreed to have a "sleepover" in the same bed with John Doe on the night of Incident 2. While she claimed that she was unable to move or voice her objections during the sexual interaction with John Doe, she contradictorily admitted that she left the room to use the bathroom. Additionally, John Doe and Jane Doe 2 remained in bed together for an extended period of time, during which Jane Doe 1 and Jane Doe 1's witness, M.W., were also present, neither of which testified to any objection or lack of consent on the part of Jane Doe 2. Interestingly, Jane Doe 2 requested that Defendant Brogan not speak with her ex-boyfriend, witness, R.K., until after she had a chance to speak with him first; Defendant Brogan obeyed this request, allowing Jane Doe 2 an opportunity to ensure R.K.'s testimony supported her version of the events. Yet, John Doe was not afforded the same courtesy when Defendant Brogan proceeded to question John Doe's ex-girlfriend, without his knowledge.

178.     The witnesses identified by Jane Doe 2 also failed to provide any corroboration for Jane Doe 2's allegations of sexual misconduct. M.E., the sole witness present on the night in question, testified that the sexual interaction between John Doe and Jane Doe 2 seemed consensual. Further, not one of the witnesses identified by Jane Doe 2 provided any detailed information whatsoever concerning the allegations; specifically:

- M.E. walked in on John Doe and Jane Doe 2 while they were kissing in Jane Doe 1's room. M.E. stated that the kissing "seemed consensual."

- C.C., Jane Doe 2's brother stated Jane Doe 2 had told him "something happened."

- R.K, Jane Doe 2's ex-boyfriend stated Jane Doe 2 told him she "went too far with [John Doe]." However, nothing in his statement indicated that Jane Doe 2 did not consent; he merely conveyed an admission that Jane Doe 2 potentially felt some regret or guilt.

- E.Y., Jane Doe 2's tutor freshman year stating that Jane Doe 2 was upset because "something happened with [John Doe]."

179.     Moreover, the witnesses identified by Jane Doe 3 also failed to provide any detailed information concerning the allegations; witnesses M.E., L.M. and E.K. all simply stated that Jane Doe 3 told them "something happened." The one witness who corroborated Jane Doe 3's account of the events was a friend of hers from back home, who was not present on the evening in question and had no independent knowledge of the incident; this witness merely acted as a self-serving receptacle for Jane Doe 3's account of the events.

180.     Based on the foregoing, Colgate failed to consider the "totality of the circumstances, including the context in which the alleged incident occurred," in violation of its own self-imposed policies, when it found John Doe responsible for the misconduct alleged.

181.    By relying on the unfounded and vague witness testimony presented in support of complainants' allegations, Colgate failed to abide by the requisite preponderance of the evidence standard when it found the complainants to be more credible than John Doe.

182.    Defendant Brogan concluded in her investigative report that Jane Doe 3 was more credible than John Doe because she promptly told several friends about the alleged misconduct. Contrarily, Jane Doe 1 was also deemed to be more credible than John Doe, even though she failed to report anything or tell anyone about the alleged misconduct for three years. Finally, Jane Doe 2 was found to be more credible than John Doe on the grounds that John Doe had gaps in his memory of the night in question (notwithstanding the fact that it had occurred three years prior). Even though Jane Doe 2 herself admitted that she did not verbally object, or otherwise give any outward indication that she did not want to engage in kissing John Doe, the Panel illogically concluded that Jane Doe 2's allegations of sexual misconduct were nonetheless reliable.

183.    Further, Defendants evidenced a presumption of guilt against John Doe throughout the Hearing, as demonstrated by: the nature of the Panel's questions which sought to confirm their preconceived notions against him, rather than to elicit information objectively; the implementation of a screen between John Doe and the complainants, suggesting to the Panel that the complainants were intimidated and afraid of John Doe; and the acceptance at face value of Defendant Brogan's assessment of the facts and credibility of the parties despite the lack of any evidence supporting complainants' version of the events.

184.    Based on the foregoing, John Doe was treated as guilty from the moment the complaints were filed, and was charged with the task of proving his innocence as to alleged events that occurred more than three years prior.

X.     **The Sanction Was Unwarranted and
       <u>Disproportionate in Light of the Circumstances</u>**

185.    The Sanction assessed to John Doe was disproportionate and unwarranted in light of the circumstances.

186.    Colgate meted out the unwarranted Sanction of expulsion to John Doe a mere one month before his anticipated graduation, notwithstanding the lack of evidence in support of Jane Doe 1's, Jane Doe 2's or Jane Doe 3's allegations of misconduct.

187.    The Sanction was disproportionate on the following grounds: (a) John Doe had an otherwise unblemished disciplinary record in his three and a half years at Colgate; (b) there was no reasonable risk of future harm as John Doe and Jane Doe 1, Jane Doe 2 and Jane Doe 3 were all expected to graduate approximately one month later; (c) John Doe had remained friendly with Jane Doe 1, Jane Doe 2 and Jane Doe 3 throughout their three and a half years at Colgate, and continued to interact on a small campus community without any issue; and (d) the investigation was biased against John Doe as the male accused.

188.    Based on the foregoing, the Sanction was unjustified and disproportionate to the alleged offenses in violation of John Doe's rights to fair process.

**AS AND FOR A FIRST CAUSE OF ACTION
<u>Violation of Title IX of the Education Amendments of 1972</u>**

189.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

190.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

191.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

192.    Upon information and belief, Defendant Colgate receives federal funding for research and development.

193.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

194.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[3]

195.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.
[3] *Id.* at 22 (emphasis added).

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint...."[4]

196.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [5]

197.    Based on the foregoing, *supra,* at ¶¶ 89-188, Defendant Colgate deprived John Doe, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant Colgate's guidelines and regulations.

198.    Based on the foregoing, *supra,* at ¶¶ 89-188, Defendant Colgate failed to conduct an adequate, reliable, and impartial investigation of complaints when it conducted its investigation of the incidents of October 28-29, 2011, February 11-12, 2012 and April 28-29, 2012 and subsequent investigation and review, in a manner that was biased against John Doe. From the outset, the investigation and Hearing were slanted in favor of Jane Doe 1, Jane Doe 2 and Jane Doe 3 when the investigation proceeded without notifying John Doe of the charges against him; Defendant Brogan presented a skewed version of the facts when she failed to substantively question John Doe's witnesses; and the Panel accepted complainants' statements at face value, despite the lack of any corroboration other than vague and unreliable witness statements obtained three years after the incidents had occurred. The foregoing procedural

---

[4] *Id.* at 20.
[5] *Id.* at 21.

defects resulted in the erroneous and adverse finding that John Doe was responsible for each of the charges.

199.    Colgate has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt. Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Colgate on the basis of his sex.

200.    Defendant Colgate had no intention of following its own policies and procedures for John Doe as the male accused of sexual misconduct when it erroneously found John Doe responsible for sexual misconduct despite the absence of any reliable or credible evidence.

201.    Defendant Colgate's stated policies and procedures demonstrate Defendant Colgate's gender-biased practices with respect to respondents, who are invariably male students, accused of sexual misconduct. Specifically:

- Following receipt of notice of a violation or a complaint, Colgate's Handbook provides that the *complainant* is promptly given the opportunity to select an EGP member or other individual to serve as an adviser. However, the respondent, who is invariably a male student, is *not* immediately provided the opportunity to select an adviser. Thus, the complainant is able to receive assistance and guidance from the outset, before respondent is even aware that a complaint has been filed against him.

- According to Colgate's policies, once a complaint is filed, the Associate Provost for Equity and Diversity makes an initial determination as to whether a policy violation may have occurred, based *solely* on the information contained within the notice of violation or complaint. The respondent, who is habitually a male, is not provided the opportunity to submit any information to the Associate Provost before a decision is made as to whether a policy violation may have occurred.

- Further, Colgate's policies do not require that *any notification* whatsoever be given to the respondent, who is invariably male,

upon receipt of a notice of violation or complaint filed by a complainant.

- In fact, Colgate does not require that any notice be given to the respondent until a Notification of Charges is delivered by the EGP chair a mere *one week* prior to the Hearing, and thus, after the investigation has been completed.

- In addition to all of the rights provided to a respondent pursuant to Colgate's policies, a complainant, who is generally female, is granted two additional rights that are *not* afforded to a respondent, namely: to receive amnesty for minor student misconduct that is ancillary to the incident and to be free from retaliation.

- Finally, Colgate's policies interchangeably refer to the complainant as "victim" while referring to the respondent as the "accused" or "perpetrator." Such characterizations demonstrate a presumed bias of guilt against the respondent, who is invariably a male student.

202. Colgate applied its stated policies and procedures and gender-biased practices in a manner that discriminated against John Doe on the basis of his sex and led to an erroneous and adverse outcome. Specifically:

- On April 6, 2015, Defendant Taylor arbitrarily denied John Doe's request for a brief adjournment of the Hearing so that he could fully prepare his defense, despite the fact that the investigation had been ongoing for at least five and a half months and the complainants had more than three years to prepare their cases and recruit favorable witnesses.

- Defendant Brogan questioned complainant's witnesses about the specific allegations, while she failed to question John Doe's witnesses about anything substantively related to such allegations.

- Defendant Brogan demonstrated a bias against John Doe when she repeatedly used the term "victim" to describe the complainants throughout her reports.

- The Panel improperly placed the burden of proof on John Doe to establish that each of the complainants consented to the alleged sexual activity, when it accepted at face value complainants' allegations, despite the lack of any corroborating or reliable evidence.

- The Panel expressed a higher level of scrutiny and skepticism when questioning John Doe, while the complainants were subjected to virtually no questioning.

203. Upon information and belief, since the EGP was established at Colgate in 2013, the number of male students expelled has increased considerably.

204. Upon information and belief, Colgate has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

205. Upon information and belief, all students that have been expelled from Colgate for sexual misconduct have been male.

206. Upon information and belief, Colgate possesses communications evidencing Defendants' inclination to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

207. Upon information and belief, present and former students and faculty of Colgate recognize that female complainants alleging sexual misconduct are taken seriously, while male respondents are not.

208. Upon information and belief, present and former students and faculty of Colgate have perceived the inherent and systematic gender bias against male students accused of sexual misconduct at Colgate, which prevents male students from receiving a fair and impartial hearing when a complaint of sexual assault is made against them by a female student.

209. For instance, in an article published in the Colgate Maroon News on November 6, 2014, Assistant Professor of Educational Studies Melissa Kagle described her experience as a member of the University Student Conduct Board and involvement with the EGP process. Specifically, Ms. Kagle recognized that the student conduct process has strayed too far from fundamental fairness, with the University taking on the role of the "complainant" and speaking

on behalf of "victims." Thus, she states, the University effectively becomes accuser, judge and jury, which is contrary to the most basic principles of due process, "protections Colgate claims to provide students." She further explained that the administration has vigorously asserted that private institutions are not bound by due process or constitutional protections, but only by the much lower "fundamental fairness" standard, which gives substantial discretion to the University and less protections to students. Fundamental fairness means, according to Colgate's own lawyers, that students undergoing a disciplinary procedure must have a "decision-making process free from bias or prejudice." (*see* http://www.thecolgatemaroonnews.com/ commentary/article_6fceba24-a502-11e4-a2b2-9f567b399274.html)

210.     Similarly, Charles A. Dana Professor of Political Science Michael Johnston published an article on September 18, 2014 entitled "Watch Yourself at All Times," in which he detailed his short lived career as an elected faculty representative on the University's Student Conduct Board. Mr. Johnston lasted a mere two hours as a faculty representative, during which he attended a mandatory training session. Mr. Johnston states he instantly recognized the minimal guarantees and safeguards provided to students involved in a disciplinary proceeding at Colgate. The main focus of his training session was a Power Point presentation presented by an attorney from Bond, Schoeneck and King, the University's legal counsel, who explicitly stated that the University, as a private institution, "need not honor the Constitutional standards one might expect to apply; indeed, "due process" as mentioned in the Student Handbook is due process in "an administrative sense" only. Colgate's legal counsel further stated that Colgate can "choose what level of rights to afford students," and is obliged only to observe "fundamental fairness." Mr. Johnston identified the interests and agendas of Colgate's administration which affect the protections afforded to students involved in the disciplinary process; namely, Colgate's

public image and financial wellbeing. Finally, when several of the trainees challenged the justifications of Colgate's current procedures, Colgate's counsel explained that, while it might be possible to uphold some constitutional standards, at a place like Colgate it would be *inconvenient, expensive or awkward to do so*. (*See* http://abettercolgate.com/2015/03/14/what-yourself-at-all-times/).

211.    In response to Michael Johnston's "Watch Yourself at All Times," Colgate Professor of Political Science Barry Shain commented, "when I tried last spring to report on the University's policy of limiting students' due process rights and to warn parents of the dangers their sons confronted under this administration's misguided approach to Title IX issues, via an interview I gave to the Maroon's Editor, the administration apparently refused to let him run it."

(*see*   http://colgateaaup.blogspot.com/2014/09/watch-yourself-at-all-times.html).    Shain   also noted, "when one takes into account recent decisions of the EGP, then it appears that this administration believes itself capable of doing both, that is, imposing grievous fines on students and imprisoning still others. The effective fines result from the administration's policy of suspending male students suspected of what it understands to be Title IX infractions pending investigation; for a full-pay student this could result in a rather large fine possibly amounting to $30,000 or more."

212.    Further, Colgate's Advisory Committee on Campus Security noted in their 2013/2014 Compliance Report: "We have spent much of the year untangling questions about the EGP. The campus at large needs increased transparency and education about this process, and if/how it differs from the Conduct Board adjudication process. **We strongly recommend** assessment of the EGP process…" Significantly, the Advisory Committee's assessment questions include:

- Who provides oversight of this process at any given time?

- Is there an external body that could provide oversight that isn't in-house?

- Are there built-in legal protections on the EGP as there are on the Student Conduct Board ("SCB")?

- Why is the composition of the SCB hearing panel larger and more diverse than the EGP hearing panel?

- Are there significant patterns in who is coming in front of EGP panels?

213.     Interestingly, Defendant Rugg and Defendant Flack published an article titled "Barriers to Institution-Wide Diversity and Inclusion" in January of 2015 in which they discussed their perspective on diversity and inclusion efforts at Colgate. Defendant Rugg and Defendant Flack acknowledged that Colgate's culture "permits anonymous, one-sided, personal attacks and vague accusations that are almost impossible to confirm or deny. *Opinion is presented as fact, inferences and assumptions are left unchecked, conclusions are accepted without factual verification,* and this tactic becomes an informal basis for subjective evaluation." (*see* http://colgateaaup.blogspot.com/p/blog-page_18.html)(emphasis added).

214.     Upon information and belief, Colgate alumni have also perceived the inherent and systematic gender bias against male students accused of sexual misconduct at Colgate.

215.     In fact, A Better Colgate, an alumni organization composed of more than 4,400 members, is currently fighting for more transparency and fairness in Colgate's disciplinary processes, stating in an open letter to Defendant Board of Trustees on January 15, 2015: "We see several recurring themes: a lack of equality, honesty, fairness, due process, transparency, accountability. Worse, we sense hostility, condescension, and an attitude and actions that oftentimes come across as abusive – toward students, alumni, and townspeople. The evidence is

accumulating that Colgate is morphing into an increasingly expensive excursion into a bizarre Twilight Zone of sorts, where student rights exist on a sliding scale, dictated by the whims of a bloated administrative bureaucracy that smothers students in every aspect of their lives, in and out of the classroom. Entire student organizations can be arbitrarily wiped out and now apparently even individual students themselves can be bullied and intimidated on their way to being suspended or expelled." (*See* http://abettercolgate.com/can-we-talk-about-how-to-make-colgate-better/)

216.     Significantly, while the charges against John Doe were filed approximately three years after the alleged incidents, the Hearing proceeded on April 7, 2015 (despite John Doe's reasonable request for an adjournment) and the Decision and Sanction were issued on April 8, 2015. Interestingly, on April 9-11, 2015, Defendant Board of Trustees held its annual meeting at Colgate. Upon information and belief, Defendant Nelson provided the trustees with a report on recent expulsions resulting from sexual assault complaints, in light of the growing national controversy surrounding the campus disciplinary process and pressure from the United States government to aggressively discipline male students accused of sexual misconduct.

217.     Based on the foregoing, *supra,* at ¶¶ 185-188, Defendant Colgate imposed sanctions on John Doe that were disproportionate to the severity of the charges levied against him and without any consideration of his exemplary academic performance and clean disciplinary record at Colgate.

218.     Based on the foregoing, *supra,* Defendant Colgate's guidelines and regulations are set up to disproportionately affect the male student population of the Colgate University community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

219.    Based on the foregoing, *supra*, male respondents in sexual misconduct cases at Colgate are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

220.    Based on the foregoing, *supra*, at ¶¶ 89-188 and 201-202, Colgate's Student Handbook and Equity Grievance Procedures are inherently discriminatory against males accused of misconduct. Colgate's policies and procedures fail to ensure a fair and impartial investigation and hearing process.

221.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract

222.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

223.    Based on the foregoing, Colgate created express and implied contracts when John Doe accepted an offer of admission to Colgate and paid tuition and fees.

224.    Based on the aforementioned facts and circumstances, Defendant Colgate breached express and/or implied agreement(s) with John Doe.

225.    Defendant Colgate committed several breaches of its agreements with John Doe during the investigation and hearing process. A non-exhaustive list of Colgate's breaches include the following:

**Colgate failed to complete the investigation within 60 days.**

226.    Colgate's Handbook provides: "The University aims to complete all investigations within a 60-calendar-day time period, which can be extended as necessary for

appropriate cause…"   However, despite the absence of any identified "appropriate cause" Colgate took over five and a half months to complete its investigation of the subject incidents.

227.    While Colgate failed to conduct a timely investigation of the allegations and failed to timely bring the case to a close within sixty (60) days, it strictly enforced its time limitations in denying John Doe's reasonable request for an adjournment of the Hearing.

228.    Thus, Colgate breached its duty to complete the investigation within sixty (60) calendar days.

**Colgate did not allow John Doe an equal opportunity to present information and witnesses.**

229.    Colgate's Handbook requires that, during an investigation "the complainant and the respondent will have an equal opportunity to share information and request that witnesses be interviewed."

230.    Colgate breached its contract with John Doe when it failed to inform him of the exact nature of the allegations against him until five and a half months after commencement of the investigation. Undoubtedly, John Doe was not provided an equal opportunity to share information and request that witnesses be interviewed when he was not even aware of the charges which he was defending himself against. While complainants had three years to form their allegations and recruit favorable witnesses, John Doe was not made aware of the exact charges against him until he received the Notification of Charge letters two weeks prior to the Hearing.

231.    Thus, Defendant Brogan conducted the investigation in a manner favorable to the complainants, while John Doe was left to engage in guesswork regarding the specific allegations against him.

232.     Consequently, Colgate breached its contract when it failed to conduct an investigation in a manner that allowed complainants and respondent an equal opportunity to share information.

**Colgate failed to provide John Doe a reasonable opportunity to present facts and arguments.**

233.     Colgate's Handbook provides that "the complainant and the respondent will have a reasonable opportunity to present facts and arguments" at the Hearing.

234.     Colgate breached its contract with John Doe when the Panel relied almost exclusively on witness statements, as presented by Defendant Brogan in her investigative report. As no witnesses appeared for the Hearing, John Doe was denied the opportunity to present facts and arguments relevant to his case because he was unable to question all witnesses against him and refute or verify the witness testimony as summarized by Defendant Brogan in her own words.

235.     Thus, Colgate breached its contract with John Doe when it failed to provide him a reasonable opportunity to present all facts and arguments.

**Colgate denied John Doe the opportunity to defend himself.**

236.     Colgate's Handbook provides that "anyone appearing at the hearing to provide information will present and respond to questions on their own behalf and *not through anyone else.*"

237.     Nevertheless, Colgate breached its agreement with John Doe when it required him to direct every question for the complainants through the Chair of the Panel. Subsequently, he was denied the opportunity to present questions on his own behalf. Requiring John Doe to ask all of his questions through an intermediary prevented him from being able to expose the flaws and inconsistencies in the complainants' statements.

238.    Accordingly, Colgate breached its contract with John Doe when it prevented him from being able to directly question his accusers.

**Colgate failed to utilize the preponderance of the evidence standard.**

239.    The U.S. Department of Education Office of Civil Rights and Colgate's Handbook require that a preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. The Handbook defines preponderance of the evidence as: "whether it is more likely than not that the accused individual committed each alleged violation."

240.    Colgate breached its agreement with John Doe when it failed to utilize the preponderance of the evidence standard in reaching its Decision. Had it done so, it would have reached the opposite conclusion; namely, that John Doe was not responsible for the misconduct alleged.

241.    Based on the foregoing, the Panel improperly placed the burden of proof on John Doe to establish that each of the complainants consented to the alleged sexual activity, when it accepted at face value complainants' allegations, despite the lack of any corroboration or reliable evidence.

242.    Based on the foregoing, a fair reading of the evidence reveals that each of the complainants' accounts of the events lacked any corroboration or reliability. Yet John Doe was inexplicably deemed less credible.

243.    Colgate therefore breached its contract with John Doe when it failed to utilize the requisite preponderance of the evidence standard.

**Colgate failed to provide a rationale for the Decision.**

244.    Colgate's Handbook requires that the parties receive "simultaneous written notification of the outcome, which will include *a rationale for the outcome*."

245.     Nonetheless, the three finding letters were identical, simply stating, "[a]fter a careful review of the information presented during the hearing, the Hearing Panel found [Jane Doe 1/2/3]'s account to be more credible than yours."

246.     Defendant Taylor failed to provide any rationale or explanation whatsoever for these credibility determinations and boilerplate findings, yet John Doe was held responsible in each case.

247.     Accordingly, Colgate breached its contract with John Doe when it failed to provide any rationale for the outcome related to each complaint.

**Colgate failed to address retaliation against John Doe.**

248.     Colgate breached its contract with John Doe when it failed to prevent or penalize acts of retaliation against John Doe.

249.     Colgate's Handbook provides, "retaliation against an individual for reporting a complaint, for supporting a complainant, or for assisting in providing information in the context of an investigation or disciplinary proceeding is a serious violation of Colgate's policy and will be subject to further disciplinary action."

250.     Nonetheless, Colgate failed to abide by its own policies when fellow Colgate students engaged in several acts of retaliation against John Doe including: public social media discussions about John Doe, labeling him a serial rapist and claiming the organizations he was a part of allowed rapists to be members; complainants' friends violently elbowing him in the kidney while at a bar; telling John Doe's friends that he is a bad guy; pulling aside his date at Senior Ball to warn her that he is a bad guy who can't be trusted and will hurt her; and Jane Doe 3 posting a celebratory message on Instagram after learning of John Doe's expulsion, prompting another round of social media attacks on John Doe's character.

251. Despite the public and repeated acts of retaliation against John Doe, Colgate failed to take any steps to ensure that such retaliation ceased and/or penalize the individuals responsible for the retaliation.

252. As a direct and foreseeable consequence of the foregoing breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

253. John Doe is entitled to recover damages for Defendant Colgate's breach of the express and/or implied contractual obligations described above.

254. As a direct and proximate result of the above conduct, actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

255. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A THIRD CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

256. John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

257. Based on the aforementioned facts and circumstances, Defendant Colgate breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe by meting out a disproportionate Sanction of expulsion notwithstanding the lack of evidence in support of Jane Doe 1, Jane Doe 2 and Jane Doe 3's claims of sexual misconduct.

258.     As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

259.     John Doe is entitled to recover damages for Defendant Colgate's breach of the express and/or implied contractual obligations described above.

260.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Unfair or Deceptive Trade Practices

261.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

262.     New York General Business Law § 349: Deceptive Acts and Practices Unlawful provides consumer protection by declaring as unlawful "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state…" *See* New York General Business Law § 349.

263.     Colgate's Handbook states, among other things:

> Colgate University complies with all federal and state civil rights laws banning discrimination in private institutions of higher education. Colgate will not discriminate against any person because of race, color, sex, pregnancy, religion, creed, national origin (including ancestry), citizenship status, physical or mental disability, age, marital status, sexual orientation, gender identity and expression, veteran or military status (including special disabled veteran, Vietnam-era veteran, or recently separated veteran), predisposing genetic characteristics, domestic violence victim status, or any other protected category under applicable local, state, or federal law.

> This policy prohibits acts of discrimination, harassment, sexual assault and sexual exploitation…[a]ny and all such acts are serious violations of our community values. This policy is a fundamental

> part of a Colgate community where all members can study, live, and work together in a community characterized by equal opportunity, inclusiveness, safety and mutual respect.
>
> Colgate fully subscribes to all federal and state civil rights law banning discrimination in private institutions of higher education. These include but are not limited to Title IX....Colgate is committed not only to compliance with these laws but with promoting a community that lives out the values these equal opportunity laws envision.

264.     Based on the foregoing, *supra* at ¶¶45-67, Colgate's Student Handbook sets forth the procedure by which Colgate students who have been accused of violating one or more of the policies are investigated, heard, and, possibly, disciplined.

265.     Defendant Colgate has engaged in the following acts or practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, including potential applicants to Defendant Colgate, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances: by causing John Doe to believe that Colgate would follow its policies, copies of which were provided to John Doe and are also available on Colgate's Internet website; and by causing John Doe to believe that if he paid tuition and fees to Colgate, that Colgate would uphold its obligations, covenants and warranties to John Doe as described in its policies.

266.     Defendant Colgate had no intention of following its own policies and procedures for John Doe as the male accused of sexual misconduct when it found John Doe responsible despite the lack of any corroborating statements or reliable evidence.

267.     Defendant Colgate's stated policies and procedures, together with its violations thereof only with respect to John Doe as the male accused of sexual misconduct, demonstrate Colgate's deceptive practices with respect to males accused of sexual misconduct at Colgate.

268.     Based on the foregoing facts and circumstances, Colgate engaged in unfair or deceptive trade practices in violation of N.Y. GBS. LAW § 349.

269.     As a result of Colgate's deceptive acts and practices, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

270.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Estoppel and Reliance

271.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

272.     Colgate's various policies constitute representations and promises that Colgate should have reasonably expected to induce action or forbearance by John Doe.

273.     Colgate expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Colgate would not tolerate, and John Doe would not suffer, discrimination or harassment by fellow students or faculty members and would not deny John Doe his procedural rights should he be accused of a violation of Colgate's policies.

274.     John Doe relied to his detriment on these express and implied promises and representations made by Colgate, by choosing to attend Colgate rather than other schools of equal caliber and paying the required tuition and fees.

275.     Based on the foregoing, Colgate is liable to John Doe based on Estoppel.

276.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

277.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A SIXTH CAUSE OF ACTION
#### Negligence

278.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

279.     Defendants owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care to allow John Doe an equal opportunity to present information and witnesses in support of his defense; a duty of care to conduct an impartial and thorough investigation of the allegations of sexual misconduct against him; and a duty of care to utilize the preponderance of the evidence standard in reaching a determination.

280.     Based on the foregoing, *supra*, at ¶¶ 89-188 and 222-255, Defendants breached their duties owed to John Doe.

281.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

282.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Violation of New York State Human Rights Law

283.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

284.    Defendant Colgate is an education corporation organized and operating as such under the laws of the State of New York.

285.    The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

286.    Colgate's Handbook states, among other thing:

> This policy prohibits acts of discrimination, harassment, sexual assault and sexual exploitation…[a]ny and all such acts are serious violations of our community values. This policy is a fundamental part of a Colgate community where all members can study, live, and work together in a community characterized by equal opportunity, inclusiveness, safety and mutual respect.

> Colgate fully subscribes to all federal and state civil rights law banning discrimination in private institutions of higher education. These include but are not limited to Title IX….Colgate is committed not only to compliance with these laws but with promoting a community that lives out the values these equal opportunity laws envision.

287.    Based on the foregoing, *supra*, at ¶¶ 89-221, Colgate permitted discrimination against John Doe on the basis of his sex.

288.    Based on the foregoing, *supra*, at ¶¶ 89-221, Colgate authorized, condoned and/or acquiesced to discriminatory conduct against John Doe.

289.     Based on the foregoing, *supra*, at ¶¶ 89-221, Colgate knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

290.     Defendant Colgate engaged in the following discriminatory acts or practices against John Doe as the male accused: Colgate subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex; upon accepting the complainants' uncorroborated account of the events, the Panel discriminated against John Doe, based solely on his gender; Colgate failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to protect the rights of male students; the Decision was discriminatory in that given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached.

291.     Based on the foregoing facts and circumstances, Colgate engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(4).

292.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

293.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
#### Declaratory Judgment

294.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

295.     Colgate has committed numerous violations of the Parties' contracts and of federal and state law.

296.    John Doe's future educational and career prospects have been severely damaged.  Without appropriate redress, the unfair outcome will continue to cause irreversible damages to John Doe's future educational and employment prospects, with no end in sight.

297.    As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of John Doe's formal student record at Colgate.

298.    By reason of the foregoing, John Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by the Panel at Colgate be reversed; (ii) John Doe's reputation be restored; (iii) John Doe's disciplinary record be expunged; (iv) the record of John Doe's expulsion from Colgate be removed from his education file; (v) any record of the complaint against John Doe be permanently destroyed; (vi) John Doe be permitted to finish the courses required to graduate from Colgate and receive his degree and diploma; and (vii) Colgate's rules, regulations and guidelines are unconstitutional as applied.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendants as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action under New York General Business Law § 349 Deceptive Acts and Practices Unlawful, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for negligence, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    on the seventh cause of action under New York State Human Rights Law § 296(4), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)    a declaratory judgment pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) the outcome and findings made by Colgate be reversed; (ii) John Doe's reputation be restored; (iii) John Doe's disciplinary record be expunged; (iv) the record of John Doe's suspension and expulsion from Colgate be removed from his education file; (v) any record of the complaint filed against John Doe's be permanently destroyed; (vi) John Doe be permitted to finish the courses required to graduate from Colgate and receive his degree and diploma; and (vii) Colgate's rules, regulations and guidelines are unconstitutional as applied; and

(ix)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.


Dated:   New York, New York
          August 27, 2015


                  **NESENOFF & MILTENBERG, LLP**
                  *Attorneys for Plaintiff John Doe*

                  By: _____

                  **Andrew T. Miltenberg, Esq. (517014)**
                  **Tara J. Novack, Esq. (*admission pending*)**
                    **363 Seventh Avenue, Fifth Floor**
                    **New York, New York 10001**
                    **(212) 736-4500**
                    **amiltenberg@nmllplaw.com**
                    **tnovack@nmllplaw.com**