UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN DOE

                   Plaintiffs,

      v.

COLGATE UNIVERSITY, COLGATE UNIVERSITY
BOARD OF TRUSTEES, JEFFREY HERBST,
Individually and as agent for Colgate University, SUZY
M. NELSON, Individually and as agent for Colgate
University, KIMBERLY TAYLOR, Individually and as
agent for Colgate University, MARILYN RUGG,
Individually and as agent for Colgate University,
VALERIE BROGAN, Individually and as agent for
Colgate University, and TAMALA FLACK, Individually
and as agent for Colgate University,

                   Defendants.

Civil Action No.:
5:15-cv-1069 (LEK/DEP)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO PRECLUDE THE EXPERT TESTIMONY OF PLAINTIFF'S EXPERT

BOND, SCHOENECK & KING, PLLC
*Attorneys for Defendants Colgate University,*
*Jeffrey Herbst, Suzy M. Nelson, Kimberly Taylor,*
*Marilyn Rugg and Valerie Brogan*
One Lincoln Center
Syracuse, New York 13202-1355
Telephone:  (315) 218-8000
Email:  lharshbarger@bsk.com
Email:  ksmith@bsk.com

WARD GREENBERG HELLER & REIDY, LLP
*Attorneys for Defendant Tamala Flack*
1800 Bausch & Lomb Place
Rochester, New York 14604-2713
Telephone: 585.454.0700
Email:  tdantonio@wardgreenberg.com

Of Counsel:
    Laura H. Harshbarger, Esq.
    Kristen E. Smith, Esq.
    Thomas S. D'Antonio, Esq.

2966467.4

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................... 1

ARGUMENT .............................................................................................. 2

   POINT I ................................................................................................. 5

   AYA GRUBER IS NOT QUALIFIED TO TESTIFY AS AN EXPERT ............................ 5

     A. Gruber Is Not Qualified to Testify as an Expert about Campus Disciplinary
       Investigations into Sexual Assault Allegations................................ 5

     B. Gruber is Not Qualified to Testify About Trauma and Reporting ............................ 11

   POINT II ................................................................................................ 13

   GRUBER'S TESTIMONY WILL NOT AID THE JURY.................................. 13

       1. Gruber Cannot Testify About Legal Conclusions ................................. 14

       2. Gruber's Testimony will Confuse the Jury........................................ 15

       3. Gruber Cannot Testify as a "Mouthpiece" for Plaintiff's Counsel...................... 17

       4. Gruber Cannot Testify About the Credibility of Witnesses................................ 18

   POINT III................................................................................................ 19

   GRUBER'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS NOT
   BASED ON RELIABLE DATA OR METHODOLOGY................................... 19

   CONCLUSION........................................................................................ 23

2966467.4

## TABLE OF AUTHORITIES

**Cases**                                                                                                        **Page(s)**

*Allstate Ins. Co. v. Gonyo,*
   2009 U.S. Dist. LEXIS 36597 (N.D.N.Y. Apr. 29, 2009) .......................................................3

*Amorgianos v. Amtrak,*
   303 F.3d 256 (2d Cir. 2002) .............................................................................................19, 20

*Bazile v. City of New York,*
   215 F. Supp. 2d 354 (S.D.N.Y. 2002), *aff'd*, 64 Fed. Appx. 805 (2d. Cir.
   2003) ..........................................................................................4, 9, 13, 14, 19, 21

*Boucher v. U.S. Suzuki Motor Corp.,*
   73 F.3d 18 (2d Cir. 1996) ......................................................................................................19

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) ..............................................................................................2, 3, 14, 19

*Forte v. Liquidnet Holdings, Inc.,*
   675 Fed. Appx. 21 (2d Cir. 2017) ...........................................................................................3

*General Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ..............................................................................................................14

*Hickey v. City of New York,*
   173 Fed. Appx 893 (2d Cir. 2006) .........................................................................................20

*Highland Capital Mgmt., L.P. v. Schneider,*
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...................................................................................18

*In re Initial Public Offering Sec. Litig.,*
   174 F. Supp. 2d 61 (S.D.N.Y. 2001) ...............................................................................13, 14

*Israel v. Springs Indus., Inc.,*
   2006 U.S. Dist. LEXIS 80863 (E.D.N.Y. Nov. 3, 2006) .......................................................20

*Kakeh v. United Planning Org., Inc.,*
   587 F. Supp. 2d 125 (D.C. Cir. 2008) ...................................................................................20

*Matter of Kickertz v. New York Univ.,*
   25 N.Y.3d 942 (2015) ...........................................................................................................10

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999) ................................................................................................................3

2966467.4

*LinkCo, Inc. v. Fujitsu Ltd.*
   2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. 2002) ...................................................17

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.,*
   1999 U.S. Dist. LEXIS 16035 (S.D.N.Y. 1999) ..................................................17

*Morse/Diesel, Inc. v. Trinity Indus.,*
   67 F.3d 435 (2d Cir. 1995) ...................................................................................5

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005)..................................................................4, 5, 13, 19

*Primavera Familienstiftung v. Askin,*
   130 F. Supp. 2d 450 (S.D.N.Y. 2001).................................................................18

*In re Rezulin Prods. Liab. Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)............................................................13, 17

*Salem v. U.S. Lines Co.,*
   370 U.S. 31 (1962).................................................................................................13

*Taylor v. Evans,*
   1997 U.S. Dist. LEXIS 3907 (S.D.N.Y. 1999) ....................................................17

*United States v. Lumpkin,*
   192 F.3d 280 (2d Cir. 1999).....................................................................................3

**Statutes**

Federal Rule of Evidence 702 ................................................................2, 3, 5, 19

**Other Authorities**

13:2 Ohio St. J. Crim. Law 279 .....................................................................................6

38 Cardozo L. Rev. 415 (2016) .....................................................................................6

64 Kansas L. Rev. 101 (2016) .......................................................................................7

2966467.4

## PRELIMINARY STATEMENT

Plaintiff was expelled from Colgate University ("Colgate" or "the University") as a result of a student disciplinary finding that he had committed acts of sexual misconduct against three female students.  In this action, Plaintiff complains that Colgate's investigation and adjudication were flawed and constitute breach of contract, and that the finding was the result of gender-bias against him in violation of Title IX.[1]  Plaintiff has retained Aya Gruber, a law professor at the University of Colorado, as an expert to opine that Colgate's investigation and disciplinary hearing were flawed and that the University personnel involved in the process were gender-biased.

The proffering of Gruber as an expert makes a mockery of the concept of expert testimony. Gruber has never conducted a campus sexual assault investigation or, indeed, any form of sexual assault investigation – *not one* – but Plaintiff asks that she be permitted to testify as an expert about all of the ways in Colgate conducted its sexual assault investigation improperly.  Plaintiff asks the Court to allow Gruber to offer her opinion as to *how* Colgate should have interviewed the sexual assault complainants in this case, but Gruber has *not once* interviewed a sexual assault complainant herself.  Gruber has never administered any Title IX adjudicatory process at any college or university, but she is proffered as an expert on how Colgate mishandled its Title IX adjudicatory process.  Gruber opines on how campus administrators' minds work and the biases she says they harbor, but conducted no empirical research (and she relies on none) in forming her conclusions, and cannot possibly offer reliable expert testimony on campus administrators' beliefs, thought processes and supposed biases.  She

---

[1] In addition to a claim under Title IX, Plaintiff asserts causes of action for breach of contract, breach of the covenant of good faith and fair dealing, unfair and deceptive trade practices, estoppel/reliance, and negligence.

is held out as an expert qualified to opine on Colgate's Equity Grievance Policy (the "Policy") and how the Policy should be applied and what the Policy does and does not allow, but she has done nothing more than what any lay factfinder could do: she read the Policy.  Gruber's CV seems impressive at first blush, but the reality is that she is a law professor who concentrates on criminal law and feminism, neither of which are relevant to the issues in this case.

Perhaps more importantly, even if Gruber could properly be qualified as an expert, her testimony should still be precluded because it will not aid the jury.  Instead, she seeks to supplant the jury's role.  Gruber offers her conclusions as to the ultimate issues (*i.e.*, whether Colgate followed its Policy and whether administrators were motivated by gender bias). But, she has reached those conclusions based on the same information to which the ultimate factfinder will have access (*i.e.*, the disciplinary investigation file and the Policy).

Further, Gruber's testimony should be precluded because it will confuse the jury.  Gruber criticizes Colgate's student discipline process for not following rules of criminal procedure which, of course, it need not do.  She has admitted that she reached her conclusion that Plaintiff was unfairly disciplined based not on whether he violated the standard of misconduct in Colgate's student disciplinary code but rather on whether his conduct met a "civil and criminal standard of liability," which, of course, is irrelevant.  Gruber's testimony, if allowed, would tangle laymen up in concepts that are inapplicable and would serve only to distract the jury from applying the appropriate legal standards.  For these reasons, the Court should exercise its "gatekeeper" discretion and preclude Gruber as an expert.

## **ARGUMENT**

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the principles announced by the Supreme Court in *Daubert v. Merrell Dow*

2

2966467.4

*Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence
> or to determine the fact at issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
> and
>
> (d) the expert has reliably applied the principles and methods to
> the facts of the case.

The burden of establishing admissibility rests with the proponent of the proffered expert

testimony.  *Allstate Ins. Co. v. Gonyo*, 2009 U.S. Dist. LEXIS 36597, at *7 (N.D.N.Y. Apr. 29,

2009).  Trial courts are responsible for determining the admissibility of expert testimony.  *Forte*

*v. Liquidnet Holdings, Inc.*, 675 Fed. Appx. 21, 23 (2d Cir. 2017) (trial judges are "gatekeepers"

who must ensure experts employ in the courtroom the same intellectual rigor characterizing

experts practicing in the field).  While a qualified expert may be permitted to testify "if his or her

testimony will assist the trier of fact to understand the evidence or determine a fact in issue"

(*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999), ultimately, to be admissible, expert

testimony must be both relevant and reliable.  *Daubert*, 509 U.S. at 589-91; *Kumho Tire Co.*, 526

U.S. at 141-42 (extending *Daubert's* general holding not only to "scientific" testimony, but also

to "technical" and "other specialized knowledge" testimony).

Accordingly, before admitting expert testimony, the Second Circuit has articulated three

inquiries that a district court must undertake as part of its "gatekeeping" function: (1) whether

the witness is qualified as an expert to testify as to a particular matter, (2) whether the opinion is

3

based upon reliable data and methodology, and (3) whether the expert's testimony will assist the trier of fact. *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).

In *Bazile v. City of New York*, 215 F. Supp. 2d 354 (S.D.N.Y. 2002), *aff'd*, 64 Fed. Appx. 805 (2d. Cir. 2003), the Southern District precluded the testimony of an expert that sought to opine on the propriety of an investigation and the existence of discriminatory animus – the very same issues on which Gruber seeks to opine here. In *Bazile*, the plaintiff (a police officer) sued his employer (the NYPD), alleging that he was subjected to a hostile work environment in violation of Title VII. The plaintiff was disciplined for shooting at a pit bull in an apartment building. During the investigation of his conduct, he was placed on modified duty and was required to be evaluated by a psychologist. The plaintiff alleged that these actions were motivated by his race and national origin, and retained an expert who opined on the sufficiency of the NYPD's investigation and the motivations of the investigators and decision makers. The court ruled the expert's testimony to be inadmissible because he "lacked the necessary qualifications to comment on the methods used by the NYPD to investigate a firearm discharge and to assess the existence of a discriminatory animus behind their actions." 215 F. Supp. 2d at 365. The court noted that the expert had no experience in "conducting internal disciplinary investigations, such as the one involved in the instant case which took place in a large public agency like the NYPD." *Id.* Similarly, the expert had "no particular expertise that would qualify [him] to assess whether a discriminatory animus motivated the NYPD in this case." *Id.* Accordingly,

> …his testimony is not only based on subjective belief, but also does not fit the facts of the case. [The expert's] testimony does not rely upon any theory related to discriminatory motivations, nor are there any standards which control the operation on his opinions. The Court finds that his conclusions would be of little value to the finder of fact. The average jury can assess whether or not the NYPD acted with a discriminatory animus without the assistance of [the expert's] testimony.

2966467.4

*Id.* (citations omitted).  Here, Gruber's testimony should be excluded for the same reasons -- she has no experience in conducting sexual assault investigations at all and certainly not in a student disciplinary context.  Gruber's opinions as to the motivations of University personnel are not based in any standards that ensure reliability, and are entirely unnecessary to assist the jury.

## POINT I

### AYA GRUBER IS NOT QUALIFIED TO TESTIFY AS AN EXPERT

Gruber lacks the relevant knowledge to be qualified as an expert.  Under Rule 702, to testify as an expert, a witness must be shown to be qualified "by knowledge, skill, experience, training, or education" to testify about a particular matter.  *Nimely*, 414 F.3d at 396-97.  Where a proffered expert attempts to offer testimony on subjects outside of her expertise, that testimony should be precluded.  *See Morse/Diesel, Inc. v. Trinity Indus.*, 67 F.3d 435, 444 (2d Cir. 1995) (upholding exclusion of expert opinions that were "outside [the expert's] field of expertise").

### A.    Gruber Is Not Qualified to Testify as an Expert about Campus Disciplinary Investigations into Sexual Assault Allegations

Gruber's undergraduate degree is in Philosophy.  She received her Juris Doctorate, but has no other advanced degrees or formal education.  Gruber Dep., at 19.[2]  Gruber admitted that following law school, when practicing law in the public defender's office, she handled only one sexual solicitation case that resolved by plea bargain and a "grab to the buttocks case" that never went to trial. Gruber Dep., at 21-25 (sexual assault "was not a big part of my docket at all.").

Since entering academia, Gruber's area of scholarship and teaching has been focused primarily on criminal law.  Harshbarger Decl., Ex. A.[3]  While she testified during her deposition

---

[2] The transcript of Gruber's deposition is attached to the accompany Declaration of Laura H. Harshbarger ("Harshbarger Decl.") as Exhibit C.

[3] Gruber lists  in her CV as categories of research "Substantive Criminal Law, Criminal Procedure, Feminism, Critical Race Theory, Critical Legal Studies, Comparative Criminal Law

2966467.4

that she has recently begun to encompass a discussion of sexual assault on college campuses into a few of her criminal law courses, this remains an extremely small part of the course content. Gruber Dep., at 31-34 (testifying that she spends perhaps two class meetings out of an entire semester long course covering campus sexual assault topics).

Gruber's list of publications is long, but irrelevant to the issues in this student discipline case.[4]  At her deposition, she said that she had written only four articles that concern sexual assault on college and university campuses.  However, upon further questioning, she admitted that one of the four: "Consent Confusion"[5] is a discussion about *criminal law*.  Gruber Dep., at 45-47.  Similarly, her article "Not Affirmative Consent"[6] concerns criminal law issues.  The remaining two articles: "Rape Law Revisited"[7] and "Anti-Rape Culture"[8] are ultra-academic

---

and Procedure" and listing as courses "Criminal Law, Criminal Procedure (Investigation), Criminal Procedure (Adjudication), Torts, International Criminal Law (Course and Seminar), Criminal Law in Context Seminar, Critical Theory Colloquium Seminar."  Harshbarger Decl., Ex. A.

[4] Gruber claims that her articles have been cited extensively; however that others cite to her articles on criminal law or neo-feminist theory does not render her qualified as an expert on the subjects about which she seeks to opine in this case (*i.e.*, the sufficiency of Colgate's investigation and Policy and the purported gender bias of University personnel).

[5] 38 Cardozo L. Rev. 415 (2016) (Harshbarger Decl., Ex. D).

[6] 47 U. Pac. L. Rev. 683 (2016) (Harshbarger Decl., Ex. E).

[7] 13:2 Ohio St. J. Crim. Law 279 (Harshbarger Decl., Ex. F).  The abstract for this essay (Harshbarger Decl., Ex. G) describes its thesis as follows:

> [t]he current rape reform redux is not just a rehashing of old arguments, but boasts many new features. Today's rape activism occurs in a moment when feminist ideas about coerced sex no longer exist at the margins — they govern and enjoy cultural acceptance, if not hegemony. Today's reformist dialogue presumes that to condemn rape is to fight patriarchy itself, even as it eludes other questions of sex, sexism, and the relationship between the two. Today's rape activists seek to unsettle gender categories and be inclusive, even as they emphasize violence against women, in particular. Today's rape reforms purport to intervene in hypermasculine sexual "culture," but such intervention often consists of neoliberal, individualistic programs to prevent and punish sexual transgression. The introduction maps the contours of the rape issue's new legal and political terrain and welcomes both novel and reformulated perspectives and responses.

6

pieces that discuss the current social rhetoric about campus sexual assault through a lens of neo-feminist thought.  None of these articles address how to conduct a sexual assault investigation on a college or university campus.

Further, Gruber has no experience with or expertise in the very thing about which she is offered as an expert:  how to conduct campus sexual assault disciplinary investigations and adjudications.  For ten pages of her 29 page report (pp. 9 - 19),[9] Gruber discusses her opinions about how Colgate's handling of the sexual assault allegations against Plaintiff was "procedurally deficient."  The next seven pages (pp. 19 - 26) consist of her opinions as to how the investigation should have been conducted differently, including the questions that should and should not have been asked.  However, Gruber has never held the role of a Title IX coordinator at any college or university, and she has never been involved in a single campus sexual misconduct case as an investigator or a decision-maker.  Gruber Dep., at 35; 41-42; 50-51.  Despite her lengthy report detailing the failings of Colgate's investigation, *Gruber herself has never been involved in a campus sexual assault investigation in any way*:

> Q:  Have you ever been a Title IX Coordinator at any college or university?
> A:  No.

---

[8] 64 Kansas L. Rev. 101 (2016) (Harshbarger Decl., Ex. H). The abstract for this article (Harshbarger Decl., Ex. I), describes its thesis as follows:

> The essay focuses on the costs of anti-rape culture's construction of the status quo as one in which at least a quarter of college women will be brutalized by a sexual predator and left traumatized, possibly for life. In addition to creating the risk that the sex that college women inevitably have is a minefield of mental distress, the rhetorical strategy has other costs, including punitive over-correction, bureaucratic management of students stripped of their subjectivity, and speech restrictions. In the end, the essay counsels reformers to be cautious lest their commendable concern for safety and equality creates a culture in which drunken sex is ruinous to women, administrative power distributes burdens randomly, or worse, to marginalized men, and silence is the norm in an area desperate for open discussion.

[9] The expert report of Gruber is attached to the Harshbarger Declaration as Exhibit B.

> Q: Have you ever been involved in any college or university sexual assault case as an investigator?
>
> A: No.
>
> Q: Have you ever been involved as a panel member or any other form of decision-maker?
>
> A: In a Title IX case?
>
> Q: Correct.
>
> A: No.

Gruber Dep., at 41.  Further, while Plaintiff offers Gruber as an expert on how the questioning

of the sexual assault complainants in this case should have been handled differently (and indeed

has an entire section of her report entitled "Selective and Incomplete Questioning"), **she herself**

**has never interviewed a victim of sexual assault or conducted sexual assault investigation**:

> Q: Well – okay. So, so how about this, tell – tell me the different contexts in which you have interviewed alleged victims of sexual assault?
>
> A; Well, I think by interviewed, you mean speak to ask questions of?
>
> Q: Correct. For the purpose of finding out what occurred with respect to a sexual assault allegation.
>
> A: ***I don't know if I've ever spoken to someone for the purpose of finding out what occurred for a sexual assault investigation.***
>
> Q: How about cross-examination? Have you ever cross-examined any alleged victim of sexual assault?
>
> A: In a sexual assault case?
>
> Q: Correct.
>
> A: No.

Gruber Dep., at 27.  Moreover, in response to a question about the amount of Title IX training

she has received, she responded that she has never attended training because: "***I am not a Title***

***IX investigator or adjudicator***."  Gruber Dep., at 67-68.

Respectfully, this should be the end of Gruber's bid to be qualified as an expert. **She has precisely zero experience** in conducting campus sexual assault investigations and disciplinary processes.  A person who has never conducted a sexual assault investigation and has never been involved in an investigatory, administrative or adjudicatory role with respect to a campus sexual assault allegation is not conceivably an "expert" at how to conduct such investigations, how to question sexual assault victims and witnesses, or how to administer a Title IX-compliant student disciplinary proceeding.  *See Bazile*, 215 F. Supp. 2d at 382 (precluding expert with "no expertise in how to conduct an internal disciplinary inquiry" of the kind at issue and "no documented expertise in the art of questioning witnesses in such a proceeding").

Gruber claims to have done "extensive research" into issues of Title IX and sexual assault, but her deposition testimony reveals that she has done no empirical research or even any form of formalized studies.  Gruber Dep., at 51-52.  Rather, her "research" consists of "[r]eading law review articles, sociology studies, the various documents from the federal government, climate surveys, [and] popular articles".[10]  Gruber Dep., at 51.  This does not make up for the glaring fact that Gruber has never done the very thing about which she is offered as an expert: the investigation and adjudication of a campus sexual assault allegation.

In addition to her complete lack of personal experience, Gruber's utter lack of familiarity with student conduct proceedings is evident.  Gruber's overarching opinion is that Plaintiff was denied "due process."  Report, at 1 ("A thorough review of the documents you provided reveals

---

[10] Plaintiff may offer as a supposed qualification that Gruber is a member of an American Law Institute ("ALI") committee that is drafting a model code for campus sexual assault policies. Gruber is one of a cast of nearly two hundred persons in a "members consultative group." Harshbarger Decl., Ex. J.  Gruber's involvement was a single two-hour conversation with the reporter who is drafting the proposal, and she is so minimally associated with the project that she was unaware of the status of the project. Gruber Dep., at 40-41.  This is an insufficient qualification to transform Gruber into an expert in this case.

9

that Colgate's disciplinary process violated Plaintiff's right to and expectation of due process").

However, Gruber struggled to explain what her own report was referring to when she used the

term "due process":

> Q: … What is the basis of your belief that [John Doe] was entitled to due process?
>
> A: Well, he was entitled to the process that was due, right? So I think you're asking whether he's entitled to constitutional due process under the Fifth Amendment?
>
> Q: Correct.
>
> A: So it's interesting because I didn't really see the question of whether private universities are obligated under constitutional due process to afford such rights such that if they don't afford them, they're in violation of the Constitution. I didn't actually see that as my primary goal here in this report. More of what I saw is sort of identifying the areas where I thought that the process fell short of giving the plaintiff the rights he was due. I certainly do not mean to indicate that a student in a disciplinary hearing is entitled to the same process as a criminal defendant in a criminal case. And certainly, I would not argue that the plaintiff in this case was entitled to, for example, a jury trial, which, you know, just – he wouldn't be.
>
> …
>
> Q: … you're a professor of law. You understand that due process has – it is a term of art, correct?
>
> A: Yes. It can be constitutional due process, absolutely.
>
> Q: So – so what do you mean? When you say "The university violated his right to an expectation of due process at a private university," what does that mean?
>
> A: So I believe what you're saying is that you don't believe a private university owes constitutional due process to the student, and what I'm telling you –
>
> Q: I'm asking you because you're the expert.
>
> A: Yeah.
>
> Q: Do you believe that at a private university, a student is entitled to constitutional due process? Is that the standard you used in preparing this report? . . . . ***Do you believe that students at a private university are entitled to constitutional due process?***
>
> A: ***I – actually, I'm not sure about that. I think that remains to be seen.***

Gruber Dep., at 53-56.  It does not "remain to be seen."  It is well-settled that students subject to

disciplinary proceedings at private institutions are not afforded the "full panoply of due process

rights." *Matter of Kickertz v. New York Univ.*, 25 N.Y.3d 942, 944 (2015).

Gruber's odd use of the phrase "due process" is not the only legalism that she seems to misunderstand in the student disciplinary context.[11] Gruber opines in her Report that Plaintiff arguably had a "statutorily guaranteed" right to additional time to prepare for the disciplinary hearing. Report, at 12. When asked which "statute" she was referring to, Gruber responded "I wasn't referring to public legislation. I was referring to the EGP Procedure, what I would refer to as the governing procedural statute of this case…I meant the policy." Gruber Dep., at 102-103. Gruber also described the Title IX office as the "civil rights agency of Colgate University." Gruber Dep., at 64. Her use of incorrect terminology evidences Gruber's lack of familiarity with disciplinary proceedings at colleges and universities.

Gruber cannot possibly be held out to the jury with the aura of an expert to opine on Colgate's investigation and adjudication of sexual assault (right down to what and how questions should have asked) when she herself as absolutely no experience, skill, training or knowledge about any of it. Just as the court in *Bazile* held that an expert who lacked experience in conducting investigations of the kind at issue in could not be held out to the jury as an expert on conducting that kind of investigation, Gruber must be precluded.

**B.      Gruber is Not Qualified to Testify About Trauma and Reporting**

Gruber devotes three pages of her report (pp. 5 - 8) to her opinions about "trauma and reporting," but she does not have the requisite "knowledge, skill, experience, training, or education" to be an expert on this subject. She is not a behavioral scientist, neuroscientist or neurobiological scientist, does not hold any degrees in mental health, is not a licensed mental health practitioner, and is not an expert in any field of mental health. Gruber Dep., at 68-69. In

---

[11] She also states in her report that prior to Plaintiff's hearing, he was not provided with "a copy of the discovery." Report, at 11. She admitted during her deposition testimony that she "meant" the investigative file. Similarly, while she criticizes Colgate for not providing Plaintiff with a copy of the investigative file to keep in his possession, she admits that she is unfamiliar with how the issue of file access is handled by colleges and universities generally. Gruber Dep., at 103.

2966467.4

fact, she has not taken a single psychology course. <u>Gruber Dep.</u>, at 19.  When asked what

qualifies her as an expert to give opinions about trauma, Gruber replied:

> A. So I am not giving diagnostic opinions about trauma. I am giving cultural beliefs
> about trauma and the sociology of trauma as it play out in sexual assault cases.
> It's something I have studied extensively.
>
> Q. When you say you have studied it extensively, you have read about it, right?
>
> A. Yes. Read and analyzed, yeah.

<u>Gruber Dep.</u>, at 70-71.  First, this is simply not true.  Gruber *is* giving a diagnostic opinion.  She

opines about whether or not the three complainants experienced trauma and, remarkably, even

how long they would have suffered the effects of trauma.  <u>Report</u>, at 6 (opining that "trauma is

an unlikely explanation for [complainants' delay in reporting the assault]…nor does it tend to

last for three years").  She also opines on the complainants' internal conceptions about their

experiences by describing what she calls a cultural "serial rapist trope" and then opines on its

impact on the three women who made complaints of sexual assault against Plaintiff:

> "The "myth" of the campus serial rapist appears to have had a profound effect in
> this case. Had the three complainants been unaware of each other, it is probable
> that none would have conceived of their case as an assault meriting official
> report".

<u>Report</u>, at 8.  This is outrageous. Bear in mind that Gruber has no mental health training

whatsoever and has never spoken to any of the three complainants.

      Second, even if Gruber were not offering diagnostic opinions, she would still not be a

competent expert for the testimony she seeks to offer.  None of Gruber's multiple-page opinions

about trauma are based on anything but Gruber's unscientific speculation.  *See* <u>Point II</u>, *infra.*

She opines on what she calls "cultural beliefs" about trauma, the impact these "cultural beliefs"

have on college and university administrators generally and Colgate's personnel in particular,

and how those supposed beliefs played out in the questioning of the complainants and the

evaluation of the evidence.  <u>Report</u>, pp. 5-7.  To reiterate, she has never spoken to any of the

2966467.4

persons involved in this case (Gruber Dep., at 91), and she bases her opinions on no studies or data at all, let alone reliable data. *See* Point II, *infra* .

Like the precluded expert in *Bazile*, she "has no special qualifications for psychoanalyzing the investigators" or the other adjudicators or the three female student complainants in this case. *Bazile*, 215 F. Supp. 2d at 382. In sum, Gruber does not have the qualifications to support the opinions about "trauma and reporting" that are featured at pages 5-7 of her Report, and which are peppered throughout her Report.

## POINT II

### GRUBER'S TESTIMONY WILL NOT AID THE JURY

The Second Circuit has "consistently held . . . that expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 397 (internal quotations and citations omitted). Indeed, "[t]he rule prohibiting experts from providing their legal opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of evidence law - a kind of axiomatic principle." *In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d 61, 70 (S.D.N.Y. 2001) (internal quotations omitted).

Further, expert testimony is unnecessary and properly precluded if the underlying facts can be accurately and intelligibly described to the jury, and if the jurors are as capable of comprehending the facts and of drawing conclusions from them as are the "experts." *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (quotation omitted); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding portions of plaintiffs' expert's

2966467.4

testimony that was "a narrative reciting selected regulatory events" because "such material…is properly presented through percipient witnesses and documentary evidence"). Thus, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert" and expert testimony that simply recounts a party's legal arguments is inadmissible. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, Gruber's "conclusions will be of little value to the finder of fact." Rather, "[t]he average jury can assess whether or not [the University] acted with a discriminatory animus without the assistance of [Gruber's] testimony." *Bazile*, 215 F. Supp. 2d at 365.

### 1.    <u>Gruber Cannot Testify About Legal Conclusions</u>

The fundamental premise of Gruber's expert report is that Colgate administrators did a bad job when conducting the underlying investigation, and from this gender-bias should be presumed. However, it is the province of the jury to determine the ultimate issues in the case. Gruber's opinion that Colgate's administrators acted out of gender-bias is a legal conclusion, which is not permissible expert testimony because rendering legal conclusions usurps the role of the jury. For this same reason, Gruber's additional legal conclusions that Colgate's process itself was "biased" (<u>Report</u>, II.G, at 19-25) and that such bias was "not harmless error," (<u>Report</u>, II.H, at 26) should be excluded as improper expert testimony. *In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d 61, 70 (S.D.N.Y. 2001). *See also Bazile*, 215 F.Supp.2d at 382 (rejecting expert testimony as to discriminatory animus where discriminatory animus was an issue about which the jury could reach its own conclusion).

Similarly, Gruber's testimony as to her opinion that Colgate misapplied or misinterpreted its Policy must be precluded, as it seeks to usurp the role of the jury. Plaintiff asks the jury to find that Colgate is liable to him for contractual breach for failing to follow its Policy. Gruber

14

seeks to support him in this claim by testifying as to the ways in which she believes Colgate's Policy required Colgate to take some action, or refrain from taking some action, in a way that Plaintiff would have preferred. These opinions she expresses under the major heading "The University's Procedural Deficiencies." Report, pp. 9-19. All of these opinions are ultimate conclusions for the jury, and Gruber has reached her opinions about whether Colgate followed its Policy by doing no more than what the jury can do: read the Policy and consider at the evidence. (Gruber Dep., at 90-91). She admits that she has no experience with Colgate's Policy that pre-dates this case (Gruber Dep., at 90); she has no familiarity with any other cases that Colgate handled pursuant to the Policy (Gruber Dep., at 91); and, in fact, her grasp on the Policy is so weak that even she had to admit that her opinions are in part based on her mistaken misreading of the Policy (Gruber Dep., at 96-99). To the extent Gruber claims to be an expert on Colgate's policy because she has read other universities' policies, this is irrelevant, as other universities' policies have no bearing on the issues in the case.

### 2.    Gruber's Testimony will Confuse the Jury

The jury stands to become confused by Gruber's testimony. For example, she criticizes Colgate's policy for not complying with the federal rules of criminal procedure (Report, p. 14), which, of course, have no application to a private university's student disciplinary process.

Further, her testimony is not based on what Colgate's Policy is but rather what she believes the policy should be. For instance, in her Report, she accurately sets forth Colgate's standard for consent to sexual activity ("it is *the responsibility of all parties to make certain that the other has consented* before engaging in the activity"), but, then, she does not apply this definition in forming her opinions about Colgate's handling of this case. Report, pp. 8-9. Instead, she based her opinion on what she says is the "civil or criminal" standard for liability which she describes as "the accused knew or had substantial reason to believe *that the*

15

complainant did _not_ consent." She says she used the "civil or criminal" standard because she believes it is "the minimal standard the University _should_ have used." Report, pp. 92-93 (emphasis added). This is a recipe for juror confusion, as this case does not ask the jury to do what Gruber is doing (*i.e.*, to attempt to influence public policy by deciding what the applicable definition of consent should be).

Her Report works to its concluding crescendo that, "The University has elected to adopt an inquisitorial model, rather than an adversarial model . . . .In my opinion, principles of basic fairness, legality and impartiality dictate that the process be far better than the one afforded to Plaintiff." Report, p. 29; *see also* Report, p. 7 ("The University cannot encourage wide and indiscriminate reporting and then fail to provide an adequate method to discriminate between reports, under the auspices of encouraging reporting."). This is another symptom of the same illness that plagues Gruber's testimony: the issue in this case is whether Colgate followed the student disciplinary policy *that it has*, not whether some other policy might be better.

Similarly, Gruber intends to advise the jury that Plaintiff should have been afforded "due process" and that the U.S. Department of Education's Office for Civil Rights ("OCR") requires this (Report, p. 10), but, when deposed, she had to admit that OCR statement on which she is relying applies only to public universities (Gruber Dep., at 99-100).[12]

---

[12]   In response to Plaintiff's disclosure of Aya Gruber's expert report and wishing to be prepared in the event that Gruber is permitted to misinform the jury about the law, the nature of investigations on college campuses, Defendants retained an expert (who actually is an expert, having been Title IX Coordinator at a prominent university and having extensive experience conducting investigations), but with explicit notice to Plaintiff that Defendants were doing so without prejudice to their position that Gruber's expert Report is incompetent and improper. Defendants ask the Court not to send the parties down the rabbit hole by allowing Gruber's testimony.

16

Plaintiff should not be allowed to thoroughly confuse laymen factfinders with testimony about civil or criminal standards of liability, federal rules of criminal procedure, and rules that apply to public (but not private) universities, none of which apply.  This will not "aid" the jury.

### 3.    Gruber Cannot Testify as a "Mouthpiece" for Plaintiff's Counsel

In large part, Section II of Gruber's Report is simply a recitation of Plaintiff's arguments and version of the facts. This is not the purpose of expert testimony under the Federal Rules of Evidence. *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. 2002) (excluding expert testimony because report contained arguments and conclusory statements masquerading behind a veneer of technical language).  Courts in this Circuit have repeatedly rejected expert testimony that is presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence. *See Rezulin*, 309 F. Supp. 2d at 551 (S.D.N.Y. 2004) (rejecting portions of expert testimony that was a "narrative reciting selected events because such material, to the extent that it is admissible, is properly presented through percipient witnesses and documentary evidence"); *LinkCo,* 2002 U.S. Dist. LEXIS 12975, at *6 (expert's report found to be based on a review of documents, computer documents, computer files, deposition transcripts and exhibits, and held that testimony by fact witnesses familiar with those documents would be "far more appropriate and renders the expert witness's testimony unnecessary for the education of the jury."); *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, 1999 U.S. Dist. LEXIS 16035, at *10-11 (S.D.N.Y. 1999) (where expert's testimony is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties, the expert's testimony may not take the place of that of the individuals who actually negotiated the deal"); *Taylor v. Evans*, 1997 U.S. Dist. LEXIS 3907, at *4-5 (S.D.N.Y. 1999) (stating that "[e]xpert testimony is also not admissible when it addresses 'lay matters which a jury is capable of understanding and deciding without the expert's help'" and rejecting portions

17

of expert report on the ground that the testimony consisted of a "narrative of the case which a lay juror is equally capable of constructing"). In *Highland Capital Management*, 379 F. Supp. 2d at 468-69, for example, this Court held that a proposed expert witness "rehashing" otherwise admissible evidence about which he had no personal knowledge was inadmissible and precluded the testimony.

The same result is required here. Gruber's attempt to explain and interpret the investigative file as well as the adjudicatory process itself should be rejected, as those processes and events can be presented to the jury through the testimony of individuals with firsthand knowledge. Gruber has no firsthand knowledge of these issues and did not even speak to anyone who was involved in the investigation or the hearing. The jury is entitled to reach its own conclusions about whether or not Colgate followed its procedures (Report, II.A-F) and/or is gender-biased (Report, II G) based on the testimony of the individuals who have firsthand knowledge of the events rather than an expert witness. *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (expert testimony may not "supplant the role of counsel in making argument at trial" or "the role of the jury interpreting the evidence.").

Indeed, Gruber's report contains headings echo all of Plaintiff's legal and factual arguments ("The University Provided Deficient Notice of Charges"; "Dean Taylor Improperly Denied Plaintiff's Request for Time to Prepare"; "Dean Taylor Improperly Joined the Cases" and it goes on and on). This is not expert testimony; this is another lawyer arguing to the jury, only this time from the witness stand. It is improper and must be precluded.

### 4.    Gruber Cannot Testify About the Credibility of Witnesses

Gruber's various "credibility assessments" weaved throughout her Report (*see generally* Report, at 20-28) likewise constitute inadmissible expert testimony that will usurp the role of the jury, rather than aid it. Importantly,

2966467.4

It is a well-recognized principle of our trial system that 'determining the weight and credibility of [a witness's] testimony. . . . belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men . . . .'; *see also United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1998) ("The credibility of witnesses is exclusively for the determination by the jury, and *witnesses may not opine as to the credibility of the testimony of other witnesses at the trial*." (internal citation omitted and emphasis added)). Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702. *See, e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *Scop*, 846 F.2d at 142-43; *see also, e.g.*, *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999); *Westcott v. Crinklaw*, 68 F.3d 1073, 1076-77 (8th Cir. 1995).

*Nimely*, 414 F.3d 381, 397-398 (2d Cir. 2005); *see also Bazile*, 215 F. Supp. 2d at 382 ("the relative credibility of the testimony of plaintiff and the defendants" is "a determination that is left for the trier of fact and not for a supposed expert."). Indeed, Gruber herself admits that in her Report she is making "an assessment of the credibility of a story." <u>Gruber Dep.</u>, at 129. Such evaluations are inadmissible under Rule 702.

## POINT III

### GRUBER'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT IS NOT BASED ON RELIABLE DATA OR METHODOLOGY

To be reliable, expert testimony must be based on sufficient facts or data, and it must be the product of reliable principles and methods previously applied," and thus, "should be excluded if it is speculative or conjectural." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotations and citations omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002). "'[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert*

2966467.4

and Rule 702 mandate the exclusion of that unreliable opinion testimony.'"  *Id. at* 266; *see also*

*Kakeh v. United Planning Org., Inc.*, 587 F. Supp. 2d 125, 130 (D.C. Cir. 2008) ("When an

expert's testimony is based on 'guesswork, speculation or conjecture,' it should be excluded."

(citations omitted)); *Hickey v. City of New York*, 173 Fed. Appx 893, 894-95 (2d Cir. 2006)

(upholding the exclusion of an expert's testimony where the expert "lacked concrete knowledge

regarding many of the assumptions underlying his conclusions").  Further, while an expert may

incorporate assumptions into her or his opinion, those assumptions must be ones that a

reasonable juror could find correct based on admissible evidence.  *Israel v. Springs Indus., Inc.*,

2006 U.S. Dist. LEXIS 80863, at *48 (E.D.N.Y. Nov. 3, 2006).

Throughout Gruber's report are opinions about bias and thought processes of

administrators. Merely by way of example, she opines:

- "The training currently employed by universities is more biasing than de-biasing. It is unlikely that self-selecting Title IX investigators, administrators, and their designees, in contrast to jurors off the street, harbor negative stereotypes such as 'all rape complainants lie'." Report, p. 4.

- "Title IX personnel tend to hold the belief that because rape victims often have memory problems, memory lapses are proof of rape." Report, p. 6.

- ". . . there is a common mistaken belief among university administrators that "nonconsensual" sex is the same as "unwanted" sex.  Report., p. 1

Gruber cites nothing for these and her similar opinions about what all university

administrators believe.  She admits that she has conducted no empirical research.  Gruber Dep.,

at 52.  She has not even conducted anything close to reliable – let alone verifiable – inquiry:

Q:  How many Title IX coordinators have you interviewed in the – in connection with your work?

A:  I haven't interviewed any Title IX coordinators.

Q:  How many Title IX investigators have you interviewed in connection with your research?

20

> A: None.
>
> Q: And how about decision-makers? How many Title IX decision-makers have you interviewed in connection with your research?
>
> A: No.

Gruber Dep., at 52.  Gruber bases her opinion on things she has read and conversations she has had (apparently casually as she admits she conducted no studies).  Report, at 57; 71. This is precisely the kind of expert opinion that fails to meet standards of reliability.  *Bazile*, 64 Fed. Appx at 809 (affirming preclusion of expert testimony about investigators' motivations in part because the testimony lacked "any standards which control the operation of his opinions").

Incredibly, although she wishes to inform the jury that Title IX training "is more biasing than de-biasing," and therefore that Colgate's personnel were unwitting sufferers of this training-induced bias (*see* Report, at 4), Gruber admits that she has never actually attended any Title IX trainings that form the basis of her opinion:

> Q: And do you – how many – how many Title IX training sessions have you attended?
>
> A: I haven't attended any training sessions.
>
> . . .
>
> Q: Okay. You have not attended any Title IX training?
>
> A: No.

Gruber Dep., at 67-68.  Rather, she believes that she is able to opine on how Title IX training affects the thought processes of attendees because she has read Title IX training materials. Gruber Dep., at 68.  Of course, she admits (as she has to) that "just because something is in a training guide doesn't necessarily mean the person who hears it believes it." Gruber Dep., at 71.

In sum, Gruber has not conducted any reliable inquiry whatsoever into the supposed effects of Title IX training on administrators' attitudes or biases (Gruber Dep., at 52) and has not

even attended such training herself (Gruber Dep., at 67-68).  Yet she wishes to inform the jury with the air of expert authority about the ways in which Title IX training biases university personnel.  Gruber's opinions are nothing more than her own non-scientific conjecture as to what might go on in the minds of others.  This is not appropriate expert testimony.

Gruber offers many other similar opinions about the motivations and biases of the specific administrators involved in Plaintiff's case.  However, her deposition shows that this is all nothing more than sheer speculation on her part with no grounding in any reliable data or methodology at all.  For instance, Gruber admitted that she was speculating when making the assumption that the investigators and decision-makers in this case relied on a particular statistic in forming their opinions about the three complainants' allegations:

> Q: …What is your basis for saying that the decision-makers and adjudicators in this case relied on that statistic?
> A: I think that statistic is an influential statistic, so they –
> Q: So you're speculating?
> A: Yeah. I don't know whether they know it or not…

Gruber Dep., at 62.

Gruber asserts that "there is a common mistaken belief among university administrators that 'nonconsensual' sex is the same as 'unwanted' sex." Report, p. 1.  She later states in her report, however, that, in fact, "[i]t is impossible to know for sure whether the hearing panel mistakenly interpreted non-consensual sex to mean internally unwanted sex…". Report, p. 9.  And then she admitted during her deposition that "I can't recall anything the administrators particularly said in this case" that would support her opinion and that she does not "know whether it was the panelists' particular belief in this case." Gruber Dep., at 59-60.

Gruber opines that Colgate's investigator, Valerie Brogan, is inherently biased because she has a law enforcement background.

22

> "It seems as though a person with a police background might find it difficult to
> shift gears and be as much of an advocate for the accused sex offender as the
> alleged victim."

Report, p. 20.  That this is sheer speculation is proven from the "it seems as though" preface

alone.  In any event, Gruber admitted that in reaching this opinion, she has never conducted any

studies -- not even any interviews -- to form her opinion as to what, if any, biases exist in law

enforcement personnel who later go on to work on college campuses as sexual assault

investigators (Gruber Dep., at 116-119).[13]  To further highlight the unreliability of Gruber's

opinion, when asked if she herself (as a former public defender) had any bias in favor of accused

persons, she answered with just as little basis, "no."  Gruber Dep., at 119.

Overall, Gruber's Report and expected testimony, are replete with speculation and

conjecture and are utterly lacking in any supportive data or methodology.  Accordingly, her

"expert" testimony lacks all indicia of reliability and should be precluded.

## CONCLUSION

For the reasons discussed above, Plaintiff should be precluded from offering Aya Gruber

as an expert to create an issue of fact in opposition to Defendants' summary judgment motion or

to testify at trial.

---

[13]  In her article *Rape Law Revisited*, Gruber makes a similar assertion that "[m]ost investigators
in college Title IX offices are . . . self-selecting women's rights advocates, former civil rights
enforcers . . ."  Harshbarger Decl., Ex. F, p. 286, n.44.  For this definitive, absolutist statement,
she cites to the bio of one person – the person who occupies the Title IX Coordinator role at
Gruber's University of Colorado – who is a former trial attorney for the Department of Justice.
Id.  This should be all the evidence one needs to conclude that Gruber's expert opinions are
based on virtually nothing that one could remotely call scientific, verifiable, or even reliable.
Her repeated insinuations in her deposition that she just knows things and that this should be
good enough (see e.g. Gruber Dep., at 56-59, 61-62, 66-67, 117-119), is simply not good enough
for the Court's gate-keeping mission.

2966467.4

Dated: September 11, 2017                    BOND, SCHOENECK & KING, PLLC


By:___*s/ Laura Harshbarger*_____
      Laura Harshbarger (509779)
      Kristen E. Smith (513756)
*Attorneys for Defendants Colgate University,*
*Jeffrey Herbst, Suzy M. Nelson, Kimberly Taylor,*
*Marilyn Rugg and Valerie Brogan*
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: 315.218.8000
Email: lharshbarger@bsk.com
Email: ksmith@bsk.com

Thomas S. D'Antonio, Esq.
WARD GREENBERG HELLER & REIDY, LLP
*Attorneys for Defendant Tamala Flack*
1800 Bausch & Lomb Place
Rochester, New York 14604-2713
Telephone: (585) 454-0700
Email: tdantonio@wardgreenberg.com

24

2966467.4