UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN DOE,

                           Plaintiff,

        -against-                                    5:15-CV-1069 (LEK/DEP)

COLGATE UNIVERSITY, *et al.*,

                           Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff John Doe, a former Colgate University student proceeding pseudonymously,

brings this action to challenge Defendant Colgate University's decision to expel him because of

sexual assault allegations by former Colgate students Jane Does 1, 2, and 3. Dkt. No. 1

("Complaint") ¶¶ 1, 186. Plaintiff alleges (1) violations of Title IX of the Education Amendments

of 1972, 20 U.S.C. § 1681 *et seq.*; (2) violation of New York State Human Rights Law ("HRL")

§ 296(4); (3) other state statutory and common law claims. Id. ¶¶ 189–298. In addition to

Colgate, Plaintiff names as Defendants current and former Colgate administrators Jeffrey Herbst,

Suzy Nelson, Kimberly Taylor, Marilyn Rugg, Valerie Brogan, and Tamala Flack, individually

and as Colgate's agents. Id. ¶ 1.

Defendants moved for summary judgment on each of Plaintiff's claims, Dkt. No. 67

("Summary Judgment Motion"), and to preclude the testimony of Plaintiff's proffered expert,

Dkt. No. 85 ("Preclusion Motion"). For the reasons that follow, both of Defendants' motions are

granted.

## II.  BACKGROUND

### A.  Factual History

Plaintiff is a male who attended Colgate from 2011 until he was expelled in April 2015, his senior year, after being found responsible for three instances of sexual misconduct that occurred during the 2011–12 academic year. Compl. ¶¶ 1–4, 133.

#### 1.  *Relevant Colgate Policies*

##### a.  Sexual Misconduct

During the 2011–12 academic year, Colgate's Policy on Sexual Misconduct and Sexual Harassment ("Sexual Misconduct Policy") defined the violation "Sexual Misconduct I" as including "any sexual penetration . . . by a man or a woman upon a man or a woman without effective consent." Dkt. No. 67-17 ("Taylor Exhibit G") at 5. The Policy defined "Sexual Misconduct II" as "any intentional sexual touching . . . with any object by a man or woman upon a man or woman without effective consent." Id. The Policy defined the violation "Sexual Exploitation" as sexual misconduct that does not constitute either of the above violations, but can include, in relevant part, "exposing one's genitals in non-consensual circumstances." Id.

##### b.  Colgate's Equity Grievance Policy ("EGP")

Colgate's EGP imposes procedural rules to adjudicate alleged violations of the Sexual Misconduct Policy.[1] Dkt. No. 67-13 ("Taylor Declaration") ¶ 32. The EGP prescribes "no formal time limitation on the bringing of a complaint." Taylor Ex. G at 13. "During the investigation [of a complaint], the complainant and the respondent will have an equal opportunity to share

---

[1]  Plaintiff's hearing was governed by the EGP for the 2014–15 academic year. Taylor Decl. ¶ 32.

information and request that witnesses be interviewed." Id. at 14. "Once an investigation is completed, the investigator(s) will meet with the associate provost for equity and diversity and the appropriate EGP co-chair," and the associate provost then decides whether, "[b]ased on that meeting," enough evidence exists to "proceed[] with the complaint process." Id. at 15. In cases where it is determined that a hearing is required, "the associate provost for equity and diversity will appoint a non-voting panel chair . . . and three members of the EGP to the hearing panel." Id. at 16. The panel chair is required to send a letter to the hearing participants "[a]t least one week prior to the hearing," describing the allegations involved, the date of the hearing, and "a description of the applicable procedures." Id. During the hearing, "the complainant and the respondent will have a reasonable opportunity to present facts and arguments and to present questions through the chair." Id. at 17. After the hearing, the hearing panel decides the respondent's responsibility for the alleged EGP violations based on a preponderance of the evidence standard and what sanctions, if any, to impose. Id. at 18. Following the panel's decision, each party receives notice of the hearing's outcome, "which will include a rationale for the outcome." Id. at 20. Parties can appeal the decision. Id. at 20–21.

### 2. Anti-Sexual Assault Advocacy at Colgate

In April 2014, members of a Colgate student group called "Breaking the Silence" gathered "to raise awareness of sexual assault on Colgate's campus." Dkt. No. 73-2 ("Plaintiff's Exhibit 2"). Breaking the Silence released a statement in connection with the event that declared, "For too long, sexual assault and sexual abuse on this campus have been kept quiet." Id. In July 2014, defendant Rugg, Colgate's Title IX Coordinator and Associate Provost for Equity and Diversity, gave a presentation to campus tour guides, which stated that Colgate had "expelled

3

students found responsible for violating [its] EGP process." Dkt. No. 73-1 ("Rugg Deposition") at 158–59.

Breaking the Silence organized a Sexual Climate Forum held on October 27, 2014. Rugg Dep. at 162. The Forum featured a speaker who blamed fraternities for the majority of sexual assaults at Colgate, and argued for their abolition. Dkt. No. 67-11 ("Rugg Declaration") ¶ 36; see also Dkt. Nos. 73-3 ("Forum Article 1"), 73-4 ("Forum Article 2"), 73-5 ("Forum Article 3"). In Winter 2015, defendant Herbst, then the president of Colgate University, wrote an article in a Colgate publication that stated, "[N]early 20 percent of college-age women and about 6 percent of undergraduate men will be victims of attempted or actual sexual assault during their college years." Dkt. No. 73-27 ("Herbst Article") at 3. The article also mentioned a seminar called "Yes Means Yes," which it hailed as "empowering our young men and women to effect change" regarding sexual assault. Id.

### 3. EGP Training

Rugg, as Colgate's Title IX Coordinator, was charged with attending and implementing training for Colgate administrators and faculty tasked with responding to sexual assault on campus. Rugg. Decl. ¶ 8. An EGP training presentation that Rugg delivered in Fall 2013 covered issues of sexual misconduct and consent. Dkt. No. 73-8 ("Plaintiff's Exhibit 8"). The presentation includes an example of effective consent, featuring the hypothetical parties "John and Kate." Id. at 4.[2] Another slide states, "a capable complainant's unreasonable failure to communicate her expectations to her partner may be grounds for departure from . . .

---

[2] The cited page numbers for this document refer to those generated by the Court's electronic filing system ("ECF").

4

recommended sanctions." Id. at 8. Another slide asks, "Did the sexual aggressor know of the incapacity of his partner?" Id. at 13. Rugg also attended a training in April 2014, hosted by the Association of Title IX Administrators ("ATIXA"). Rugg Dep. at 149. Attendees of this training were advised to refer to sexual assault complainants as "victims" when speaking to the complainant, but to refer to the complainant as "complainant" when speaking to the respondent. Id. Attendees at the training were also advised to discourage the respondent from "lawyer[ing] up and refus[ing] to give a statement." Id. at 150. Colgate did not incorporate these three practices into its EGP. Id.; Dkt. No. 84 ("Reply") at 3.

### 4. The Complaints Against Plaintiff

On October 28 and 29, 2014, Colgate received three anonymous complaints—one by each of Jane Does 1, 2, and 3—accusing Plaintiff of sexually assaulting them. Dkt. No. 67-4 ("Defendants' Statement of Material Facts") ¶ 21. Jane Doe 1 alleged that, on October 28, 2011, she was heavily intoxicated at a party and accepted Plaintiff's offer to walk her home. Dkt. No. 67-18 ("Taylor Exhibit N") at 66. While walking her home, Plaintiff put his hands down Jane Doe 1's underwear, making her uncomfortable. Id. Jane Doe 1 believed that Plaintiff followed her into her dorm room "under the guise of looking out for [her]." Id. While she was "laying in bed," Plaintiff allegedly inserted his fingers into her vagina. Id.

Jane Doe 2 alleged that, on February 11, 2012, she, Jane Doe 1, Plaintiff, and several other students smoked marijuana behind a building on campus, and Jane Doe 2 was allegedly "uncomfortable" because Plaintiff was touching and kissing her. Id. at 11. Jane Doe 2 states that she was highly intoxicated after mixing alcohol and marijuana. Id. Jane Does 1 and 2 hid in a bathroom in a dormitory building "to see if [Plaintiff] would leave while [they] stood inside." Id.

Plaintiff was still waiting outside the bathroom when they exited, and Jane Doe 1 invited Jane Doe 2 to sleep in her room. Id. Plaintiff "overheard and proposed a sleepover." Id. Plaintiff followed the two women into Jane Doe 1's bed, and "touch[ed] [Jane Doe 2] all over." Id. Jane Doe 2 says that Jane Doe 1 left, "probably feeling uncomfortable," and Plaintiff then "pulled his pants down and kept trying to force [Jane Doe 2] to touch his penis." Id. Jane Doe 2 entered "the fetal position" and "kept pulling [her hand] back." Id. at 12. Once Jane Doe 2 realized that she could leave, she told Plaintiff that she needed to use the bathroom. Id. The next day, Plaintiff sent Jane Doe 2 a text message that stated, "Hey, I don't remember anything that happened last night, but if I did something wrong, I'm sorry." Id. at 12.

Jane Doe 3's complaint relates to the night of April 28, 2012. She alleged that she "consented to" leaving a party with Plaintiff to "make out" with him. Id. at 69. While walking back to Colgate's dormitories, Jane Doe 3 repeatedly refused Plaintiff's request for sex. Id. They began kissing, and Plaintiff allegedly "tried to finger" her. Id. Jane Doe 3 "kept pushing his hand away and he kept shoving his hand up [her] skirt and past [her] spandex," and eventually penetrated her vagina with his finger. Id. at 69. Jane Doe 3 said she wanted to go home, and entered her dormitory building, Andrews Hall. Id. Plaintiff followed her, "shepherded" her into a bathroom, and, without her consent, touched her breasts, put his hands down her pants, exposed his penis to her, and tried to "push [it] against" her. Id. Jane Doe 3 pushed him and ran out of the bathroom. Id. Several days after the incident, she "told [Plaintiff] that what he did was unacceptable and he could get in big trouble for it." Id. at 70.

### 5. The Investigation

#### a. Investigators' Meetings with the Complainants

On November 7, 2014, Jane Doe 2 approached Rugg, revealed that she authored one of the complaints against Plaintiff, and asked to file a "formal complaint." SMF ¶ 22. Rugg assigned Brogan and defendant Flack as co-investigators for the complaint. Rugg Decl. ¶¶ 38–39. Brogan was Colgate's Assistant Director for Investigations in the Campus Safety Department, and previously worked as a detective in the Abused Persons Unit within the Onondoga County Sheriff's Department. Dkt. No. 67-6 ("Brogan Declaration") ¶¶ 1–3. She interviewed Jane Doe 2 regarding her complaint on November 7. Id. ¶ 15. Brogan interviewed Jane Does 1 and 3 on December 2 and 3, 2014, as witnesses for Jane Doe 2's complaint. Id. ¶¶ 18–19. Jane Does 1 and 3 each admitted that they authored their respective complaints, and were interviewed about their complaints after answering questions about Jane Doe 2. Id.

#### b. Investigators' Meetings with Plaintiff

Brogan and Flack interviewed Plaintiff regarding the three incidents on December 12, 2014. SMF ¶ 37. Regarding Jane Doe 1, Brogan wrote that Plaintiff first claimed to have no memory of anything involving her in October 2011, and that he never had sexual contact with her. Taylor Ex. N. at 30. After further questioning, Plaintiff recalled attending a party with Jane Doe 1 and thinking that she was drunk. Id. at 31. He recalled walking her home and entering her dorm room, where Jane Doe 1 began undressing. Id. He stated that she hugged him while partially dressed and then he left. Id. Regarding Jane Doe 2, Plaintiff had "very little memory" of the evening and only remembered "snapshots" because he drank heavily and smoked marijuana. Id. One snapshot involved Plaintiff being in Jane Doe 1's room, and the next and final snapshot

of the night "was of [Jane Doe 2] lying on top of him and they were kissing" and his pants were unzipped. Id. Plaintiff texted Jane Doe 2 the next morning asking if she was okay. Id. at 32. Regarding Jane Doe 3, Brogan wrote that Plaintiff "remembered that he said some sexually aggressive things," which upset Jane Doe 3. Id. Plaintiff stated that Jane Doe 3 expressed her discomfort with his language when they met in person several days later. Id. Plaintiff denied entering Andrews Hall, stating that he "recalled standing outside of Andrews and watched her walk inside alone." Id.

After Colgate's winter break, on January 28, 2015, the investigators met once more with Plaintiff, and explained that the allegations against him constituted Sexual Misconduct I and II, which they defined for him. Brogan Decl. ¶ 31. Plaintiff submitted a written statement with his version of events on February 16. Id. ¶ 32. In relevant part, the statement adds to his previous description of events by stating that, during the Jane Doe 1 incident, Plaintiff started "touching [her]" while she was "stripped down to just her underwear." Taylor Ex. N. at 56. The investigators met with Plaintiff again on February 27, and he clarified "that he had touched [Jane Doe 1's] bare breasts." SMF ¶ 63. In total, Brogan and Flack interviewed sixteen witnesses during their investigation, including every witness that Plaintiff asked them to interview. SMF ¶ 60. The investigation was completed in March 2015. Brogan Decl. ¶ 40.

### 6. Hearing Preparation

#### a. Decision to Proceed to Hearings

Rugg and defendant Taylor, who served as "the non-voting EGP Co-Chair," Taylor Decl. ¶ 4, agreed that hearings were necessary after reviewing the investigators' documents. Rugg Decl. ¶ 54. Taylor and Rugg determined that Jane Doe 1's allegations constituted Sexual

Misconduct I and II. Taylor Decl. ¶ 33. Jane Doe 2's allegations constituted Sexual Misconduct II and Sexual Exploitation. Id. ¶ 34. Jane Doe 3's allegations constituted Sexual Misconduct I and II, as well as Sexual Exploitation. Id. ¶ 35.

### b. Selection of the Hearing Panel and Issuance of Charge Letters

Taylor decided to organize the three complaints into three separate hearings before the same panel. Taylor Decl. ¶¶ 54–55. The panel would hear each case individually and conclude it before proceeding to the next case. Id. ¶ 55. To find panelists for Plaintiff's adjudication, Rugg screened potential panelists for conflicts of interest, and eventually selected faculty members Jeff Bary, Mary Moran and Nichole Doroshenko, the Biology Department's Head Technician. Rugg Decl. at ¶¶ 43–50. Jane Doe 2 was a Women's Studies major, and Bary's wife was a Women's Studies professor, but he did not know Jane Doe 2's major. Dkt. No. 67-5 ("Bary Declaration") ¶ 7. Moran was a professor in Colgate's Sociology and Anthropology Department and its Africana and Latin American Studies Program. Dkt. No. 67-8 ("Moran Declaration") ¶ 2. She once served on a lunchtime discussion panel with Jane Doe 2, but did not speak directly to Jane Doe 2 "before are after this panel" and did not know her well. Id. ¶ 10.

On March 24, 2015, Taylor issued the parties "charge letters in each of the three cases," which informed the parties that the hearings were scheduled for April 7, 2015. Taylor Decl. ¶ 37. The charge letters were sent "to Plaintiff and the applicable complainant in each case." Id. As the non-voting chair of the hearing panel, Taylor reviewed the documents compiled during the investigation of the complaints against Plaintiff, and removed information that she deemed irrelevant or overly prejudicial. Id. ¶ 40–46.

<u>c.</u>  <u>Plaintiff's Preparation for the Hearings</u>

The investigation documents that would be used during the hearing—all the investigation

materials that Taylor did not remove during her review—became "available for review on"

March 27, 2015. Taylor Decl. ¶ 47. Subject to Taylor's availability in her office, Plaintiff could

access the EGP hearing file at any time between then and April 7. Dkt. No. 67-2 ("Doe

Deposition") at 214; Dkt. No. 73-29 ("Response Statement of Material Facts") ¶ 97. Plaintiff met

with his attorney on March 30. Taylor Decl. ¶ 52; Dkt. No. 67-19 ("Exhibits O–V") at 2–3.[3]

Plaintiff had strep throat on March 31. Doe Dep. at 122–23. He first requested to review the files

on April 3, and he and his attorney reviewed the files for "[h]ours" later that day. SMF ¶ 98.

They reviewed the documents again on April 7, before the hearings. <u>Id.</u> ¶ 99. Plaintiff was

permitted to call additional witnesses for the hearings, and to seek more information from

previously interviewed witnesses, but he did neither. Doe Dep. at 127–28. He similarly elected

not to prepare additional documentation to support his case during the hearings. SMF ¶ 107.

Plaintiff's attorney asked Taylor to postpone the hearings to give him and Plaintiff more time to

review the hearing materials. <u>Id.</u> ¶ 100. Taylor declined the request because she believed that

Plaintiff had an ample opportunity to review the materials. Taylor Decl. ¶ 52.

### 7. *The Hearings*

The three hearings were held on April 7, 2015. SMF ¶ 102. Plaintiff "did not request

questions to be asked of the complainants." <u>Id.</u> ¶ 108. He was permitted to offer information

beyond that contained in his written statement, and could have voiced his disagreement with any

items in the hearing materials. <u>Id.</u> ¶¶ 111–12. Plaintiff also asked questions of Brogan during the

---

[3]  The cited page numbers for this document refer to those generated by ECF.

hearings "and spoke at the hearing and was not prevented from saying or asking anything." Id. ¶ 113.

### 8. *Determining Responsibility and Imposing Sanctions*

The hearings were held consecutively, a separate hearing for each complaint. Bary Decl. ¶ 13. At the close of the final hearing, the panel discussed each case individually, and came to a decision regarding responsibility in each case before moving to the next case. Id. ¶ 15. Regarding Jane Doe 2, the panel found that Plaintiff's credibility was diminished because he could not remember much of the night. Id. ¶ 20; Moran Decl. ¶ 20; Dkt. No. 67-7 ("Doroshenko Declaration") ¶ 22. The panelists also viewed Plaintiff's apology text as an "admission" that he had behaved inappropriately. Bary Decl. ¶ 21; Doroshenko Decl. ¶ 28; Moran Decl. ¶ 22. Regarding Jane Doe 3, the panelists were persuaded by the level of detail in her recounting of the April 2012 incident, and the fact that, shortly after the incident, she told multiple witnesses that Plaintiff had engaged in sexual misconduct. Bary Decl. ¶ 25; Doroshenko Decl. ¶ 37; Moran Decl. ¶ 26.

Regarding Jane Doe 1, the panelists found Plaintiff's account unpersuasive because his story changed significantly over time. Bary Decl. ¶ 33; Doroshenko Decl. ¶ 42; Moran Decl. ¶ 31. Namely, the panel considered his initial reluctance to admit that he touched Jane Doe 1 to be suspicious. Doroshenko Decl. ¶ 42; Moran Decl. ¶ 31. Moreover, the panelists perceived that Plaintiff's behavior with each complainant amounted to a pattern of behavior—engaging in non-consensual sexual activity with the Jane Does after walking them home following a night of drinking—and found that Jane Doe 1's account was more credible because it fit that pattern. Moran Decl. ¶ 34; Bary Decl. ¶ 34. Therefore, the panelists found Plaintiff responsible for each

of the violations alleged. Bary Decl. ¶¶ 21, 31, 34–35; Doroshenko Decl. ¶¶ 29–31, 38, 43; Moran Decl. ¶¶ 24, 29, 36. Plaintiff received one decision letter for each hearing, Dkt. No. 67-19 ("Taylor Exhibits S, T, & U") at 13–21,[4] and each letter stated that "[t]he Hearing Panel received conflicting accounts of the events in question," and that the panel found Plaintiff responsible because it considered the applicable Jane Doe's "account to be more credible." Id.

Regarding the imposition of sanctions, Taylor provided "comparator information" indicating that "expulsion . . . had been imposed in previous Sexual Misconduct I cases where non-consensual penetration . . . was determined to have occurred," but did not mandate the imposition of any sanction. Moran Decl. ¶ 37; Bary Decl. ¶ 37; Doroshenko Decl. ¶ 50. The panel imposed the sanctions of expulsion for the Jane Does 1 and 3 incidents and suspension for Jane Doe 2. SMF ¶ 119. Plaintiff appealed the panel's decisions, and Dean of the College Nelson was in charge of deciding the appeals. SMF ¶ 126. Nelson reviewed the hearing materials, listened to an audio recording of each hearing, and read Plaintiff's appeal letter. Id. ¶ 129. Nelson denied the appeals after "finding that none of the grounds for an appeal had been met." Id. ¶ 131.

### 9. Alleged Retaliation

Before Plaintiff was expelled, one of the complainants' friends elbowed him in the kidney at a bar. Doe Dep. at 168. Furthermore, posts on the "anonymous forum" Yik Yak referenced Plaintiff, id. at 165, and at least one post referred to him as "[a] serial rapist." Dkt. No. 73-11 ("Yik Yak Posts") at 3. That Yik Yak post was forwarded to Taylor by a concerned student. Id. Plaintiff never complained of retaliation to Colgate. SMF ¶ 132.

---

[4] The cited page numbers for this document refer to those generated by ECF.

### B. Procedural History

Plaintiff filed a Complaint in this Court on August 31, 2015. Compl. The Complaint alleged seven causes of action against Defendants: (1) violations of Title IX; (2) violation of New York HRL; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) violation of New York General Business Law § 349; (6) liability based on an equitable estoppel theory; and (7) negligence.[5] Id. ¶¶ 189–298. In addition, Plaintiff seeks a declaratory judgment under 28 U.S.C. § 2201. Id. ¶ 298. On June 21, 2017, Defendants moved for summary judgment on all of Plaintiff's causes of action, including his request for a declaratory judgment. Summary Judgment Mot.; Dkt. No. 67-3 ("Memorandum"). Plaintiff opposed the Motion, Resp., and Defendants filed a reply, Reply. Defendants also seek to preclude testimony from Plaintiff's proposed expert witness. Preclusion Mot.

## III.   LEGAL STANDARD

### A. Motion to Preclude

Defendants move to preclude the expert testimony, Dkt. No. 73-13 ("Report") at 1, proffered by Plaintiff's expert, law professor Aya Gruber. Preclusion Mot. They argue that Gruber (1) is unqualified to opine on Title IX investigations or the relationship between trauma and sexual assault reporting; (2) impermissibly provides opinions on legal conclusions and the credibility of witnesses; and (3) fails to support her opinions with reliable data. See Dkt. No. 85-1 ("Preclusion Memorandum").

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony,

---

[5] Plaintiff withdrew the negligence cause of action in his response, Dkt. No. 73-28 ("Response") at 1, n.1. The Court, therefore, grants Defendants' Summary Judgment Motion with respect to the negligence claim.

codifying rules outlined in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), and

<u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine the fact at issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence." <u>In re Mirena IUD Prods. Liab. Litig.</u>, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016) (citing <u>Bourjaily v. United States.</u>, 483 U.S. 171, 175–76 (1987)). To determine the admissibility of expert testimony, "First, the district court must determine whether an expert is qualified," a determination that "'may be based on 'a broad range of knowledge, skills, and training.'" <u>Id.</u> at 412 (citing <u>In re Fosamax Prods. Liab. Litig.</u>, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009)). Second, the district court must evaluate whether the proposed testimony will "help the trier of fact." <u>Id.</u> at 413 (citing Fed. R. Evid. 702). Accordingly, expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it" is inadmissible. <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991).

Finally, the district court must determine whether the expert testimony is reliable. <u>Daubert</u>, 509 U.S. at 593–94. To determine reliability, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case

at hand." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002). If the expert's reasoning is flawed, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." <u>Id.</u> (quoting <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 745 (3d Cir. 1994)). Nevertheless, "[n]othing . . . requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997); <u>see also</u> <u>Bah v. City of New York</u>, No. 13-CV-6690, 2017 WL 435823, at *9 (S.D.N.Y. Jan. 31, 2017) ("[E]xpert testimony should be excluded if it is speculative or conjectural.") (alteration in original) (quoting <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996)).

**B. Summary Judgment Motion**

A court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The nonmoving party must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u>

While the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), a court at the summary judgment stage must "review all of the

evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000); see United States ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 653 n.3 (2d Cir. 2016).

## IV. DISCUSSION

### A. Motion to Preclude

#### 1. Opining on Trauma, Serial Rapists, and Consent

Gruber makes the following arguments in the section of her expert report devoted to Title IX and gender bias: (1) although most rape victims recover from trauma very quickly or are not traumatized at all, college administrators, influenced by feminist ideology, presume that sexual assault complainants are traumatized, which leads to procedural defects in Title IX hearings; (2) Colgate presumed that the complainants were traumatized in the cases against Plaintiff, which caused bias in the investigation and hearing; (3) administrators possess the erroneous belief that most male rapists are serial rapists; (4) Colgate's administrators and the complainants treated Plaintiff's alleged behavior as sexual assault instead of "unpleasant" but consensual sexual activity because they bought into the "serial rapist trope," and; (5) the hearing panel may have "mistakenly interpreted non-consensual sex to mean internally unwanted sex." Report at 5–9.

#### a. The "Trauma Trope"

Gruber provides an inadequate factual basis to support her sweeping assertion that administrators presume that all complainants are traumatized. See Fed. R. Evid. 702 (stating that expert testimony "must be based upon sufficient facts or data"). Her Report cites no evidence for these conclusions, and her Declaration cites only her Report and four law journal articles that she

authored. Dkt. No. 95-7 ("Gruber Declaration") ¶¶ 9–10. Two of the cited articles, Not Affirmative Consent, Dkt. No. 95-14, and Consent Confusion, Dkt. No. 95-9, contain no supporting information. Another article, Rape Law Revisited, relies on sparse anecdotal evidence and conjecture to support the conclusion that "reform is more about protecting complainants from trauma . . . than truth-seeking." Dkt. No. 95-13 at 286–89. The fourth article, Anti-Rape Culture, asserts that "today's campus factfinders regard questioning a victim's credibility . . . as victim-blaming." Dkt. No. 95-13 ("Anti-Rape Culture") at 1046. Gruber provides one example for this proposition, citing a Harvard Law Review Article criticizing Harvard's sexual misconduct training. Id.; Trading the Megaphone for the Gavel in Title IX Enforcement, 128 Harv. L. Rev. Forum 103, 110 (2015).

Gruber also cites the 2011 Dear Colleague Letter ("2011 DCL"), authored by the Department of Education's Office for Civil Rights ("OCR"), that states: "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating." Anti-Rape Culture at 1046. During the period relevant to this action, the 2011 DCL set forth OCR's interpretation of Title IX and encouraged colleges and universities to more aggressively respond to sexual assault. Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. to Title IX Coordinators (Apr. 4, 2011), available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. The recommendation Gruber cites has nothing to do with "victim-blaming," as she asserts. Moreover, it does not assume that *all* complainants are traumatized, nor does it suggest that the credibility of complainants should not be challenged—as discussed below, many Title IX respondents,

including Plaintiff, are permitted to cross-examine complainants by directing questions to the complainant through the hearing panel.

Most importantly, analyzing the 2011 DCL does not provide insight into the beliefs of administrators incorporating its requirements into their Title IX programs. A "[u]niversity's adoption of positions recommended by the federal government does not in turn suggest that the [u]niversity did so because of gender bias—all it plausibly suggests is that the [u]niversity sought to comply with OCR's recommendations." Doe v. Univ. of Chicago, No. 16-C-8298, 2017 WL 4163960, at *5 (N.D. Ill. Sept. 20, 2017); see Mancini v. Rollins Coll., No. 16-CV-2232, 2017 WL 3088102, at *6 (M.D. Fla. July 20, 2017) ("[A]bsent university-specific allegations of community pressure, allegations of a national bias against males based on the [2011 DCL] have been found insufficient to support an inference of gender bias." (citing Doe v. Cummins, 662 F. App'x 437, 452–53 (6th Cir. 2016))).

In sum, Gruber's research shows only that *some* administrators in *some* Title IX offices believe that complainants are traumatized, which does not permit the conclusion that all, or even many, administrators share this belief. Additionally, Gruber provides no factual basis for her opinion that those administrators who *do* believe that all complainants are traumatized also rely on that belief to "explain away the complainants' credibility problems." Report at 6. These conclusions rely too heavily on overgeneralization and a smattering of anecdotes to be considered reliable. See Charter Practices International, LLC v. Robb, No. 12-CV-1768, 2015 WL 13000251, at *5 (D. Conn. Mar. 31, 2015) (granting motion to exclude "because [the expert's] analysis is largely anecdotal and does not rely upon any particular type of expertise, scientific methodology, or principles that would assist the jury"); Playtex Prods., Inc. v. Procter & Gamble

18

Co., No. 02-CV-8046, 2003 WL 21242769, at *10 (S.D.N.Y. May 28, 2003) (holding that expert's conclusions were unreliable because they were "based on 'anecdotal conversations' she has had with some patients, and not on any survey or scientific study").

Plaintiff argues that the Court should accept the above conclusions as reliable because, "[i]n certain fields, experience is the predominant . . . basis for a great deal of reliable expert testimony." Dkt. No. 94 ("Preclusion Response") at 17 (citing Cruz v. Kumho Tire Co., Inc., 2015 WL 2193796, at *4 (N.D.N.Y. May 11, 2015)). While personal experience can be the basis for reliability, it is hard to imagine how Gruber's personal experiences could form a sufficiently comprehensive factual basis for her sweeping claim regarding the prevalence of feminist bias among Title IX administrators. Furthermore, her relevant personal experience is not extensive—for instance, she has never attended a Title IX training, served on a Title IX panel, conducted a Title IX investigation, or interviewed a Title IX coordinator, investigator, or decision-maker to learn whether they presumed that all complainants are traumatized. Dkt. No. 85-5 ("Gruber Deposition") at 35, 41, 50–51, 67–68. Cf. Valentin v. New York City, No. 94-CV-3911, 1997 WL 33323099, at *21 (E.D.N.Y. Sept. 9, 1997) (permitting expert testimony regarding retaliation against police officers despite lack of "formal studies" because the expert engaged in "innumerable conversations with members of the New York City's three . . . police agencies . . . over twenty-three years of active police service and twenty years of scholarly research on the police"). Therefore, the Court finds that Gruber's conclusion regarding Title IX administrators' acceptance of the "trauma trope" is speculative and unreliable.

Because the Court finds that Gruber's general conclusions regarding Title IX administrators' acceptance of the trauma trope is unreliable, it also rejects her application of

these conclusions to Colgate's administrators. Report at 4. The remainder of Gruber's opinion regarding the "presumption of trauma" at Colgate is unsupported by any citation to the record and instead relies on conclusory assertions. See Report at 6 (stating that Colgate relied on the "trauma framework" when it "explain[ed] away the complainants' credibility problems, such as the three-year gap in reporting, memory lapses, and inconsistent testimony"); Gruber Decl. ¶ 16 ("[T]he presumption that the complainants were traumatized led the investigator to pursue the case in a manner that indicated the goal was to confirm that . . . sexual misconduct occurred."). The Court finds that these opinions are speculative and unreliable.

### b.  The "Serial Rapist Trope"

Gruber states that "[a] common claim from anti-rape activists and Title IX administrators is that the epidemic of campus rapes is attributable to a small number of 'serial rapists' on campus," and that this belief is erroneous. Report at 7. Even if this is a "common claim," Gruber provides no facts to support her opinion that the "'myth' of the campus serial rapist appears to have had a profound effect in [Plaintiff's] case." Id. at 8. She states, "[h]ad the three complainants been unaware of each other, it is probable that none would have conceived of their case as an assault meriting official report," and that they only complained about Plaintiff after meeting with one another and deciding that he was a serial rapist. Id. Gruber points to nothing in the record to support this assertion, and her opinion is inadmissible for this basis alone. Moreover, Gruber's attempt to divine the internal reasoning of the complainants is improper because her testimony usurps the jury's role of assessing a witness' motivations. See Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 45 (S.D.N.Y. 2016) ("Inferences about the intent or motive of parties or others lie outside of the bounds of expert testimony." (quoting In re Rezulin

Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)); In re Diet Drugs, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for the experts.").

Finally, Gruber states that Colgate's administrators relied on the serial rapist myth when they "regarded the bare fact that there were three accusers as evidence of a 'pattern' and therefore proof that all three incidents were, in fact, sexual assaults rather than unpleasant" but consensual sexual activity. Gruber Decl. ¶ 17. However, Taylor's undisputed declaration testimony reveals that she determined that the three incidents constituted a pattern after considering that all the incidents happened during Plaintiff's freshman year, each incident involved Plaintiff returning to a residence hall with a complainant after a night of drinking "under the guise of friendship," two of the incidents involved similar alleged sexual acts, and the incidents "reflected a troubling escalation to the April 2012 incident." Taylor Decl. ¶ 26. Therefore, the premise of Gruber's opinion—that Taylor relied only on the fact that there were three accusers—has no factual basis, and the Court deems this testimony unreliable.

### c. Consent

Gruber opines that Plaintiff's hearing panel likely "misapplied the nonconsent standard in the" EGP by finding Plaintiff responsible in each case based on the erroneous belief that non-consensual sex means "internally unwanted sex" rather than sex with an objectively unwilling participant. Report at 8–9. In her deposition, Gruber stated that this opinion is based solely on her impression that this misunderstanding of consent is a "common belief." Gruber Dep. at 60. She then admitted that she could not "recall anything the administrators particularly said in this case" to suggest that they misunderstood the EGP's objective consent standard, and that it was

"impossible for [her] to know" whether the panelists misunderstood consent "based on what [she] had seen." Id. at 59–60. Gruber's opinion regarding the panel's application of the EGP's nonconsent standard is precisely the sort of "guesswork" that renders expert testimony inadmissible. Kakeh v. United Planning Org., Inc., 587 F. Supp. 2d 125, 130 (D.C. Cir. 2008).

### 2. Opining on Procedural Deficiencies in the Cases against Plaintiff

The final section of Gruber's Report opines, at length, on the various ways that Colgate was allegedly unfair to Plaintiff. Report at 9–28. She argues that (1) the EGP inadequately protects students from conflicts of interest; (2) Colgate did not provide Plaintiff with sufficient notice of the allegations against him; (3) Plaintiff was given insufficient time to prepare for his hearing; (4) Colgate "[i]mproperly [j]oined the [c]ases"; (4) at least two members of the hearing panel had conflicts of interest; (5) Plaintiff was denied "a meaningful opportunity to appeal," and; (6) Brogan's investigation was biased. Id. Gruber concludes that "the procedural problems with the cases likely impacted the panel's decision on some, if not all, of the charges for which Plaintiff was found responsible." Id. at 28.

First, the Court finds Gruber's conclusion improper because the question of whether there were defects in the proceedings against Plaintiff that impacted the outcomes of his hearings is, as noted in the Title IX discussion below, a legal conclusion. "[W]hile an expert 'may opine on an issue of fact within the jury's province,' an expert 'may not give testimony stating ultimate legal conclusions based on those facts.'" Snyder v. Wells Fargo Bank, N.A., No. CV-4496, 2012 WL 4876938, at *5 (S.D.N.Y. Oct. 15, 2012) (quoting Muller-Paisner v. TIAA, No. 03-CV-6265, 2012 WL 3205583, at *8 (S.D.N.Y. Aug. 9, 2012); see also Andrews v. Metro North Commuter R. Co., 882 F.2d 705, 709 (2d Cir. 1989) (rejecting expert's statement that "the railroad was

22

negligent" as an improper conclusion); <u>Roniger v. McCall</u>, No. 97-CV-8009, 2000 WL 1191078,

at *5 (S.D.N.Y. Aug. 22, 2000) (holding that an expert opining on plaintiff's "efforts to find

comparable employment" could not offer opinions on "whether [plaintiff's] job search was

'reasonable,' 'active and proper,' 'vigorous,' 'serious,' and the like").

Second, as discussed below, Plaintiff's breach of contract claim is premised on Colgate's

violation of the EGP. Gruber concludes that Colgate violated the EGP in Plaintiff's hearing,

Decl. ¶¶ 22 ("[T]he University's failure to give [Plaintiff] adequate time to prepare not only

violated the rights contemplated by the Equity Grievance Procedures but the equitable principles

of Title IX."), and the headings in this section of her Report state conclusions that closely track

the allegations in Plaintiff's breach of contract claim, <u>e.g.</u>, Report at 10 ("The University

Provided Deficient Notice of Charges"), 13 ("Dean Taylor Improperly Joined the Cases"), 17

("The University Denied Plaintiff a Meaningful Opportunity to Appeal"). These are all

conclusions to be reached by the fact-finder, not Gruber.

Third, Gruber's discussion of Brogan's allegedly biased investigation, Report at 19–26

(scrutinizing the questions that Brogan asked of witnesses, listing questions that an unbiased

investigator should have asked, stating that Brogan "approach[ed] this case more like an SVU

detective concerned with making a case against a criminal suspect than a neutral investigator"),

not only offers opinions in service of an improper legal conclusion, but is also an opinion that

Gruber is unqualified to make. Even if Gruber is an accomplished legal scholar with respect to

criminal procedure, Report at 1–2, and even if Title IX discussions make up a small portion of

her criminal law courses, Gruber Dep. at 31–34, she has never conducted an investigation of an

alleged sexual assault, attended a Title IX training, or served as a Title IX investigator, <u>id.</u> at 27,

41, 67–68. Moreover, Gruber does not state that she has performed any research, written any articles, taught a class, or delivered a presentation discussing what constitutes appropriate conduct for a Title IX investigator. See Gruber Decl. ¶¶ 29–46.

Although Gruber teaches a criminal procedure course that discusses "investigative bias," id. ¶ 31, her knowledge of bias in *criminal* investigations is not a sufficient experiential foundation for her exacting scrutiny of Brogan's conduct during a qualitatively distinct *Title IX* investigation. As she concedes elsewhere, what constitutes appropriate conduct can vary dramatically between criminal and Title IX investigations. E.g., Report at 20 (observing that "the university investigator, unlike the police investigator, is permitted to opine on the relative credibility of the witnesses in the case"). See also Bleiler v. Coll of Holy Cross, No. 11-CV-11541, 2013 WL 4714340, at *13 (D. Mass. Aug. 26, 2013) ("[I]n the intimate setting of a college or university, prior contact between the participants is likely and does not per se indicate bias."). Therefore, Gruber is unqualified to render an opinion regarding the thoroughness of or presence of bias in Brogan's investigation. Bazile v. City of New York, 215 F. Supp. 2d 354, 365 (S.D.N.Y. 2002) (holding that expert was unqualified because, even though expert had "experience . . . in supervision of law enforcement personnel, he [had] none in conducting internal disciplinary investigations").

Finally, Gruber observes that Brogan was "a former police sex-crimes investigator," that "the police necessarily function in a manner that is pro-victim," and that "[i]t *seems* as though a person with a police background *might find it difficult* to" work as an unbiased Title IX investigator. Report at 19–20 (emphasis added). Gruber's qualified language is telling; this claim is nothing but conjecture. Because this opinion lacks a factual basis, the Court finds it

inadmissible. In conclusion, Gruber's report is replete with speculation, improper legal conclusions, and opinions that she is unqualified to make. "Because [Gruber's] Report is so ridden with improper statements and opinions, [the Court] decline[s] to identify the limited portions that might qualify as expert testimony." Snyder, 2012 WL 4876938, at *5. The Court grants Defendants' Motion to Preclude Gruber's testimony.

### B. Summary Judgment Motion

#### 1. Title IX

Title IX states, "[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving federal assistance." § 1681(a). Plaintiff brings an "erroneous outcome" claim under Title IX. Resp. at 2. To establish an erroneous outcome claim, a plaintiff must first provide evidence indicating that the outcome of the proceeding was flawed. Yusuf v. Vassar Coll., 35 F.3d 709, 716 (2d Cir. 1994). Second, the plaintiff must provide evidence indicating that "gender [was] a motivating factor in the decision to discipline." Doe v. Columbia, 831 F.3d 46, 53 (2d Cir. 2016) (quoting Yusuf, 35 F.3d at 715). For instance, "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender" can create an inference of gender bias. Yusuf, 35 F.3d at 715; see id. at 716 (holding that evidence that males "are invariably found guilty" helps to establish gender bias).

However, evidence of bias against the accused in sexual misconduct hearings does not equate to bias against men. Columbia, 831 F.3d at 57 (observing that, while allegations that a hearing process favored victims over the accused may "support the inference of bias, they do not

necessarily relate to bias on account of sex"); <u>Doe v. Trs. of Boston Coll.</u>, No. 15-CV-10790, 2016 WL 5799297, at *25 (D. Mass. Oct. 4, 2016); <u>Haley v. Va. Commonwealth Univ.</u>, 948 F. Supp. 573, 579 (E.D. Va. 1996) ("[B]ias against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination."). The Court addresses each of Plaintiff's arguments in support of his erroneous outcome claim below, and finds that Plaintiff fails to provide sufficient evidence that gender bias motivated Colgate's decision to expel him.

### a.  Pressure on Colgate Administrators

Plaintiff alleges that "Colgate's sexual climate during the 2014–15 academic year" is evidence of "outside pressure[]" on Defendants that caused Plaintiff's proceeding to be tainted by gender bias. Resp. at 3. In <u>Columbia</u>, the Second Circuit found allegations that Columbia faced external pressure to favor female complainants over male respondents sufficient to survive a motion to dismiss. 831 F.3d at 57–58. Columbia faced significant criticism from the public press. <u>Id.</u> Student groups also called on the university to provide "statistics on sanctions issued by [Columbia] in sexual assault cases," criticized the leniency of sexual misconduct procedures in the student newspaper, and accused Columbia's Title IX investigator of conducting "inadequate investigation[s]." <u>Id.</u> at 51 (alteration in original). The Court, emphasizing the plaintiff's minimal burden at the motion to dismiss stage, held that criticism of Columbia's "toleration of sexual assault of female students" may plausibly have led to its "adopt[ing] a biased stance in favor of the accusing female and against the defending male . . . to avoid further fanning" this criticism. <u>Id.</u> at 57–58. Unlike in <u>Columbia</u>, "the parties [here] have reached the summary judgment stage and [Plaintiff] must demonstrate a genuine issue of material fact, not merely allegations of a plausible inference of gender bias." <u>Boston Coll.</u>, 2016 WL 5799297, at *25 n.7.

*i. Student Activism*

Plaintiff's argument that Colgate's 2014 Sexual Climate Forum exerted gender-biased pressure on Colgate, Resp. at 4, is unavailing. Plaintiff states that the Forum contained a "keynote speaker [who] described male students as sexual aggressors who ply females with alcohol," that "[a] student reporter criticized the speaker as biased," and that "[m]en were portrayed as sexual predators and serial rapists." Id. None of Plaintiff's citations to the record support this startling description of the Forum. No evidence indicates that any Forum speaker said anything about male aggressors "ply[ing] females with alcohol."[6] The phrase "serial rapists" comes from Jane Doe 1's complaint, which says only that she heard "disturbing statistics about serial rapists" at the Forum, and says nothing about men being portrayed as rapists. Taylor Ex. N at 66. Finally, the only mention of bias comes from a Colgate Maroon-News article that suggests that the Forum's speaker was biased against "Greek Life," but does not claim that the speaker was biased against *men*. Forum Article 3.

The Court observes that, as demonstrated here and as will be demonstrated throughout this opinion, Plaintiff's counsel regularly supports arguments with statements that mischaracterize the record. The frequency with which these mischaracterizations appear in Plaintiff's Response and Response Statement of Facts is unprofessional and inappropriate, and the Court admonishes Plaintiff's counsel and cautions counsel to avoid this practice in future filings.

---

[6] Plaintiff cites for this proposition an article in the Colgate Maroon-News. Forum Article 1. The author is describing her own assessment about the nature of sexual assault on college campuses, not her observations of the speech, when she states that "the idea is men give women alcohol, women get drunk and so women are willing to hook up with men." Id.

Plaintiff also argues that the fact that Colgate saw "a huge amount of student activism centered around survivor support" in the 2014–15 academic year is evidence of a gender-biased campus climate, and cites the student group Breaking the Silence as an example. Resp. at 4. However, the only evidence regarding Breaking the Silence suggests that it sought to raise awareness of sexual assault at Colgate, making no distinction between male and female victims. Pl.'s Ex. 2. The Court holds that raising awareness of sexual assault, without drawing gendered assumptions about males, does not raise an inference of anti-male bias. See also Doe v. Coll. of Wooster, 243 F. Supp. 3d 875, 886 (N.D. Ohio 2017) (distinguishing Columbia and holding no inference of gender bias where public criticism leveled against the university's handling of sexual assault was "gender neutral"); Univ. of Chicago, 2017 WL 4163960, at *5 (holding that a university's approval of student groups "dedicated to breaking the silence about violence against women" does not create an inference of gender bias).

### ii. The 2011 DCL

Plaintiff points to the 2011 DCL as evidence of "pressure" on Colgate to erroneously find men responsible for sexual misconduct. Resp. at 5. As stated in the Preclusion Motion discussion, Colgate's effort to comply with the 2011 DCL, standing alone, is not evidence of gender bias. Plaintiff also observes that men "found responsible for digital penetration after the issuance of the DCL were expelled." Resp. at 5. However, in one of only two post-2011 DCL hearings at Colgate where digital penetration was alleged, the male respondent was found *not* responsible for digital penetration. Dkt. No. 73-6 ("Plaintiff's Exhibit 6").[7] Therefore, Plaintiff's

_____

[7] This evidence also defeats Plaintiff's allegation that "male respondents in sexual misconduct cases at Colgate . . . are invariably found guilty, regardless of the evidence, or lack thereof." Compl. ¶ 219. In fact, between 2012–14, Colgate held nine EGP hearings related to

reliance on previous EGP outcomes fails to support a link between the 2011 DCL and gender bias.

Finally, in a supplemental filing, Dkt. No. 89 ("Supplemental Filing"), Plaintiff directs the Court's attention to OCR's recently-issued Dear Colleague Letter, Letter from Candice Jackson, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. to Title IX Coordinators (Sept. 22, 2017) ("2017 DCL"). The 2017 DCL criticizes the 2011 DCL for recommending that schools establish sexual misconduct procedures that reduce protections for the accused and "are in no way required by Title IX law or regulation." 2017 DCL at 1. The 2017 DCL does not impact the Court's analysis of Plaintiff's Title IX claim. Plaintiff appears to rely on the 2017 DCL to argue that Colgate violated Title IX by conforming its EGP to the 2011 DCL's less stringent procedural requirements. Supplemental Filing. However, the 2017 DCL's different interpretation of Title IX simply demonstrates that OCR can "from time to time change its interpretation" of a statute. Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, 467 U.S. 837, 863 (1984). It does not mean that Colgate's compliance with the 2011 DCL, the governing interpretation of Title IX during the period relevant to this action, somehow violated Title IX.

### iii.  Rugg's Presentation to Campus Tour Guides

Plaintiff cites Rugg's deposition testimony for the proposition that she "trained campus tour guides to advise concerned parents . . . that Colgate . . . would expel students who violated the sexual misconduct policy." Resp. at 3–4. However, not only does this accusation as written

---

sexual misconduct (in addition to Plaintiff's), all involving male respondents. SMF ¶¶ 133–35; Pl.'s Ex. 6. Three respondents were found responsible and expelled, two were found responsible of only some of the alleged violations and received less severe sanctions, one "accepted responsibility and received probation and a housing ban," and three were found not responsible. SMF ¶¶ 133–35; Pl.'s Ex. 6.

contain no reference to gender, Plaintiff mischaracterizes Rugg's testimony. Rugg did not state that she trained campus tour guides to promise parents that Colgate would expel students found responsible for committing sexual misconduct—rather, Rugg prepared a presentation for campus tour guides that stated, "We *have* expelled students for violating our EGP policy." Rugg Dep. at 159 (emphasis added). This is a factual statement, not a promise of future punishment.

*iv. President Herbst's Winter 2015 Message*

Plaintiff cites as evidence of gender-biased pressure a university publication authored by Colgate's former President Herbst in Winter 2015. Resp. at 4. However, the portion of the article that Plaintiff excerpts acknowledged that both men and women can be victims of sexual assault, and makes no reference to men as aggressors or women as victims. Herbst Article at 3; see Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 767 (D. Md. 2015) (holding that "public notices or newsletters informing the student body writ large about the risk of sexual assault on college campuses . . . in a gender-neutral tone" do not create an inference of gender bias). Plaintiff states that Herbst "touted the 'Yes Means Yes' seminar, which focused on 'female sexual power' and a 'world without rape.'" Resp. at 4. However, Plaintiff does not explain the content of the seminar, whether it criticizes Colgate's EGP hearings, or whether it impacts Colgate to a degree that would support an inference of pressure on administrators. In conclusion, Plaintiff presents insufficient evidence to permit a reasonable jury to find that Colgate faced pressure that caused gender bias to infect his EGP hearing.

### b. Alleged Gender Bias in Colgate's EGP Training

Plaintiff next contends that gender bias motivated the outcome of his hearing because Colgate's EGP training was gender-biased. Resp. at 6–8.

*i. Rugg's Training Materials*

First, Plaintiff assert that the trainings Rugg provided to Colgate's EGP panelists and investigators "promoted the biased assumption that males are sexually aggressive," citing the use of gendered language in one of Rugg's training presentations. Resp. at 6. One slide in this presentation describes a generic complainant as "she," another describes a generic respondent as "he," and one recurring example depicts "John" asking for, and receiving, consent from "Kate." Pl.'s Ex. 8. The presentation does not otherwise mention gender, and does not, for instance, encourage attendees to presume that female complainants tell the truth or contain biased assumptions about men. Id. The mere use of gendered pronouns does not permit an inference of gender bias. See Hardy v. New DN Co., No. 95-CV-5818, 1997 WL 666212, at *11 (S.D.N.Y. Oct. 24, 1997) ("[U]se of the term 'him' suggests perhaps an insensitivity to the desirability of using gender-neutral language, but cannot reasonably be understood as evidence of a discriminatory bias."). Even if gendered language, standing alone, could generate an inference of gender bias, Plaintiff provides evidence of limited use of gendered pronouns in one training presentation, which is too benign and isolated to permit an inference that Rugg's training materials caused the training's attendees to become gender-biased.

*ii. ATIXA Training*

Plaintiff alleges that Rugg's attendance at an ATIXA presentation in April 2014 instilled Colgate's hearing procedures gender bias. Resp. at 7–8. Plaintiff states that the ATIXA representative at the training advised attendees to implement several allegedly biased strategies in

Title IX implementation. Id.[8] However, Colgate does not appear to have implemented any of these strategies. Rugg Dep. at 149–50. Defendants correctly observe that "all Plaintiff has done is point to outside advice that Colgate chose not to follow." Reply at 3. Therefore, there is insufficient evidence to establish that Colgate's EGP training created an inference of gender bias.

### c. Colgate's EGP

Plaintiff first states that Colgate's EGP inherently suffers from gender bias because ATIXA drafted it. Resp. at 8. However, putting aside the issue of whether ATIXA is a gender-biased organization, the Court rejects the argument that the EGP, regardless of its contents, is inherently gender-biased because an organization that helped draft it may have been biased. Second, Plaintiff states that the EGP was gender-biased for the following reasons: (1) complainants could get an advisor when they filed a report, but respondents could not get an advisor until after the investigation was completed; (2) Colgate could jointly investigate separate complaints that form a "pattern" of behavior; (3) "[A] respondent did not know the specific allegations against him until *after* the investigation was completed"; (4) panels were permitted to "sanction respondents for policy violations not included in the charge letter"; (5) complainants could have dividers placed between them and respondents at hearings; and (6) "complainants—but not respondents—received amnesty for student misconduct such as

---

[8]  Plaintiff states that the strategies included (1) referring to complainants as "victims" when speaking to complainants but as "complainants" when speaking to respondents; (2) discouraging respondents from hiring an attorney for the hearing; (3) "not question[ing] complainants at the hearing"; and (4) treating multiple complaints as a "pattern of behavior" to encourage reporting. Resp. at 7. Plaintiff's sole citation for this information is a sheet of notes that Rugg took during the meeting. Resp. at 8; Dkt. No. 73-10 ("Plaintiff's Exhibit 10"). The Court observes that this exhibit says nothing to suggest that the ATIXA training mentioned the third or fourth strategies alleged by Plaintiff. Pl.'s Ex. 10.

alcohol violations." Resp. at 8.

None of these cited provisions make assumptions regarding the gender of the complainant or respondent. Facially gender-neutral sexual misconduct policies like Colgate's EGP do not create an inference of gender bias. Yu v. Vassar Coll., 97 F. Supp. 3d 448, 478 (S.D.N.Y. 2015) (rejecting argument that university hearing policies reflected gender bias where policies were "entirely gender neutral"). Because Plaintiff does not establish that Colgate's EGP intentionally discriminated against males, the EGP does not create an inference of gender bias.

In fact, although the Court need not comment further, it notes that Colgate's procedures do not even support an inference of bias against respondents generally, let alone male respondents. For instance, two of Plaintiff's allegations described above rely on misconstruction of the EGP. See, e.g., Taylor Ex. G at 13 (stating nothing regarding a respondent's inability to get an advisor), 18 (stating that hearing panels can find respondent responsible for charges not included in the charge letter only when "the evidence does not support the charge as stated in the charge letter but does support a lesser violation"). Colgate's implementation of its hearing procedures similarly contradicts Plaintiff's understanding of these procedures. See, e.g., Doe Dep. at 101–02 (admitting that Plaintiff was able to seek an advisor as early as December 2014 or January 2015), Dkt. No. 73-7 ("Taylor Deposition") at 103–04 (stating that both complainants and respondents can, and have, requested dividers at hearings). Plaintiff presents other provisions—clauses permitting joint investigation of complaints and assuring complainants that they can report alleged sexual misconduct without fear of reprisal for alcohol use—with no explanation for how these provisions cause unfair results for respondents. In any case, Plaintiff's failure to demonstrate that the EGP creates an inference of gender bias renders this argument

incapable of supporting his Title IX claim.

#### d. The Investigation

Plaintiff first alleges that the investigation of the complaints against him were tainted by gender bias because the primary investigator, Val Brogan, once worked in the Abused Persons Unit at the Onondaga County Sheriff's Department. Resp. at 9; Brogan Decl. ¶ 3. Plaintiff reasons that Brogan may be biased against "males accused of sexual misconduct" because "she historically had an adversarial relationship" with them. Resp. at 9. This assessment of Brogan's history with alleged sexual assault perpetrators is entirely conjectural, however, and the Court rejects the notion that a person must harbor bias against men because that person handled sexual assault cases while working for law enforcement. See Sahm v. Miami Univ., 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) (finding that the fact that a Title IX investigator also served "as a part-time police officer [and] a member of the Task Force on the Prevention of Sexual Assault" did not raise inference of gender bias).

Second, Plaintiff states that Brogan "believes that most victims tell the truth," and states that this is so because "her subjective reports . . . refer[] to the complainants as 'victims.'" Resp. at 9. However, Brogan's statement that her "experience" has been that most victims tell the truth, Dkt. No. 73-12 ("Brogan Deposition") at 126–27, does not permit the conclusion that Brogan *assumes* that victims tell the truth, or that she assumed the complainants in this case were telling the truth before gathering evidence. Plaintiff's citation to two documents in the investigative file where Brogan uses the word "victim" once and otherwise only refers to the complainants by their names, or as "student" or "her," Taylor Ex. N at 13–16, 67, does not alter this conclusion. Most importantly, a belief that complainants tell the truth does not reflect gender bias because males

can also be victims of sexual assault.

Third, Plaintiff complains that Brogan asked some witnesses questions about Plaintiff that she did not ask about complainants. Id. However, he provides no explanation for why an investigator's mere failure to ask reciprocal questions of an alleged victim and alleged perpetrator of sexual assault is evidence of any bias, let alone gender bias. Moreover, Brogan asked several questions crafted to find favorable evidence for Plaintiff, undermining his assertion of bias. See, e.g., Taylor Ex. N at 31 (asking Plaintiff if Jane Doe 1 "had come on to him"), 32 (asking Plaintiff to provide names of people he had spoken to about the incident with Jane Doe 2, and asking him whether "he could think of any reason" that the complainants would lie), 39 (asking a witness why Jane Doe 3 "decided to report this incident" in 2014), 48 (asking a witness if she was "shocked when [Jane Doe 3] told [her] something happened with [Plaintiff] she wasn't comfortable with").

Fourth, Plaintiff argues that Brogan exhibited gender bias by "assuming that he was responsible in every instance for obtaining consent" because she did not ask if Jane Doe 2 received Plaintiff's consent before engaging in sexual activity with him even though "he was incapacitated and vomiting." Resp. at 10. However, Plaintiff never complained that Jane Doe 2 sexually assaulted him, Doe Dep. at 145, and he never suggested that this was the case during the investigation. Because Plaintiff's consent was never at issue, it is unremarkable that Brogan did not independently investigate whether Jane Doe 2 obtained his consent.

Fifth, Plaintiff alleges that Brogan had a "conflict of interest" because she "served on the panel for Colgate's Sexual Climate Forum." Compl. ¶ 131. However, as discussed above, participation in the Forum, by itself, does not indicate gender bias. Moreover, although Jane

Doe 2 helped organize the Forum and "invite[d Brogan] to appear as a panelist," Brogan had "very limited" communication with Jane Doe 2 and "did not develop any familiarity with her," and therefore did not deem it necessary to recuse herself. Brogan Decl. ¶ 11. As stated in the Preclusion Motion discussion, this limited interaction between participants in a hearing is common in the university setting and is insufficient to create an inference that Brogan conducted a biased investigation, let alone a gender-biased investigation.

For these reasons, Plaintiff has provided insufficient evidence to demonstrate gender bias in the investigation.

### e. Taylor's Alleged Gender Bias

Plaintiff states that Taylor should not have been heavily involved in so many aspects of his hearings, that she had a relationship with the complainants, that she provided complainants with "a quiet space" during the hearing, and that she only sent charge letters to Plaintiff after Jane Doe 3 sent her an email threatening litigation if Colgate did not move quickly on her complaint. Resp. at 11–12. However, these observations are unhelpful for Plaintiff's Title IX claim. His assertion that Taylor's significant involvement in the proceedings against him establishes bias is unsupported by any reasoning, id. at 11–12, and is thus conclusory.

Second, although Plaintiff observes that Taylor knew the complainants, as stated above, an administrator's mere prior contact with a hearing participant does not create an inference of bias. Moreover, Taylor's undisputed declaration testimony indicates that she did not know Jane Does 1 or 3, and that she interacted infrequently with both Plaintiff and Jane Doe 2 through various events on campus. Taylor Decl. ¶¶ 7–10. This is not evidence of a conflict of interest with respect to any party in the proceedings.

Third, the fact that Taylor accommodated the complainants' requests to reserve a "waiting room" for them and another for their friends during the hearing, Taylor Dep. at 98–99, does not suggest unfairness because Plaintiff never alleges that he asked for, and was denied, similar accommodations. Furthermore, Plaintiff fails to account for accommodations that Taylor provided him during the hearing process. For instance, before Plaintiff's hearings, Taylor ensured that no investigation materials that she considered overly prejudicial to him would be presented to the hearing panel for their consideration. Taylor Decl. ¶¶ 40–41. For instance, she removed information indicating that two additional Colgate students had accused Plaintiff of sexual assault. Id. ¶ 42. She also declined to add to the hearing file an anonymous report received on March 11, 2015, that accused Plaintiff of photographing a nude, unconscious female student. Id. ¶ 43. This seriously undermines Plaintiff's assertion that Taylor was biased against him.

Fourth, while Jane Doe 3 did send Taylor an email on March 23, 2015, the day before the charge letters were issued to Plaintiff and the complainants, Dkt. No. 73-14, this is ultimately not probative of any bias on Taylor's part. The email urged Taylor to hurry and select a hearing date, and hinted that Jane Doe 3 was concerned about "the legality of the proceedings so far." Id. However, it is unclear what Plaintiff intends the e-mail to prove. If he is arguing that the e-mail prompted his hearing panel to find him responsible, this is unsupported by any evidence. If he is arguing that Colgate only decided to proceed to a hearing because of Jane Doe 3's threat of litigation, this would defeat the theory of his case—that Colgate intended to expel him, regardless of the evidence, from the moment the complainants accused him of sexual assault. Moreover, the available evidence suggests that the decision to proceed to a hearing, and

the date of the hearing, must have been made before Jane Doe 3 sent her email. Taylor explained in her deposition that the charge letter contained the hearing date, and the hearing date could only be set after Rugg confirmed "the availability of all the EGP members, the investigator," and Taylor. Taylor Dep. at 67. As Taylor observes, "it would have been virtually impossible to . . . make all of those arrangements between 5:00 [PM] on the 23rd and" when she sent the charge letter to Plaintiff on the 24th. Id.

Finally, and most importantly, none of the allegations that Plaintiff raises against Taylor constitute allegations of *gender* bias. Plaintiff's Response seems aware that these allegations do not establish intentional gender discrimination, arguing only that the evidence "suggests that Taylor favored complainants, who were historically all female." Resp. at 12. Without any evidence connecting Taylor's alleged improprieties to a gender-biased motive, Plaintiff's allegations against her cannot support his Title IX claim.

### f.  Plaintiff's "Pattern of Behavior"

Plaintiff argues that Rugg' and Taylor's decision to view the complaints against him as constituting a possible pattern of behavior reflects gender bias and affected the outcome of his case. Resp. at 12–14. Plaintiff supports this claim by challenging the existence of a pattern and restating the previously rejected assertion that "Colgate's administrators viewed males as sexual predators and serial rapists." Id. at 12. As stated in the Preclusion Motion discussion above, the Court found that Defendants' explanation for treating the complaints against Plaintiff as a pattern was well-reasoned. Moreover, because Plaintiff provides no evidence to suggest that Rugg' and Taylor's decision was motivated by his gender, this argument cannot support a Title IX claim.

38

g.  The Hearings and Outcomes

Plaintiff presents a litany of allegations of gender bias regarding the April 7, 2015 hearings and their outcomes. First, he complains that Taylor wrongly denied his request to postpone the hearings to give him and his attorney advisor more time to review the hearing materials. Compl. ¶ 202. Second, Plaintiff alleges that he received inadequate notice of the Sexual Exploitation charges because he did not know about them until March 24, 2015. Id. ¶ 162. Third, Plaintiff presents a bullet point list of fourteen reasons why his April 7, 2015 hearing reflected gender bias. Resp. at 14–16. These include, for example, assertions that Brogan was "hostile . . . and intimidating" when Plaintiff asked her questions, that her credibility findings presupposed that the complainants were "victims," that the panel did not ask questions that Plaintiff thought they should have asked, that the panelists attended "Rugg's biased training programs," asked the complainants leading questions, and "assumed that [Plaintiff] was required to obtain Jane Doe 2's consent." Resp. at 14–15. In addition to the bullet points, Plaintiff asserts that, "[m]otivated by gender bias, the EGP panel disregarded exculpatory evidence . . . and made faulty credibility assessments in finding [Plaintiff] responsible for sexual misconduct." Id. at 17.

The Court has already found that the allegations relating to Colgate's Title IX training and the issue of Plaintiff's consent do not raise an issue of gender bias. The remainder of the allegations similarly fail to support an inference of gender bias. At most, Plaintiff details a list of perceived procedural flaws and tacks on a conclusory allegation that these procedural flaws were motivated by gender bias. The Court also observes that these alleged procedural flaws are a combination of unsubstantiated assertions based on Plaintiff's subjective impressions at the

hearing and a series of alleged procedural errors that are addressed and rejected in the breach of contract section below.

Similarly, although Plaintiff complains that the panel decided to expel him without considering several mitigating factors, Compl. ¶¶ 185–88, he does not explain how this decision was motivated by gender bias. Moreover, the panelists' declarations reveal that they considered the six character references that Plaintiff provided, and the fact that he was close to graduation, but ultimately concluded that these factors did not warrant a reduced sanction. Bary Decl. ¶¶ 36–40, Doroshenko Decl. ¶¶ 50–53 , Moran Decl. ¶¶ 37–38. Therefore, Plaintiff's argument that mitigating factors were not considered is without merit.

Finally, Plaintiff's allegations that hearing panelists Bary and Moran had a relationship with Jane Doe 2, Compl. ¶¶ 131, 170, are unsubstantiated. Although Bary was married to a Women's Studies professor at Colgate, it is undisputed that he did not know that Jane Doe 2 was a Women's Studies major and that he did not mention Jane Doe 2's name to his spouse. Bary Decl. ¶ 7. Regarding Moran, Plaintiff concedes in his Response Statement of Facts that she was not a Women's Studies professor and did not have any relationship with Jane Doe 2. SMF ¶¶ 69, 73; RSMF ¶¶ 69, 73. Therefore, contrary to Plaintiff's allegations in his Complaint, the two panelists appeared to have a negligible or nonexistent relationship with Jane Doe 2.

For these reasons, Plaintiff's allegations regarding the hearings and their outcomes do not create an inference of gender bias and cannot support a Title IX claim.

### h.  Denial of Plaintiff's Appeal

Plaintiff appealed the hearing panel's decision, and Dean of the College Nelson denied the appeal. SMF ¶ 131. Plaintiff argues that Nelson's denial was tainted by gender bias. Resp.

at 21. His argument, however, relies on many of the same arguments that the Court has already rejected as not presenting evidence of gender bias. For instance, the fact that Nelson "regularly attended sexual awareness events around campus," without more, is not evidence of gender bias. Similarly, Plaintiff argues that the denial of his appeal was tainted by gender bias because he believes that the hearing process was tainted by gender bias. Id. at 21–22. This argument fails because the Court, as discussed above, found Plaintiff's arguments raised against the hearing process to be unpersuasive. Plaintiff's observation that Nelson "attended . . . Women's Studies Brown Bag Lunches," Resp. at 21, is inconsequential, because he does not describe what was discussed at these lunches or explain Nelson's involvement in the lunches. Therefore, Plaintiff provides insufficient evidence to establish that the denial of his appeal was the product of gender bias.

In conclusion, Plaintiff presents insufficient evidence to permit a reasonable jury to conclude that Colgate's decision to expel him was motivated by gender bias. Accordingly, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's Title IX claim.

### 2. New York State HRL

Plaintiff alleges a violation of New York State HRL § 296(4). Compl. ¶ 283–93. However, "identical standards apply to" discrimination causes of action under § 296(4) and Title IX. Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). Because the Court rejected Plaintiff's Title IX claim, it also grants summary judgment with respect to his Human Rights Law cause of action.

### 3. Breach of Contract

Plaintiff argues that the promises Colgate makes in its EGP constituted a contract with Plaintiff and that Colgate breached its obligations under the EGP in no less than sixteen ways. Resp. at 24–27. "In New York, the relationship between a university and its students is contractual in nature." Papaspiridakos v. Educ. Affiliates, Inc., No. 10-CV-5628, 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013), aff'd, 580 F. App'x. 17 (2d Cir. 2014). The contract's terms are "supplied by the bulletins, circulars and regulations made available to the student." Gally v. Columbia Univ., 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998). Finally, "[w]hen a disciplinary dispute arises between a student and an institution, judicial review is limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations." Routh v. Univ. of Rochester, 981 F. Supp. 2d 184, 208 (W.D.N.Y. 2013).

As a preliminary matter, Defendants observe that Colgate's Student Handbook, which contains the EGP, includes a disclaimer that clarifies,"[T]his handbook is not to be regarded as a contract between the student and the university." Mem. at 2. However, "[w]hile [a university can] disclaim the existence of a specific promise through the use of such a disclaimer, it [cannot] unilaterally disclaim all contractual relations between the parties." Gally, 22 F. Supp. 2d at 206 n.7. Because the Handbook's disclaimer attempts to disclaim the Handbook's entire contractual force, the Court will not consider the disclaimer, and treats Colgate's EGP as containing terms of an agreement between Plaintiff and Colgate. The Court addresses each of Plaintiff's breach of contract arguments below, and finds that none create a genuine issue of material fact.

### a.  Inadequate Training

Plaintiff alleges that Colgate violated the EGP because "EGP members received only four hours of training annually." Resp. at 25. However, the EGP only requires that "EGP members receive annual training," Taylor Ex. G at 12, and does not specify how many hours of training will be provided. Therefore, this argument fails to establish that Colgate violated its EGP.

### b.  Untimely Complaints

Plaintiff takes issue with the fact that the complainants were able to submit their complaints approximately three years after the alleged incidents occurred. Resp. at 25. However, the EGP explicitly states that "[t]here is no formal time limitation on the bringing of a complaint, as long as the accused individual is a member of the campus community," and that "[t]he associate provost for equity and diversity may exercise discretion in handling complaints when substantial time has passed since an alleged incident." Taylor Ex. G at 13. Plaintiff was a member of the campus community when the complainants accused him of sexual assault, and Rugg—the associate provost for equity and diversity—had discretion to initiate investigation of the complaints despite the passage of time. Therefore, this argument fails to establish breach of contract.

### c.  Pattern of Misconduct

Plaintiff alleges that "jointly investigat[ing all three complaints] . . . even though the allegations differed significantly" violated the EGP. Resp. at 25. However, Defendants correctly state that "[n]othing in the Policy prohibits this or guarantees separate investigations." Reply at 10.

#### d.  Lengthy Investigation

Plaintiff alleges that, because the investigation against him lasted from November 2014 to March 2015, it breached the EGP provision that states, "The University aims to complete all investigations within a 60-day calendar period." Compl. ¶ 226. However, the words "aim to" indicate that the goal of completing investigations within sixty calendar days is an "aspirational" statement that "is not enforceable" as a contractual obligation. Knelman v. Middlebury Coll., 898 F. Supp. 2d 697, 709 (D. Vt. 2012) (citing Gally, 22 F. Supp. 2d at 208); see Pierre v. Univ. of Dayton, No. 15-CV-362, 2016 WL 1134510, at *6 (S.D. Ohio Mar. 27, 2017) (finding that student handbook promise to complete investigations "in most cases within 60 working days" was a "hortatory pronouncement[]" and not an enforceable obligation).

#### e.  Equal Opportunity to Share Information During Investigation

Plaintiff argues that he did not have "an 'equal opportunity to share information' during the investigation," as required by the EGP, Resp. at 25 (quoting Taylor Ex. G at 14), because he did not know the "exact nature of the allegations against him until five and a half months after the commencement of the investigation," Compl. ¶¶ 230–31. However, in his December 12, 2014 meeting with the investigators, just one week after the investigators interviewed the complainants, SMF ¶ 30, Plaintiff knew enough about the incidents in question to recall the incidents in detail and present his side of the story, Doe Dep. at 96–97, 209–10. Furthermore, in February 2015, Plaintiff submitted a detailed written statement containing his version of each incident after the investigators informed him that the allegations against him constituted violations of Sexual Misconduct I and II. Taylor Ex. N at 56–61. Therefore, Plaintiff "was hardly in the dark" during the investigation. Mem. at 5.

More importantly, he does not explain how the complainants were given greater opportunities to share information to the investigators. Although he had to provide his version of events during the investigation without the benefit of knowing the *complainants'* version of events, Doe Dep. at 106–07, Plaintiff does not allege that the complainants were appraised of *his* version of events during the investigation.

Furthermore, Plaintiff's argument that he was denied an equal opportunity to share information because he was not aware of the Sexual Exploitation charges until his receipt of the charge letters in March 2015, Resp. at 25; Compl. ¶ 162, is unpersuasive. Colgate defined Sexual Exploitation as including, in relevant part, "exposing one's genitals in non-consensual circumstances." Taylor Ex. G at 5. Plaintiff knew that the allegations against him constituted Sexual Misconduct I and II before he sent his written statement to the investigators, and these charges were based on allegations that Plaintiff "forced Jane Doe 2 to . . . touch[] his penis and . . . placed his penis on Jane Doe 3's thigh." Taylor Decl. ¶ 36. To perform the acts constituting Sexual Misconduct I and II, Plaintiff "necessarily exposed himself." Id. Because the Sexual Exploitation charges relied on the same facts as the charges of which Plaintiff was already aware, it is implausible to suggest that earlier knowledge of the Sexual Exploitation charges would have altered his defense. See Boston Coll., 2016 WL 5799297, at *14 (holding that plaintiff in sexual misconduct hearing was not unfairly deprived of notice where "the noticed charge" and the "charge of which he was found responsible . . . have, at their core, the same conduct"). Therefore, Plaintiff provides insufficient evidence to permit the conclusion that he was deprived of a reasonable opportunity to share information during the investigation.

### f.  Rugg Pre-Determined That a Hearing was Necessary

Plaintiff alleges that Rugg's decision to search for hearing panelists before Brogan's investigation was completed breached an EGP provision requiring Rugg to decide whether a hearing is necessary only after the investigation is completed and after Rugg meets with the investigators. Resp. at 25–26; Taylor Ex. G at 15. However, Rugg searched for *potential* EGP panelists in early February 2015 because she thought that the "allegations *likely* would proceed to hearing." Rugg Decl. ¶¶ 42–43 (emphasis added). Searching for potential panelists does not equate to a decision to proceed to a hearing. There is no serious dispute that the official decision to proceed to a hearing was made "in early March," after Rugg conferred with Taylor and the investigators and "reviewed the investigation materials." Rugg Decl. ¶ 54. Therefore, this argument does not establish a breach of contract.

### g.  Taylor's Decision to Hold One Hearing for All Complaints

Plaintiff alleges that Taylor breached the EGP by "decid[ing] that one hearing should be held for all complaints," Resp. at 26. There were three hearings on April 7, 2015. SMF ¶ 87. That the three hearings occurred on the same day in front of the same panel, Resp. at 26, does give the Court pause. Such an arrangement creates a risk that the panel may not judiciously separate the facts in each hearing and may find a respondent responsible for an act in one case based only on his behavior in another case.

However, as stated above, regardless of whether Plaintiff's hearings were held on one day or over several weeks and in front of different panels, the same information relating to all three complaints would still be available for each panel to consider as a possible pattern of misconduct. See Taylor Decl. ¶ 28 ("Given that the end result was the same (i.e., the hearing panel in all of

the cases hearing and considering all of the information in all three cases), I made the decision that it was not appropriate or necessary to empanel three separate hearing panels."). Therefore, while Colgate's practice is inadvisable, the Court is not persuaded that holding Plaintiff's hearings on one day created a risk of impropriety.

More importantly for the purposes of Plaintiff's breach of contract claim, the Court is not persuaded that holding three hearings on one day in front of the same panel transforms three hearings into one. Nothing in the EGP required Taylor to provide different panelists for each hearing. Moreover, the panel did not behave as if it was conducting a single hearing. If Taylor had held a single hearing, each of the complainants "would have been entitled to remain present throughout each other's testimony," and she thought this "would be potentially intimidating to [Plaintiff]." Id. ¶ 29. After conferring separately with Plaintiff and the three complainants, Taylor decided *not* to join the cases into one hearing because Plaintiff did not consent to the arrangement. Id. ¶ 54. Instead, Taylor "open[ed] one case; conduct[ed] the case; close[d] it; dismiss[ed] the parties; and then convene[d] the complainant and [Plaintiff] for the next case." Taylor Decl. ¶ 55. Only the applicable Jane Doe was permitted in the room during each hearing. Taylor Dep. at 84. The panel deliberated each case separately, and made separate findings of responsibility in each case before proceeding to deliberation of the next case. Bary Decl. ¶ 15; Doroshenko Decl. ¶ 21; Moran Decl. ¶ 18; Taylor Decl. ¶ 80.

Therefore, the Court finds that Plaintiff has not established that Colgate failed to substantially comply with its obligation to provide him with three hearings.

### h.  Taylor's Unilateral Decision to Present Pattern Evidence

Plaintiff alleges that Taylor, by unilaterally deciding to allow the panel to consider pattern

evidence in each hearing, breached a provision of the EGP that states, "Any information that the chair *and* panel believes is relevant and credible may be considered, including hearsay, history and information indicating a pattern of behavior." Resp. at 26; Taylor Ex. N at 17 (emphasis added). The Court agrees with Defendants' reasoning that Taylor did not breach this provision by placing arguably relevant and credible "evidence before the panel and let[ting] them decide *at the hearing* whether the evidence was relevant and credible." Reply at 10 (emphasis in original). As required by the EGP, the only evidence considered at Plaintiff's hearings was evidence that Taylor and the panel both considered relevant and credible.

### i. Insufficient Notice of Charges

Plaintiff "received thirteen days' notice of the charges against him," but alleges that "Colgate should have given him at least one week's notice *per complaint*," for a total of three weeks' notice. Resp. at 26 (emphasis added). This is an unfounded interpretation of the EGP. The EGP provides that parties must receive notice of charges "at least one week prior to the hearing," Taylor Ex. N at 16, but it does not state that a respondent facing multiple consecutive hearings must receive one additional week of notice per complaint.

### j. Taylor's Denial of Plaintiff's Request to Adjourn the Hearing

Plaintiff argues that "[t]he EGP permits Taylor, as Co-Chair, to reschedule hearings for 'compelling reasons,'" and that Taylor breached the EGP by denying his request to reschedule the hearing even though he presented "compelling reasons" to do so. Resp. at 26. However, this Court previously rejected an identical argument regarding this provision of Colgate's EGP. Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 361 (N.D.N.Y. 2014). Colgate's EGP states that the panel Chair "*may* reschedule the hearing" if there exist compelling reasons to do so. Id. (emphasis in

original). "The use of the word 'may' clearly indicates that the determination of 'compelling circumstances,' and the decision to reschedule the hearing is in the discretion of the hearing panel chair." Id. Just like in Faiaz, the Court holds that Taylor's denial of Plaintiff's request to reschedule the hearing does not constitute a breach of contract.

### k.  Taylor's Request that Plaintiff "Enter a Plea"

Plaintiff alleges that, at the start of the hearing, "Taylor read the charges against [Plaintiff], and asked him to enter a plea, which is not part of the EGP." Resp. at 26. However, Taylor never used the word "plea" at the hearing. See Dkt. No. 73-16 ("Hearing Audio"). Defendants accurately observe that "Taylor's practice is to read the charges and ask the student to respond. There is no language in the Policy that prohibits this, and Plaintiff has not pointed to any." Reply at 11 (citations omitted).

### l.  Reasonable Opportunity to Present Facts, Arguments, and Witnesses

Plaintiff alleges that, because he "had inadequate time to prepare for the hearing," he was denied a "'reasonable opportunity' to present facts and arguments, present witnesses and question witnesses at the hearing," as required by the EGP. Resp. at 27. The Court finds this contention unpersuasive. First, Plaintiff provides insufficient evidence to establish that he had inadequate time to prepare for the April 7, 2015 hearings. As stated above, Plaintiff knew enough about the charges against him and the incidents in question to submit a detailed written account of the incidents in February 2015. SMF ¶¶ 46–53; Taylor Ex. N at 56–61. Plaintiff could also review the EGP hearing materials in Taylor's office "at any time he chose between March 27 and April 7." SMF ¶ 97.

He did not seek to review the file until April 3, and states that he did not review it earlier

because of scheduling difficulties with his attorney. Doe Dep. at 123. However, Plaintiff could have reviewed the files at an earlier time without his attorney, and Colgate will not be held accountable for scheduling difficulties between a student and their advisor. The Court is also not persuaded that Plaintiff's March 31 bout of strep throat, id. at 122–23, deprived him of adequate time to prepare for the hearing. Plaintiff does not explain why he was unable to review the file before March 31, or, given that he was well enough to review the files on April 3, why he did not try to review the files again on April 4, 5, or 6. Therefore, the Court finds that Plaintiff did not had adequate time to prepare.

Second, undisputed evidence reveals that Plaintiff was permitted to call witnesses during his hearings, he could have supplemented existing witness statements, Brogan interviewed every witness that he asked her to, those interviews were provided in the investigation file, Plaintiff could have asked questions of the complainants, and he could ask Brogan questions during his hearings. Id. at 125–30, 132, 139–40. Moreover, Plaintiff was permitted to present his side of the story during the hearing. Taylor Decl. ¶¶ 72–73, 76–77.

Finally, Plaintiff's claim that his right to question the complainants was violated because Colgate requires parties to submit questions to one another through Taylor, Compl. ¶ 237; Taylor Ex. G at 17, fails as a matter of law. See Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) (holding that a hearing respondent's failure to direct questions through the "presiding board chancellor . . . cannot be characterized as denial of process"); Yu, 97 F. Supp. at 465 ("[A]ny claim of unfairness due to a requirement that questions be asked through the panel Chair fails as a matter of law."). Therefore, the Court finds insufficient evidence to permit the conclusion that Plaintiff was deprived of a reasonable opportunity to present facts and arguments

at his hearings.

m.  Rationale for the Decision

Colgate's EGP required that parties to a hearing receive "simultaneous written notification of the outcome, which will include a rationale for the outcome." Taylor Ex. G at 20. The Court rejects Plaintiff's argument that the decision letters that he received "contained no rationale for the decision." Resp. at 27. Plaintiff received one decision letter for each hearing, Taylor Exs. S, T, & U at 13–21, and each letter stated that "[t]he Hearing Panel received conflicting accounts of the events in question," and that the panel found Plaintiff responsible because the panelists found the applicable complainant's "account to be more credible." Id. at 14, 17, 20. Perhaps Plaintiff would have preferred more elaboration on the panel's decision-making, but the EGP required *a* rationale for the outcome, not a *detailed* rationale.

n.  Retaliation against Plaintiff

Plaintiff alleges that Colgate violated the EGP by "fail[ing] to address retaliation against [him] on social media where students attacked him as a serial rapist." Resp. at 27. The EGP provided that "retaliation against an individual . . . for assisting in providing information in the context of an investigation or disciplinary proceeding is a serious violation of Colgate's policy." Taylor Ex. G at 10. Plaintiff does provide evidence that students antagonized him in connection with the allegations that he committed sexual assault. For instance, posts on an anonymous social media application called "Yik Yak" accused Plaintiff of being a "rapist," Yik Yak Posts at 3, and other students called Plaintiff "a bad guy," Doe Dep. at 169–70. However, Plaintiff provides no evidence to indicate that students antagonized him "for assisting in" the investigation into the Jane Does' complaints rather than "because [the students] believed he had engaged in the acts of

51

which he was accused." Mem. at 13. The EGP's anti-retaliation provision only protected students from the former.

Also, Plaintiff never complained to any Colgate administrator about retaliation, Doe Dep. at 167–68, 223–24. Although Colgate *did* become aware of the Yik Yak Posts, Defendants reasonably state that there was little that the University could do to address these posts since they "were entirely anonymous and no one (including [Plaintiff]) knows who posted them." Mem. at 13. Colgate could do little about alleged harassment that it had no reason to be aware of or that was wholly anonymous. Therefore, Plaintiff provides insufficient evidence to establish that Colgate breached the EGP's anti-retaliation provision.

### o. Wrongful Imposition of Sanctions

The EGP provides a list of factors for hearing panels to consider when deciding what sanctions to impose. Taylor Ex. G at 19. Plaintiff cites to Moran's Declaration for the proposition that, instead of considering these factors, "[t]he EGP panel decided to expel [Plaintiff] for 'penetration' offenses because Taylor advised them that penetration cases mandated expulsion." RSMF ¶ 121. This argument is unsuccessful because it blatantly misrepresents Moran's declaration testimony. Moran states that, "[w]hile Dean Taylor offered comparator evidence [regarding previous sanctions imposed in EGP hearings with similar findings], she did not otherwise participate in deliberations and *did not dictate a particular sanction*." Moran Decl. ¶ 37 (emphasis added).

### p. Preponderance of the Evidence Standard

Plaintiff alleges that Colgate breached the EGP's requirement that the panel make findings of responsibility in Title IX hearings using a "preponderance of the evidence" standard.

Compl. ¶¶ 239–243. If the panel had properly applied the standard in his proceeding, he argues, "it would have reached the opposite conclusion; namely, that [Plaintiff] was not responsible for the misconduct alleged." Id. ¶ 240. The Court cannot engage in a granular examination of the record to find fault in the Panel's decision-making. Yu, 97 F. Supp. 3d at 461 ("The Court's role . . . is neither to advocate for best practices or policies nor to retry disciplinary proceedings."); Boston Coll., 2016 WL 5799297, at *18 ("That this Court or a jury may have come to a different outcome than the hearing board is not the determinative test."); Walker v. President and Fellows of Harvard Coll., 82 F. Supp. 3d 524, 531–32 (D. Mass. 2014) ("It is not the business of . . . judges to tell universities what statements they may consider and what statements they must reject."). Rather, "[t]he Court need only find that were was enough evidence, which, if believed, could have supported the board's decision." Boston Coll., 2016 WL 5799297, at *18.

Here, the panelists acknowledged that the "three cases hinged on the credibility of the complaining and responding parties because there were conflicting accounts of what occurred on the three nights." Bary Decl. ¶ 10. The panel deliberated on each case individually, assessed the credibility of the parties in each case, and considered the evidence proffered by Plaintiff and the three complainants before finding Plaintiff responsible in each case. Bary Decl. ¶¶ 15, 20–21, 25, 33, 34; Doroshenko Decl. ¶¶ 22, 28, 37, 42; Moran Decl. ¶¶ 20, 26, 31, 34. This included consideration of the arguments that Plaintiff presented, see, e.g., Bary Decl. ¶ 21 (stating that he considered and rejected Plaintiff's explanation of the apology text he sent to Jane Doe 2 the morning after the alleged incident); Doroshenko Decl. ¶ 45 (stating that the panel considered, and ultimately rejected, Plaintiff's theory that the complainants "were colluding and making things

up"). The panelists, having engaged in reasoned decision-making, were free to credit the complainants' accounts and find that it was more likely than not that Plaintiff was responsible for the alleged charges. <u>See</u> <u>Boston Coll.</u>, 2016 WL 5799297, at *19 (holding that the panel did not fail to apply the preponderance of the evidence standard even though "the case was . . . a close circumstantial case"). The Court cannot hold that the Panel did not apply the correct evidentiary standard.

Plaintiff asserts that the panelists' declarations are unreliable because they were filed two years after his hearings, and because they require the Court to assess whether the declarants acted in good faith. Resp. at 16. However, Plaintiff's unsupported statements with respect to the veracity of these declarations are insufficient to create a genuine issue of material fact. Plaintiff did not depose the panelists to illuminate any credibility issues, and makes no effort to locate record evidence that would create an issue of fact with respect to the veracity of their testimony. The Court, therefore, rejects his baseless argument, and finds that there is insufficient evidence to establish that Colgate breached its obligation to utilize the preponderance of the evidence standard.

For the foregoing reasons, the Court finds that there is insufficient evidence to support Plaintiff's breach of contract claim.

### 4. *Covenant of Good Faith and Fair Dealing*

In support of his argument that Colgate breached the covenant of good faith and fair dealing, Plaintiff states that Colgate violated the covenant by imposing an unwarranted sanction despite insufficient evidence. Compl. ¶¶ 256–57. "[I]mplicit in every contract [is] a covenant of good faith and fair dealing in the course of contract performance." <u>Payday Advance Plus, Inc. v.</u>

Findwhat.com, Inc., 478 F. Supp. 2d 496, 503 (S.D.N.Y. 2007). This "claim may be brought . . . where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." JPMorgan Chase Bank v. IDW Grp., No. 08-CV-9116, 2009 WL 321222, at *4 (S.D.N.Y. Feb. 9, 2009). Moreover, "New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.'" Ely v. Perthuis, No. 12-CV-1078, 2013 WL 411348, at *5 (S.D.N.Y. 2013) (quoting Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2001)).

Plaintiff's good faith and fair dealing cause of action relies on the same facts as his breach of contract claim—specifically, that the panel found him responsible for sexual misconduct and expelled him despite insufficient evidence. Therefore, this cause of action is duplicative of the breach of contract claim.

Plaintiff's Response—in one sentence—attempts to avoid this conclusion by raising several new claims in support of his good faith and fair dealing cause of action. Resp. at 28. He states that "Colgate acted in bad faith" by being biased against Plaintiff, taking a long time to investigate the complaints against him, "encouraging" him not to get an attorney advisor, "refus[ing] his request to stay on campus during the pendency of his appeal and wait[ing] until after he would have graduated to decide his appeal." Id. Plaintiff makes no effort to develop these arguments. His allegation of "bad faith" is conclusory, and he does not explain how any of these actions, if true, deprived him of the benefit of the bargain of his contract with Colgate. "[T]he Court need not address [these] argument[s] because [they are] completely undeveloped." Metro. Prop. & Cas. Ins. Co. v. Sarris, No. 15-CV-780, 2017 WL 3252812, at *15 (N.D.N.Y. July 28,

2017) (Kahn, J.) (quoting <u>Herbert v. Architect of Capitol</u>, 839 F. Supp. 2d 284, 298 (D.D.C. 2012). Therefore, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's good faith and fair dealing claim.

### 5. New York General Business Law ("GBL") Violations

Plaintiff alleges that Colgate engaged in deceptive trade practices in violation of New York GBL § 349 by misrepresenting to him, and the "consumer public at large . . . that if he paid tuition and fees to Colgate, that Colgate would uphold its . . . policies." Compl. ¶ 265. Plaintiff additionally states that "Colgate had no intention of following its own policies and procedures for [Plaintiff] as the male accused of sexual misconduct," <u>id.</u> ¶ 266, and that his "case is an exemplar of how [other sexual misconduct] cases were handled," Resp. at 29. "To state a GB § 349 claim [sic], a plaintiff must allege (1) that a 'consumer-oriented' practice was deceptive or misleading in a material respect and (2) that plaintiff was injured thereby." <u>Prasad v. Cornell Univ.</u>, No. 15-CV-322, 2016 WL 3212079, at *22 (N.D.N.Y. Feb. 24, 2016). Moreover, "[a] private contractual dispute" is insufficient to state such a claim. <u>Id.</u> Rather, the complained-of deceptive act must have "a broader impact on consumers at large." <u>Id.</u>

Instead of providing evidence that Colgate practiced any deception with respect to other students, Plaintiff makes the unsubstantiated assertion that "Colgate . . . violated the EGP in numerous ways in a manner that was . . . injurious to [Plaintiff] and that would be injurious to all students accused of sexual misconduct." Resp. at 29. Because the evidence does not permit a conclusion that Plaintiff's dispute with Colgate was anything but a private contractual dispute, and because the Court already rejected Plaintiff's allegations that Colgate violated its policies, the Court grants Defendants' Motion for Summary Judgment with respect to this cause of action.

*6. Equitable Estoppel*

Plaintiff's fifth cause of action is premised on an equitable estoppel theory. Compl.

¶¶ 271–77. He alleges that "Colgate's various policies constitute representations . . . that Colgate

should have reasonably expected to induce action or forbearance by [Plaintiff]," and that Plaintiff

"relied to his detriment on these . . . representations . . . by choosing to attend Colgate." Id.

¶¶ 272–74. To establish an equitable estoppel claim, a Plaintiff must show

> with respect to the party estopped: (1) conduct which amounts to a
> false representation or concealment of material facts; (2) intention
> that such conduct will be acted upon by the other party; and (3)
> knowledge of the real facts. The parties asserting estoppel must
> show with respect to themselves: (1) lack of knowledge and of the
> means of knowledge of the true facts; (2) reliance upon the conduct
> of the party to be estopped; and (3) prejudicial changes in their
> positions.

Prasad, 2016 WL 3212079, at *22 (quoting Yu, 97 F. Supp. 3d at 482–83).

Plaintiff supports his equitable estoppel claim by alleging that he faced "harassment from

other students," which violated Colgate's promise to provide "an education and environment free

from discrimination." Id. However, as discussed in the breach of contract section, Plaintiff

provides insufficient evidence to permit the conclusion that Colgate failed to protect him from

retaliation by other students. He concedes that the remainder of his claims are duplicative of his

breach of contract claim, Resp. at 29, which the Court already rejected. Therefore, the Court

grants Defendants' Motion for Summary Judgment with respect to this cause of action.

*7. Declaratory Judgment*

Plaintiff also seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28.

U.S.C. § 2201, that:

> (i) the outcome and findings made by the Panel at Colgate be reversed; (ii) [Plaintiff's] reputation be restored; (iii) [Plaintiff's] disciplinary record be expunged; (iv) the record of [Plaintiff's] expulsion from Colgate be removed from his education file; (v) any record of the complaint against [Plaintiff] be permanently destroyed; (vi) [Plaintiff] be permitted to finish the courses required to graduate from Colgate and receive his degree and diploma; and (vii) Colgate's rules, regulations and guidelines are unconstitutional as applied.

Compl. ¶ 298. However, the Declaratory Judgment Act "does not create an independent cause of action." Chevron Corp. v. Naranjo, 667 F.3d 232, 244 (2d Cir. 2012) (citation omitted). Therefore, because "[Plaintiff] has failed to establish his other claims, and the declaratory relief sought rests on those claims, the claim for declaratory judgment also fails." Yu, 97 F. Supp. 3d at 484.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Preclude (Dkt. No. 85) is **GRANTED**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 67) is **GRANTED** with respect to each of Plaintiff's causes of action and the case is dismissed; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:　　　October 31, 2017
　　　　　　 Albany, New York


Lawrence E. Kahn
U.S. District Judge